# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

COUNTY OF WEBB, TEXAS

       Plaintiff,

    v.

PURDUE PHARMA, L.P.; PURDUE
PHARMA, INC.; THE PURDUE
FREDERICK COMPANY, INC.;
RICHARD SACKLER; BEVERLY
SACKLER; DAVID SACKLER; ILENE
SACKLER LEFCOURT; JONATHAN
SACKLER; KATHE SACKLER;
MORTIMER D.A. SACKLER;
THERESA SACKLER; JOHN
STEWART; MARK TIMNEY; CRAIG
LANDAU; RUSSELL GASDIA;
RHODES TECHNOLOGIES; RHODES
TECHNOLOGIES, INC.; RHODES
PHARMACEUTICALS, L.P.; RHODES
PHARMACEUTICALS, INC.; ABBOTT
LABORATORIES; ABBOTT
LABORATORIES, INC.; ABBVIE INC.;
MALLINCKRODT PLC;
MALLINCKRODT LLC; SPECGX LLC;
ENDO HEALTH SOLUTIONS, INC;
ENDO PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL
COMPANIES, INC.; PAR
PHARMACEUTICAL, INC.; TEVA
PHARMACEUTICALS USA, INC.;
CEPHALON, INC.; WATSON
LABORATORIES, INC.; ACTAVIS
PHARMA, INC.; ACTAVIS, LLC;
JOHNSON & JOHNSON; JANSSEN
PHARMACEUTICALS, INC.;
ALLERGAN PLC; ALLERGAN
FINANCE, LLC; INSYS
THERAPEUTICS, INC.; AMNEAL
PHARMACEUTICALS LLC; AMNEAL

MDL 2804

**Case No. 1:17-md-2804-DAP**

**Member Case No. 1:18-op-45175-DAP**

**Judge Dan Aaron Polster**

**[REDACTED]**
**SECOND AMENDED COMPLAINT**
**AND JURY DEMAND**

PHARMACEUTICALS OF NEW YORK,
LLC; KVK-TECH, INC.; MYLAN INC.;
MYLAN PHARMACEUTICALS, INC.;
MYLAN INSTITUTIONAL INC.;
MYLAN TECHNOLOGIES, INC.;
HIKMA PHARMACEUTICALS USA
INC.; MCKESSON CORPORATION;
CARDINAL HEALTH, INC.;
AMERISOURCEBERGEN DRUG
CORPORATION; MORRIS & DICKSON
CO., L.L.C.; WALGREENS BOOTS
ALLIANCE, INC.; WALGREEN CO.;
WALMART INC.;
WAL-MART STORES TEXAS, LLC;
CVS HEALTH CORPORATION; CVS
PHARMACY, INC.; CAREMARK RX,
L.L.C.; CAREMARK, L.L.C.;
CAREMARK TEXAS MAIL
PHARMACY, LLC; CAREMARKPCS
HEALTH, L.L.C.; CAREMARKPCS,
L.L.C.; EXPRESS SCRIPTS HOLDING
COMPANY; EXPRESS SCRIPTS, INC;
ESI MAIL PHARMACY SERVICE, INC.;
EXPRESS SCRIPTS PHARMACY, INC.;
UNITEDHEALTH GROUP
INCORPORATED; OPTUM, INC.;
OPTUMRX, INC.; DOES 1-100,

Defendants.

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................2

II.  VENUE AND JURISDICTION ...................................................................................12

III. PARTIES ......................................................................................................................13

    A. Plaintiff ....................................................................................................................13

    B. Manufacturer Defendants.........................................................................................15

    C. Distributor Defendants..............................................................................................52

    D. Pharmacy Defendants ...............................................................................................63

    E. Pharmacy Benefit Manager Defendants ...................................................................68

    F. Doe Defendants.........................................................................................................79

IV. FACTUAL ALLEGATIONS .......................................................................................80

    A. Background on Prescription Opioids .......................................................................80

    B. The CDC Guideline of 2016 ....................................................................................81

        i.  The CDC Guideline Sets Forth Evidence-Based Recommendations on Opioid
            Prescribing ........................................................................................................81

    C. Impact on Texas and Webb County ..........................................................................84

    D. Particulars Regarding Each Defendant Group's Role in the Opioid Epidemic...............89

        i.  Manufacturer Defendants' Campaign of Deception ..................................................89

            a.  Manufacturer Defendants' Campaign to Normalize Widespread Opioid Use ...89

            b.  The Manufacturer Defendants' Hired Guns ......................................................91

            c.  The Manufacturers' False and Misleading Direct Advertising and Marketing of
               Opioids................................................................................................................99

            d.  Manufacturer Defendants' Misuse of Treatment Guidelines...........................115

        ii. Manufacturer, Distributor and Pharmacy Defendants Failed to Comply with The
           Controlled Substances Act, 21 U.S.C. § 801 et seq. and the Texas Controlled
           Substance Act, TCSA § 481.001 et seq. ................................................................120

            a.  Manufacturer Defendants................................................................................129

            b.  Distributor Defendants.....................................................................................133

            c.  The Retail and PBM Mail-Order Pharmacy Defendants ..................................140

      d.   PBMs Ensured that Opioids Were Regularly Prescribed and Flooded the Market. ........................................................................................... 154

   iii.  The CDC Guideline Can Be Readily Implemented by the PBMs, as Their Own Statements Acknowledge ...................................................................... 160

   iv.  The PBMs Are Still Not Controlling Opioid Usage Consistent with the CDC Guideline ............................................................................................... 164

      a.   Caremark ...................................................................................... 165

      b.   Express Scripts ............................................................................ 169

      c.   OptumRx ..................................................................................... 173

**V.   THE INAPPLICABILITY OF TEXAS' LIABILITY OF NONMANUFACTURING SELLERS STATUTE** ...................................................................................... **177**

**VI.   TOLLING OF THE STATUTE OF LIMITATIONS** ....................................... **177**

**VII.  CAUSES OF ACTION** ........................................................................... **180**

   1.  Public Nuisance (Against All Defendants) ................................................ 180

   2.  Negligence Per Se (Against Manufacturer, Distributor and Pharmacy Defendants) 186

   3.  Negligence (Against All Defendants) ....................................................... 187

   4.  Gross Negligence (Against All Defendants) ............................................. 189

   5.  Fraud (Against Manufacturer Defendants) ............................................... 190

   6.  Civil Conspiracy (Against All Defendants) .............................................. 191

   7.  Violation of the Deceptive Trade Practices – Consumer Protection Act § 17.41 et seq. (Against Manufacturer Defendants) ......................................................... 192

   8.  Unjust Enrichment (Against All Defendants) ........................................... 193

   9.  Violations of RICO 18 U.S.C § 1962(c) (Against All Defendants) ......................... 194

  10. Violations of RICO 18 U.S.C § 1962(d) (Against All Defendants) ......................... 203

**VIII.  PRAYER FOR RELIEF** .................................................................... **204**

# PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff, the County of Webb by and through the undersigned attorneys, (hereinafter ("Plaintiff," "Webb," or "Webb County") against Defendants: Purdue Pharma, L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer D.A. Sackler; Theresa Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Rhodes Technologies; Rhodes Technologies, Inc.; Rhodes Pharmaceuticals, L.P.; Rhodes Pharmaceuticals, Inc.; Abbott Laboratories; Abbott Laboratories, Inc.; AbbVie Inc.; Mallinckrodt PLC; Mallinckrodt LLC; SpecGx LLC; Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.; Par Pharmaceutical Companies, Inc.; Par Pharmaceuticals, Inc.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc.; Actavis, LLC; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Allergan PLC; Allergan Finance, LLC; Insys Therapeutics, Inc.; Amneal Pharmaceuticals LLC; Amneal Pharmaceuticals of New York, LLC; KVK-Tech, Inc.; Mylan Inc.; Mylan Pharmaceuticals, Inc.; Mylan Institutional Inc.; Mylan Technologies, Inc.; Hikma Pharmaceuticals USA Inc. (collectively, "Manufacturer Defendants" or "Defendants"); McKesson Corporation; Cardinal Health, Inc.; AmerisourceBergen Drug Corporation; Morris & Dickson Co., L.L.C.; CVS Health Corporation; CVS Pharmacy, Inc.; Walgreens Boots Alliance, Inc.; Walgreen Co.; Walmart, Inc. (collectively, "Distributor Defendants" or "Defendants"); CVS Health Corporation; CVS Pharmacy, Inc.; Caremark Rx, L.L.C.; Caremark, L.L.C.; Caremark Texas Mail Pharmacy, LLC; Express Scripts Holding Company; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; OptumRx, Inc.; Walmart Inc.; Wal-Mart Stores Texas, LLC; Walgreens Boots Alliance, Inc.; Walgreen Co.; collectively, "Pharmacy Defendants" or "Defendants"); Express Scripts Holding Company; Express Scripts, Inc.; CVS Health Corporation; Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; CaremarkPCS, L.L.C.; UnitedHealth

Group Incorporated; Optum, Inc.; OptumRx Inc. (collectively, "PBM Defendants" or "Defendants"); and DOES 1 through 100 inclusive (collectively, "Defendants") alleges as follows:

## I.    INTRODUCTION

1.    Defendants have caused an opioid epidemic that has resulted in economic, social and emotional damage to virtually every community in the U.S. and tens of thousands of Americans. It is indiscriminate and ruthless. It has impacted across demographic lines harming every economic class, race, gender and age group. It is killing Americans, more than 134 every day.[1] Prescription and illegal opioids account for more than sixty percent (60%) of overdose deaths in the U.S., a toll that has quadrupled over the past two decades, according to the U.S. Centers for Disease Control and Prevention ("CDC"). More people died from opioid-related causes in 2016 and 2017 than car accidents[2] or guns.[3] More than 192 people die every day from drug overdoses[4], as if an airplane crashes killing everyone on board, every day.[5]

2.    According to the CDC, the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement due to opioid misuse ***alone*** is $78.5 billion a year.[6]

---

[1] *See* NIH, *Overdose Death Rates,* NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates (estimating more than 49,000 opioid related deaths in 2017).

[2] *Deaths from Opioid Overdoses Now Higher Than Car Accident Fatalities*, HEALTHLINE (Mar. 30, 2018), https://www.healthline.com/health-news/deaths-from-opioid-overdoses-higher-than-car-accident-fatalities#1; Kevin Flower et al, *Odds of dying from accidental opioid overdose in the US surpass those of dying in car accident*, CNN (Jan. 14, 2019), https://www.cnn.com/2019/01/14/health/opioid-deaths-united-states-surpass-road-accidents/index.html

[3] Ethan Siegal, *Opioid Epidemic So Dangerous, Says CDC, It's Finally Killing As Many Americans As Guns*, FORBES (Mar. 20, 2018), https://www.forbes.com/sites/startswithabang/2018/03/20/opioid-epidemic-so-dangerous-says-cdc-its-finally-killing-as-many-americans-as-guns/#32f5256f6c21

[4] *See* NIH *Overdose Death Rates*, *supra* note 1 (estimating more than 70,000 drug overdose deaths in 2017).

[5] Jerry Mitchell, *With 175 Americans dying a day, what are the solutions to the opioid epidemic?* USA TODAY NETWORK (Jan. 29, 2018), https://www.usatoday.com/story/news/nation-now/2018/01/29/175-americans-dying-day-what-solutions-opioid-epidemic/

[6] *Opioid Overdose Crisis*, NATIONAL INSTITUTE ON DRUG ABUSE (revised Jan. 2019), https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis

The cost of the nation's opioid crisis is estimated to have exceeded $1 trillion from 2001 to 2017, and is projected to cost an additional $500 billion by 2020.[7]

3.      Prescription drug manufacturers, wholesalers/distributors, retail and mail order pharmacies, and pharmacy benefit managers ("PBMs") have created this epidemic. The manufacturers make the opioids and lie about their efficacy and addictive properties. The wholesalers and pharmacies distribute the opioids from the point of manufacture to the point of delivery to the patient. And the PBMs control, through their plan design and formulary management, which drugs go where, in what quantities, at what daily doses, and how they are paid for.

4.      Each defendant group profits enormously from the movement of the opioid products. And they do so at the expense of Plaintiff, Webb County, and communities like it nationwide. Each has incentives to move certain drugs over others. Defendants themselves create the incentives and share in their perversity – usually without disclosure to those who reasonably rely on Defendants to abide by their federal, state and common law duties.

5.      Each defendant group bears culpability in the crisis and is a necessary party to addressing the damage it has wreaked, including the costs of abatement, prevention, treatment and repair of impacted County infrastructure and services.

6.      The devastating health, economic, and societal impact of opioid abuse cannot be overstated. After years of decreasing death rates in the U.S., they are now on the rise fueled by an increase in opioid-related drug overdose deaths. Drug overdoses are now the leading cause of death for Americans under the age of fifty (50). The number of Americans who died of drug overdose

---

[7] ALTARUM, *Economic Toll of Opioid Crisis in U.S. Exceeded $1 Trillion Since 2001* (Feb. 13, 2018), https://altarum.org/news/economic-toll-opioid-crisis-us-exceeded-1-trillion-2001

deaths in 2017 was roughly equal the number of Americans who died in the Vietnam, Iraq, and Afghanistan wars combined.[8]

       7.     Overdose deaths have surged in Webb County because of Defendants' conduct.[9]



       8.     Webb County is now having to allocate substantial taxpayer dollars, resources, staff, energy and time to address the damage the opioid scourge has left in its wake and to address its many casualties. Fire and emergency medical services are over-utilized because of an increased number of opioid-related overdoses. The burden on law enforcement is substantially increased by opioid-related crimes related to prescription opioid theft, diversion, and sales on the black market. County jails, hospitals, clinics, treatment centers, intervention programs, social workers, foster care, courts, schools – virtually every aspect of County service and budget has been significantly and negatively impacted by this Defendant-made epidemic.

---

[8] Nicholas Kristof, *Opioids, a Mass Killer We're Meeting With a Shrug*, NEW YORK TIMES (Jun. 22, 2017), https://www.nytimes.com/2017/06/22/opinion/opioid-epidemic-health-care-bill html

[9] Get Treatment, *Texas state drug mortality statistics by county*, (Jun. 19, 2017), https://issuu.com/gettrreatment/docs/texas_state_drug_mortality_statisti

9.    Defendants' efforts to deceive and make opioids widely accessible have also resulted in a windfall of profits to them. The global opioids market sized was valued at over $22 billion in 2016 alone.[10] Opioids are now one of the most prescribed class of drugs with 5 opioids among the top 200 most prescribed drugs in the U.S.; hydrocodone/acetaminophen is among the top 10.[11] While Americans represent only five percent (5%) of the world's population, they consume eighty percent (80%) of the world production of prescription opioids.

10.    At all times relevant hereto, Defendants have known that the opioids at issue in this case were highly addictive and dangerous. They have known opioids are not effective for long-term chronic pain outside end-of-life, palliative or active cancer care. And yet, they purposefully built a machine designed to maximize opioid access, availability and utilization without regard for efficacy or consequence and in order to generate profits. This pernicious scheme and resulting harm is beyond anything Webb County could have foreseen, expected or prepared for.

11.    The scheme begins with Manufacturer Defendants who deliberately polluted the national marketplace, including in Webb County, with lies and misinformation about the efficacy of opioids to treat chronic pain and the risks of addiction. Using hired guns, advertising and marketing materials, the Manufacturers promoted the fictitious concept of "pseudoaddiction," advocated that signs of addiction should be treated with more opioids, falsely claimed that opioid dependence and withdrawal could be easily managed and denied the risks of higher and protracted opioid dosages, then vigorously promoted these and other dangerous falsehoods in reckless disregard of the harm they were knowingly unleashing.

---

[10] Grand View Research, *Opioids Market Size, Share & Trends Analysis Report By Product, By Application (Pain Relief, Anesthesia, Cough Suppression, Diarrhea Suppression, Deaddiction), By Region, And Segment Forecasts, 2018 – 2025* ( Mar. 2018), https://www.grandviewresearch.com/industry-analysis/opioids-market

[11] Andrea V. Fuentes, et al, *Comprehension of Top 200 Prescribed Drugs in the US as a Resource for Pharmacy Teaching, Training and Practice*, PHARMACY: JOURNAL OF PHARMACY EDUCATION AND PRACTICE (Jun. 6, 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6025009/

12.     Wholesale distributors, such as the Distributor Defendants, could have and should have been able to stem the excess flow of opioids into Texas and Webb County, but they did not. Wholesale distributors receive prescription opioids from drug manufacturers and transfer the opioids to hospitals, retail and mail-order pharmacies, doctors, and other healthcare providers who then dispense the drugs to patients. Distributors are required by federal and state law to control and report unlawful drug diversions. The Distributor Defendants purposefully ignored these responsibilities, lobbied for higher reporting thresholds and pocketed profits at the expense of Webb County.

13.     Similarly ignoring their statutory and common law obligations, Pharmacy Defendants (which include big box retail and PBM mail-order pharmacies) earned enormous profits by flooding the country, including Webb County, with prescription opioids. Fully aware of the oversupply through the extensive data and information they maintain as distributors and dispensaries, they failed to take meaningfully action to stem the flow of opioids into communities and instead participated in and profited from it. They knowingly dispensed controlled substances without a valid prescription and knowingly and intentionally distributed and dispensed controlled substances outside the usual course of the professional practice of pharmacy, in violation of the federal Controlled Substance Act ("CSA"),[12] the Texas Controlled Substance Act ("TCSA"),[13] the Texas Pharmacy Act,[14] and the Texas Health and Safety Code.[15]

14.     The Manufacturer, Distributer and Pharmacy Defendants' efforts to promote their scheme to distribute unnecessary opioids were purposefully facilitated by pharmacy benefit

---

[12] 21 U.S.C. §§ 801 et seq. (2019)

[13] TEX. HEALTH & SAFETY CODE §§ 481.001 et seq. (2019)

[14] TEX. OCC. CODE §§ 551.001 et seq. (2019)

[15] TEX. HEALTH & SAFETY CODE (2019)

managers ("PBMs") who ensured that opioids were paid for, reimbursed, or covered by public and private pharmacy benefit plans through their formularies and plan design. Reimbursement provides the grease that enabled the unlawful opioid machine to operate. Without PBM complicity and the construction of a reimbursement system designed to maximize access, no opioid would be covered by commercial or public plans and the machine would grind to a halt.

15.     In this way, PBMs are the gatekeepers to the vast majority of opioid prescriptions filled in the U.S. Caremark, Express Scripts, and OptumRx (all named defendants here) manage the drug benefits for approximately ninety-five percent (95%) of the U.S.' population or 253 million Americans.[16] PBMs design plans and create formularies which set the criteria and terms under which pharmaceutical drugs are reimbursed, numbers of refills permitted, number of pills per prescriptions, quantity limits, pre-authorization requirements, generic co-pay amount, branded drug co-pay amounts and other criteria.[17] PBMs give preferential formulary treatment to the opioids at issue to ensure access and reimbursement. They simultaneously make it harder to access less-addictive, pain treatment alternatives or critical drugs necessary for Medication Assisted Treatment ("MAT") of Opioid Use Disorder ("OUD").

16.     In these ways, the PBMs influence which drugs enter the marketplace. Their fingerprints are on nearly every opioid prescription filled and they profit in myriad ways from every pill.

17.     PBM formularies originate with recommendations from PBM pharmacy and therapeutic ("P&T") committees who evaluate, *inter alia*, drug efficiency, safety and clinical use.

---

[16] Brittany Hoffman-Eubanks, *The Role of Pharmacy Benefit Managers in American Health Care: Pharmacy Concerns and Perspectives: Part 1*, PHARMACY TIMES (Nov. 14, 2017), http://www.pharmacytimes.com/news/the-role-of-pharmacy-benefit-mangers-in-american-health-care-pharmacy-concerns-and-perspectives-part-1

[17] Matthew Kandrach, *PBM stranglehold on prescription drug market demands reform*, THE HILL (May 2, 2017), http://thehill.com/blogs/pundits-blog/healthcare/331601-pbm-stranglehold-on-prescription-drug-market-demands-reform

These P&T committees are allegedly composed of neutral, knowledgeable health care providers who the PBMs claim are committed to patient health and safety. Indeed, the PBM Defendants make clear they are not mere claims processors. They hold themselves out as "provid[ing] pharmacy care that is clinically sound,"[18] "ensur[ing] that [they] provide[] access to safe and effective medications"[19] and helping their customers "achieve better health outcomes."[20]

18.     The PBMs had a duty to perform their work with reasonable care, skill and faithfully; they did not. To the contrary, they ensured widespread access to and availability of the drugs they knew to be highly addictive and not efficacious for the treatment of run of the mill chronic pain.

19.     The PBM Defendants have publicly acknowledged their long-standing knowledge of the immense risks and harms posed by prescription opioids – including overdose,[21] misuse,[22]

---

[18] CVS Caremark, *Formulary Development and Management at CVS Caremark* (Apr. 25, 2018), https://www.caremark.com/portal/asset/FormDevMgmt.pdf at 1.

[19] Express Scripts, *Smart Formulary Management*, (Jan. 2, 2014), http://lab.express-scripts.com/lab/insights/drug-options/smart-formulary-management

[20] OptumRx, *OptumRx Opioid Risk Management*, (2018), https://www.accesskent.com/Benefits/pdf/Opioid-Brochure.pdf, at 4.

[21] *See* CVS Health, *The Balancing Act, Helping Ensure Appropriate Access to Opioids While Minimizing Risk*, INSIGHTS FEATURE (Feb. 28, 2017), https://payorsolutions.cvshealth.com/insights/balancing-act at 3 ("61% of all drug overdose deaths involved a prescription opioid" and "[p]rescription opioids account for approximately 70% of fatal prescription drug overdoses"); Express Scripts, *Putting the brakes on the opioid epidemic* (accessed Mar. 13, 2019) https://my.express-scripts.com/opioids.html at 2 ("90+ people die on an average day from an opioid-related overdose"); and *OptumRx Opioid Risk Management, supra* note 20 at 1 ("[e]very 16 minutes there is a death from opioid overdose" and "21% increase in drug overdose deaths [between] 2015-2016").

[22] *See* CVS Health, *The Balancing Act, supra* note 21 at 3 ("[i]n an average month, 4.3M Americans used painkillers for nonmedical reasons"); *OptumRx Opioid Risk Management, supra* note 20 at 1 ("4.5 million Americans abuse opioid prescription painkillers"), and 3 ("45% of 'first fill' scripts nationally are not in compliance with CDC guidelines").

and addiction.[23] They have admitted that the March 2016 Center for Disease Control Guidelines[24] on opioid prescribing "should become the default approach, " and yet they do not abide it.[25] They have acknowledged that they are "better placed than others in the pharmacy supply chain" to put the CDC Guideline into practice.[26] They have admitted they are "uniquely positioned to help address the opioid epidemic."[27] And, they have acknowledged that 46% of new opioid prescriptions processed by them "are not in compliance with CDC prescribing guidelines."

20. Years after the 2016 CDC Guideline was issued and after decades of purposeful complicity, the PBM defendants are now beginning to offer opioid management programs they falsely claim are CDC complaint; often only at extra cost to their customers.[28]

---

[23] *See* CVS Health, *The Balancing Act, supra* note 21 at 3 ("[a]s many as 25% of patients receiving Rx opioids long-term in a primary care setting struggle with addiction"); Express Scripts, *Putting the brakes on the opioid epidemic*, *supra* note 21 at 2 ("2 million people are addicted to prescription narcotics" and "[t]he odds of continuing opioid use after one year are 20% after receiving a ten-day supply"); and *OptumRx Opioid Risk Management, supra* note 20 at 2 ("opioid dependence can start in just a few days").

[24] U.S. Centers for Disease Control and Prevention, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 MORBIDITY AND MORTALITY WEEKLY REPORT 1 (2016) ("CDC Guideline").

[25] Troyen Brennan (Executive Vice President and Chief Medical Officer of CVS Health), Richard Creager, Jennifer M. Polinski (Sr. Director, Evaluation and Public Health Analytics, CVS Health), *Pharmacy Benefit Management of Opioid Prescribing: The Role Of Employers And Insurers,* HEALTH AFFAIRS (Sept. 21, 2017) https://www.health affairs.org/do/10.1377/hblog20170921.062092/full/

[26] *Id.*

[27] OptumRx, *Confronting the Opioid Epidemic* (2018), https://www.optum.com/resources/library/opioid-e-book.html?s3=rxopioid

[28] *See* CVS Health, *The Balancing Act, supra* note 21; CVS Caremark, *CVS Caremark Opioid Quantity Limits Pharmacy Reference Guide* (Jan. 2018), https://www.caremark.com/portal/asset/Opioid_Reference_Guide.pdf; CVS Health, *Utilization Management Strategies to Address the Opioid Crisis* (Feb. 28, 2018), https://cvshealth.com/thought-leadership/utilization-management-strategies-to-address-the-opioid-crisis; Express Scripts, *Putting the brakes on the opioid epidemic*, *supra* note 21; Nicholas Hamm, *Express Scripts Limits Opioid Prescriptions*, DRUG TOPICS (Aug. 17, 2017), http://www.drugtopics.com/clinical-news/express-scripts-limits-opioid-prescriptions; Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients* (Jan. 11, 2018), http://lab.express-scripts.com/lab/insights/drug-safety-and-abuse/reducing-inapprop_riate-selection_-and-excessive-dispensing-of-opioids; Optum, *OptumRx Opioid Risk Management Program Leads to Better Outcomes for Patients and Clients* (Aug. 22, 2017), https://www.optum.com/about/news/optumrx-risk-management-program-leads-to-better-outcomes.html, OptumRx, *Confronting the Opioid Epidemic, supra* note 27, *OptumRx Opioid Risk Management, supra* note 20.

21.     In reality, *none* of the PBM Defendants' new opioid management programs are consistent with the CDC Guideline. They still permit the largely unchecked prescribing of opioids for chronic pain (the CDC says opioids are not proven effective for chronic pain); still provide seven-day quantity limits for acute pain (when the CDC says "three days or less will often be sufficient"[29] and the PBMs themselves acknowledge that "a few days"[30] can make a difference in whether one becomes addicted); still permit opioid prescriptions to be delivered through mail-order pharmacies for conditions outside of active cancer, end-of-life or palliative care (which typically supply maintenance drugs for chronic conditions; it is well-established that except for active cancer, end-of-life or palliative care, opioids should not be dispensed for chronic pain); do not adhere to CDC MME/day[31] recommendations; do not cover high dosage nonopioid alternatives; do not require step therapies; and do not require prior authorizations for the most commonly prescribed immediate-release opioids. At the same time, the PBMs also continue to impose unnecessary restrictions on access to treatments for OUD.

22.     In sum, to this day the PBMs are not doing all they easily could to abate the crisis that they helped create and which they admit they are "unique positioned" to help address.

23.     While the opioid crisis has harmed nearly every corner of the country, Texas is one of the states that has been hit hardest by this man-made catastrophe. Texas has four of the top twenty-five cities in the country for opioid abuse[32] and is second in the U.S. in terms of health care

---

[29] CDC Guideline, *supra* note 24 at 16.

[30] OptumRx, *Confronting the Opioid Epidemic*, *supra* note 27 at 2.

[31] MMEs are morphine-milligram equivalents.

[32] *The Opioid Crisis in America's Workforce*, Castlight Health (last visited Mar. 13, 2019) http://archive.castlighthealth.com/typ/the-opioid-crisis/?aliId=32419579

costs associated with opioid abuse.[33] Also, Texas ranked fifth in the nation in terms of states with the most people dying from overdoses in 2014[34] and the CDC estimated that 2,989 people died from drug overdoses in Texas in 2017.[35]

24.     Accordingly, Plaintiff brings this action for injunctive and equitable relief, and to recover damages and costs it has incurred and will incur as a result of defendants' purposeful scheme.

25.     Plaintiff seeks to recover those costs and damages from the Defendants because they are the entities that caused and profited from the epidemic they knowingly, recklessly and deliberately created.

26.     Defendants' extraordinary disregard of their duties and obligations to behave as proper corporate citizens consistent with federal, state and common law is beyond anything Webb could have or should have anticipated or prepared for as a municipality. It is conduct at direct odds with how Defendants present themselves to their shareholders and the world – as highly sophisticated entities in the public health care space committed to safety and patient care.

27.     Plaintiff seeks a declaration that Defendants' conduct has violated Texas Law, and injunctive relief requiring Defendants to cease their unlawful promotion, distribution, reimbursement and sale of opioids and to correct their misrepresentations.

28.     Plaintiff seeks an order requiring Defendants to abate the public nuisance they have knowingly and foreseeably caused and from which they profited.

---

[33] Matrix Global Advisors, LLC, *Health Care Costs from Opioid Abuse: A State-by-State Analysis*, DRUGFREE (Apr. 2015), https://drugfree.org/wp-content/uploads/2015/04/Matrix_OpioidAbuse_040415.pdf

[34] *States With The Most Overdose Deaths,* FORBES, https://www.forbes.com/pictures/572cf3c94bbe6f123f285b9c/%205-texas/#3af631b25be0 (last visited Mar. 15, 2019).

[35] CDC, *Drug Overdose Death Data* (Dec. 19, 2018), https://www.cdc.gov/drugoverdose/data/statedeaths html

29.     Plaintiff also seeks punitive damages, treble damages, and attorneys' fees and costs together with any further and different relief appropriate under these extraordinary circumstances and as authorized by law.

## II.     VENUE AND JURISDICTION

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 based upon the federal claims asserted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

31.     This Court has personal jurisdiction over Defendants because they conduct business in Texas, purposefully direct or directed their actions toward Texas, consented to be sued in Texas by registering an agent for service of process, and/or consensually submitted to the jurisdiction of Texas when obtaining a manufacturer distributor or pharmacy/distributor license and have the requisite minimum contacts with Texas necessary to constitutionally permit the Court to exercise jurisdiction.

32.     This Court also has personal jurisdiction over all defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the Court in a single trial.[36]

33.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to this action occurred in this

---

[36] *See, e.g., Iron Workers Local Union No. 17 Insurance Fund v. Philip Morris Inc.,* 23 F. Supp. 796 (1998).

judicial district and because all defendants are subject to this Court's exercise of personal jurisdiction.

34.     Venue is proper within this District pursuant to 28 U.S.C. § 1391, as this District is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. §§ 1391(a) and (c), as well as TEX. CIV. PRAC. & REM. CODE § 17.042, the Texas Long-Arm statute.

35.     Certain Defendants are non-domiciliaries of Texas who regularly engage in business within Texas. These defendants have committed tortious acts outside and within Texas that have caused injury within Texas and to Webb County. Defendants expect or should reasonably have expected those acts to have consequences in Texas. Defendants, moreover, solicited business within Texas, engaged in persistent courses of conduct in Texas, and derived substantial revenue from goods used and services rendered in Texas through interstate commerce, including through the Texas Medicaid program.

36.     Defendants are regularly engaged in the business of manufacturing, distributing, dispensing and reimbursing prescription opioids in Texas and, specifically, in Webb County. Defendants' activities in Webb County in connection with the manufacture, distribution, dispensation and reimbursement of prescription opioids was, and is, continuous and systematic, and give rise to the causes of action alleged herein.

### III.     PARTIES

**A.     PLAINTIFF**

37.     Plaintiff, Webb County, is a county created under the authority of the State of Texas and is located in southern Texas. According to the U.S. Census Bureau, in 2017 it was estimated that 274,794 people live in Webb County.

38.     Webb County is governed by the Webb County Commissioners Court and the office of the County Executive. Plaintiff's offices are located at 1000 Houston Street, Laredo Texas 78040.

39.     Plaintiff directly sustained the damages alleged herein. Defendants' conduct has imposed an extraordinary burden on Plaintiff's limited resources and services for which Plaintiff seeks relief. Plaintiff has sustained, and continues to sustain, harm including, *inter alia*: (a) costs to repair and restore vital county infrastructure and services; (b) costs to treat overdose and addiction, e.g. naloxone, medication-assisted addiction treatment, emergency department and inpatient and outpatient treatment, including for pregnant women with opioid use disorder and infants suffering from neonatal abstinence syndrome; (c) costs associated with the epidemic's impact on law enforcement, judicial courts and the system in general, jails, foster care and other social services, prevention and education; (d) special costs associated with the provision of county services for public health, safety and welfare; (e) loss of productivity and harm to the economy of Webb, resulting from the epidemic. These are only a few of the many additional costs the opioid epidemic has imposed on Plaintiff, while Defendants' bottom lines have soared. Plaintiff has suffered, and continues to suffer, harm as a direct and foreseeable result of Defendants' reckless, intentional and unlawful conduct.

40.     The Defendants' conduct was extraordinary and singular. It is beyond anything Webb County could have prepared for, predicted or avoided. It is a repeated course of conduct that did, does, and will – given the realities of addiction – continue to result in recurring and ongoing harm to the Plaintiff. Defendants' conduct is especially pernicious when one considers the harm it wreaks on governmental entities such as Plaintiff who, in good faith, endeavor to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. The magnitude of Defendants' scheme is neither discrete nor of a sort that a county, including Plaintiff, could

reasonably expect to have to respond to at any time during its existence as such. It would be unreasonable, wrong, and inequitable not to allocate the additional governmental expenses, and any other costs associated with the harms Defendants' wrongful conduct has caused, to the actual parties responsible for creating the need for the resources to be expended as they are and were.

41.     Plaintiff has standing to bring the instant claims including, *inter alia*, claims for violations under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), because Plaintiff qualifies as a "person" within the meaning of the RICO Act. *See* 18 U.S.C. § 1961(3); 18 U.S.C. § 1964(c).

42.     Plaintiff is not in privity with any Defendant.

43.     Plaintiff seeks the means to abate the ongoing opioid epidemic – an epidemic that was created by Defendants' reckless, intentional, negligent and unlawful conduct and to restore and repair its County services and systems which have been significantly impacted and harmed.

## B.     MANUFACTURER DEFENDANTS

44.     Defendant, PURDUE PHARMA, L.P., is a Delaware limited partnership with its principal place of business in Stamford, Connecticut. PURDUE PHARMA, L.P. also has a Texas taxpayer number and one of its subsidiaries, Purdue Pharmaceutical Products L.P., a Delaware limited liability company for which PURDUE PHARMA, L.P. is the sole limited partner, is registered to do business in Texas. PURDUE PHARMA, L.P. is also licensed as an out-of-state prescription drug wholesale distributor and "own label distributor" with the Texas Department of State Health Services.

45.     Defendant, PURDUE PHARMA, INC., is a New York corporation with its principal place of business in Stamford, Connecticut.

46.     Defendant, THE PURDUE FREDERICK COMPANY, INC., is a Delaware corporation with its principal place of business in Stamford.

47. PURDUE PHARMA, L.P., PURDUE PHARMA, INC., and THE PURDUE FREDERICK COMPANY, INC. are referred to collectively as "Purdue."

48. In Texas and nationally, Purdue is engaged in the manufacture, promotion, and distribution of opioids, including, but not limited to:

(a) OxyContin (oxycodone hydrochloride extended release), a Schedule II opioid agonist tablet first approved in 1995 and marketed by Purdue for the "management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate."

(b) MS-Contin (morphine sulfate extended release), a Schedule II opioid agonist tablet first approved in 1987 for the management of severe pain for which alternative treatments are inadequate;

(c) Hysingla ER (hydrocodone bitartrate), a Schedule II opioid agonist tablet first approved in 2014 for the management of severe pain for which alternative treatments are inadequate;

(d) Dilaudid/Dilaudid-HP (hydromorphone hcl), a Schedule II opioid agonist first approved in 1984 for the management of severe pain for which alternative treatments are inadequate. Purdue acquired the rights to Dilaudid in 2007; and

(e) Targiniq ER (oxycodone hcl and naloxone hcl extended-release tables), a Schedule II opioid agonist first approved in 2014 for the management of severe pain for which alternative treatments are inadequate.

49. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up almost four-fold from 2006 sales of $800 million. OxyContin constitutes roughly thirty percent (30%) of the entire market for analgesic drugs (painkillers).

50. ████████████████████████████████████████████████████████

████████████████████████████

████ ██████████████████████████████████████

████ ██████████████████████████████████████████

51.     In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the U.S. $635 million. At the time, this was one of the largest settlements with a drug company for marketing misconduct. At set forth herein at length, Purdue has brazenly continued its unlawful conduct, settlement notwithstanding.

52.     Purdue transacts business in Texas, targeting the Texas market for its products, including the opioids at issue in this lawsuit. Purdue hires employees to service the Texas market. For example, Purdue recently advertised online that it was seeking a Territory Business Manager to operate out of Plano, Texas.[38] Purdue also directs advertising and informational materials to impact Texas physicians and potential users of Purdue products. For example, in December 2016, Purdue announced that it was entering into a long-term research and education alliance with The University of Texas Health Science Center at Houston, Texas to "connect researchers across disciplines, lower traditional barriers between industry and academics, and create unique educational experiences for students and trainees in the process."[39]

---

[37] ███████████████████████████████████████████████████████████████████████████████████

[38] Ladders, *Territory Business Manager I*, https://www.theladders.com/job/territory-business-manager-i-purdue-pharma-plano-tx_35053169 (last visited Mar. 13, 2019).

[39] *UTHealth, Purdue Pharm Enter Long-Term Research & Education Alliance,* PURDUE NEWS & MEDIA (Nov. 16, 2016) http://www.purduepharma.com/news-media/2016/11/uthealth-purdue-pharma-enter-long-term-research-education-alliance/

53.     Purdue also benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2017, Texas Medicaid spent over $52 million on Purdue's opioids. This represents approximately a little over 22% of total Texas Medicaid reimbursements for opioids during that time period.[40]

54.     ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████

██    ██████████████

██    ██████████████████

55.     At all times relevant hereto, Purdue promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Texas and Webb County. Between 2013 and 2016, Purdue made 182,303 of these payments totaling more than $3.86 million to promote the sale and use of OxyContin (oxycodone hydrochloride extended release) and 130,138 payments totaling more than $8.78 million to promote the sale and use of Hysingla ER (hydrocodone bitartrate).[42] During the same period between 2013 and 2016, Purdue made payments to promote the sale and use of other drugs including oxycodone IR, hydrocodone, hydromorphone, tramadol, and Dilaudid (hydromorphone hcl).[43]

---

[40] Centers for Medicaid & Medicaid Services (CMS), *State [Medicaid] Drug Utilization Data*, (last visited Mar. 13, 2019), https://www.medicaid.gov/medicaid/prescription-drugs/state-drug-utilization-data/index.html

[41] ██████████████████████████████████████████████████
██████████████████████████████████████████████████

[42] Mike Tigas et al, *Dollars for Docs (Purdue)*, PROPUBLICA (June 28, 2018), https://projects.propublica .org/docdollars/company/purdue-pharma-l-p, https://projects.propublica.org/docdollars/company/purdue-pharma.

[43] *Id*.

56.     PBM Defendant Express Scripts (identified in Section E, *infra*) appears to have played a particularly critical role in facilitating and preserving market growth for Purdue's brand opioids, including OxyContin. From at least 2003, it has maintained OxyContin as an approved reimbursable drug on Express Scripts' standard national formularies. Express Scripts imposed no pre-authorization requirements, quantity limits, step therapies or MME limits on OxyContin until 2013 at the earliest and even then only in the Medicare context. To this day, Express Scripts' standard formularies give Purdue's OxyContin preferred status (even over its generic competitors and less addictive options). Purdue's highly addictive brand Hysingla ER also enjoys preferred status to this day – again, over generic alternatives or less addictive options. To this day, Express Scripts does not track CDC Guidance with respect to Purdue's highly addictive drugs.

57.     Express Scripts also facilitated reimbursement of MS-Contin, which similarly appears not to have had pre-authorization requirements or quantity limits/MME limits before 2013 and again, even then, only in the Medicare context.

58.      On information and belief, Express Scripts formulary treatment of Purdue's branded highly addictive products was pursuant to agreements between Purdue and Express Scripts that set forth the terms of Express Scripts services to Purdue and how it would be paid by Purdue.

59.     PBM Defendant Caremark (identified in Section E, *infra*) also facilitated OxyContin's market position throughout the relevant time period. Since at least 2008, Caremark maintained OxyContin as a reimbursable drug on its standard national formularies. Caremark imposed no step therapies, pre-authorization requirements or quantity limits or MME limits on OxyContin until 2014 at the earliest. Caremark also facilitated reimbursement of MS-Contin, which similarly appears not to have had any step therapies, pre-authorization requirements or

quantity limits on prescriptions before 2013. To this day, Caremark provides preferred status to Purdue's products and does not track the 2016 CDC Guideline with respect to those drugs.

60.     On information and belief, Caremark's treatment of Purdue's branded highly addictive products was pursuant to agreements between Purdue and Caremark that set forth the terms of Caremark services to Purdue and how it would be paid by Purdue.

61.     PBM Defendant OptumRx also facilitated OxyContin and MS-Contin's market growth and availability. At all times relevant hereto, on information and belief, both were approved drugs on OptumRx's formulary. To this day, Purdue's brands Hysingla and OxyContin enjoy preferred alternative status on OptumRx's baseline national formularies.

62.     In sum, at all relevant times, the PBM Defendants ensured access to and reimbursement of Purdue's opioids.

63.     Defendant, RICHARD SACKLER, a resident of Riviera Beach, Florida, has served on the board of directors for Purdue at all relevant times and until 2018.

64.     Defendant, BEVERLY SACKLER, a resident of Connecticut, has served on the board of directors for Purdue at all relevant times and until 2017.

65.     Defendant, DAVID SACKLER, a resident of New York, has served on the board of directors for Purdue from 2012 to 2018.

66.     Defendant, ILENE SACKLER LEFCOURT, a resident of New York, has served on the board of directors for Purdue at all relevant times.

67.     Defendant, JONATHAN SACKLER, a resident of Connecticut, has served on the board of directors for Purdue at all relevant times.

68.     Defendant, KATHE SACKLER, a resident of Connecticut, has served on the board of directors for Purdue at all relevant times.

69.     Defendant, MORTIMER D.A. SACKLER, a resident of New York, has served on the board of directors for Purdue at all relevant times.

70.     Defendant, THERESA SACKLER, a resident of the United Kingdom, has served on the board of directors for Purdue at all relevant times and until 2018.

71.     At all relevant times, the aforementioned Defendants (collectively, the "Sackler Defendants") comprised a majority of the board of directors for Purdue, enabling the Sackler Defendants to exert control over Purdue's business decisions, including the implementation of deceptive sales and marketing practices associated with opioids.

72.     Defendant, JOHN STEWART, a resident of Florida, served as Purdue's CEO from 2007 to 2013.

73.     Defendant, MARK TIMNEY, a resident of Connecticut, served as Purdue's CEO from 2014 to 2017.

74.     Defendant, CRAIG LANDAU, a resident of Connecticut, served as Purdue's CEO from 2017 to the present.

75.     Defendants, JOHN STEWART, MARK TIMNEY, and CRAIG LANDAU, in their capacities as CEO of Purdue Pharma L.P. and Purdue Pharma, Inc., each directed Purdue's misconduct.

76.     Defendant RUSSELL GASDIA, a resident of Massachusetts, carried out the misconduct in his capacity as Vice President of Sales and Marketing for Purdue at all relevant times until 2014.

77.     Defendants, John Stewart, Mark Timney, Craig Landau, and Russell Gasdia, are collectively referred to as the "Purdue Officer Defendants". The Sackler Defendants and the Purdue Officer Defendants are collectively referred to as the "Purdue Individual Defendants."

78.     Substantially all of the Sackler Defendants (except David Sackler) were heavily involved in the conduct that led to the fines and criminal convictions in 2007.  From the 1990s until 2007, they directed a decade of misconduct, which led to criminal convictions, a judgment of this Court, and commitments that Purdue would not deceive doctors and patients again. That background confirms that their misconduct since 2007 was knowing, purposeful, reckless, and intentional.

79.     While the Sackler Defendants relinquished their officer titles in or around 2003 to try to shield themselves from future criminal and civil liability, they remained Purdue's owners, in control of its Board of Directors, and thus in firm control.

80.     At all relevant times, at least through the end of 2018, the Sackler Defendants controlled Purdue's deceptive sales campaign. They directed the company to hire hundreds more sales representatives to visit doctors thousands more times. They insisted that sales representatives repeatedly visit the most prolific prescribers. They directed representatives to encourage doctors to prescribe more of the highest doses of opioids. They studied unlawful tactics to keep patients on opioids longer and then ordered staff to use them. They asked for detailed reports about doctors suspected of misconduct, how much money Purdue made from them, and how few of them Purdue had reported to the authorities. They sometimes demanded more detail than anyone else in the entire company, so staff had to create special reports just for them. Richard Sackler even went into the field to promote opioids to doctors and supervise representatives face-to-face. In connection with a single meeting in 2011, for example, sales and marketing staff scrambled to prepare responses to questions from the Sackler Defendants, Defendant Mortimer Sackler asked about launching a generic version of OxyContin to "capture more cost sensitive patients," Defendant Kathe Sackler recommended looking at the characteristics of patients who had switched to

OxyContin to see if Purdue could identify more patients to convert, and Defendant Jonathan Sackler wanted to study changes in market share for opioids, focusing on dose strength.

81.     On information and belief, the Sackler Defendants' micromanagement was so intrusive that staff begged for relief. Defendant Gasdia wrote to the CEO: "Anything you can do to reduce the direct contact of Richard into the organization is appreciated." To convince the Sackler Defendants to make him CEO, Defendant Landau wrote a plan that he titled: "SACKLER PHARMA ENTERPRISE." He started by admitting that the Sackler Defendants in fact controlled the company like chief executive officers.  The family ran "the global Sackler pharmaceutical enterprise … with the Board of Directors serving as the 'de-facto' CEO."  The Sackler Defendants concealed their ongoing, extensive involvement with Purdue and its sales and marketing practices.

82.     From the money that Purdue collected as a result of its wrongful conduct, the Sackler Defendants paid themselves and their family billions of dollars. From the 2007 convictions (of certain Purdue officers) until 2018, the Sackler Defendants voted dozens of times to pay out Purdue's opioid profits to their family - in total **more than four billion dollars.**

83.     The Purdue Individual Defendants all actively participated in the common law torts and federal and state statutory violations of Purdue and benefited therefrom. The tortious conduct of the Purdue Individual Defendants was not, and could not have been through the exercise of due diligence, known to the public until their conduct was detailed in recent court filings by the Attorney General of Massachusetts.

84.     Defendant, RHODES TECHNOLOGIES is a Delaware general partnership with its principal place of business in Coventry, Rhode Island.

85.     Defendant, RHODES TECHNOLOGIES, INC. is a Delaware corporation with its principal place of business in Coventry, Rhode Island and is the general partner of RHODES TECHNOLOGIES.

86.     Defendant, RHODES PHARMACEUTICALS, L.P., is a Delaware limited partnership with its principal place of business at the same location as RHODES TECHNOLOGIES in Coventry, Rhode Island. Under information and belief, RHODES PHARMACEUTICALS, L.P. acts as the marketing arm of RHODES TECHNOLOGIES. RHODES PHARMACEUTICALS, L.P. is also licensed as an out-of-state prescription drug "own label distributor" with the Texas Department of State Health Services.

87.     RHODES PHARMACEUTICALS, L.P. was formed in 2007 by the founders of Purdue (the Sackler Defendants), four months after Purdue pleaded guilty to federal criminal charges regarding its fraudulent marketing of OxyContin. The Sackler Defendants created Rhodes Pharmaceuticals L.P. to make even more money off their highly-addictive drugs and because they knew OxyContin was coming off patent.  They created it in recognition of the opportunities to profit from generic competition to the highly addictive brands they had created at Purdue.

88.     Defendant, RHODES PHARMACEUTICALS, INC., is a Delaware corporation with its principal place of business in Coventry, Rhode Island and is the general partner of RHODES PHARMACEUTICALS, L.P.

89.     RHODES TECHNOLOGIES, RHODES TECHNOLOGIES, INC., RHODES PHARMACEUTICALS, L.P., and RHODES PHARMACEUTICALS, INC. are referred to collectively as "Rhodes."

90.     Rhodes is currently among the largest producers of  generic opioids in the U.S.[44]

91.     Together with Purdue, Rhodes accounted for 14.4 million opioid prescriptions in 2016, or 6% of the U.S. Opioid market.[45]

---

[44] David Crow, *Billionaire Sackler family owns second opioid drugmaker,* FINANCIAL TIMES (Sept. 9, 2018), https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132

[45] *Id.*

92.     Rhodes also owns, together with Purdue, the '919 Patent entitled "Oxycodone Compositions" and is involved in the manufacture of the active pharmaceutical ingredient used in Purdue's OxyContin.

93.     Rhodes is also now the registered holder of approved New Drug Application No. 19-891, which covers the manufacturer and sale of Dilaudid.

94.     Rhodes manufactures, promotes, distributes and/or sells opioids nationally, in Texas, and in Webb County,[46] including but not limited to oxycodone, morphine sulfate, hydrocodone and hydromorphone.[47]

95.     Rhodes benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2017, Texas Medicaid spent over $3.8 million on Rhodes' opioids. This represents approximately 1.7% of total Texas Medicaid reimbursements for opioids during that time period.[48] These reimbursements represent only a fraction of the total earned by Rhodes from its opioid distribution in Texas.

96.     At all times relevant hereto, Rhodes promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Texas and Webb County. For example, between 2013 and 2016, Rhodes made 64 payments totaling $284,000 to promote the sale and use of morphine sulfate.[49]

---

[46] ███████████████████████████████████████████████████████████

[47] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

[48] *Id.*

[49] Mike Tigas, et al, *Dollars for Docs (Rhodes)*, PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/rhodes-pharmaceuticals-l-p

97.     At all relevant times, the PBM Defendants ensured access to and reimbursement of Rhodes' opioids.

98.     Defendant, ABBOTT LABORATORIES, and Defendant, ABBOTT LABORATORIES, INC., are Illinois corporations with their principal place of business in Abbott Park, Illinois. ABBOTT LABORATORIES and ABBOTT LABORATORIES, INC. are both registered to do business in Texas (since 1935 and 1997, respectively).

99.     Defendant, ABBVIE INC. is a Delaware corporation with its principal place of business in North Chicago, Illinois. ABBVIE INC. was created in January 2013 when ABBOTT LABORATORIES spun off its pharmaceutical business.[50] ABBVIE INC. is registered to business in Texas and has been since 2012. ABBVIE INC. is also licensed as an out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services.

100.    Defendants ABBOTT LABORATORIES, ABBOTT LABORATORIES, INC. and ABBVIE INC. are referred to collectively as "Abbott."

101.    Abbott was engaged in the promotion and distribution of opioids nationally due to a co-promotional agreement with Defendant Purdue. Pursuant to that agreement, between 1996 and 2006, Abbott actively promoted, marketed, and distributed Purdue's opioid products.

102.    Abbott, as part of the co-promotional agreement, helped drive OxyContin utilization such that it became the largest selling opioid in the nation. Under the co-promotional agreement with Purdue, the more Abbott generated in sales, the more money it earned. Specifically, Abbott received twenty-five to thirty percent (25-30%) of all net sales for prescriptions written by doctors its sales force called on. This agreement with Purdue was in

---

[50] *Abbott completes split with AbbVie*, DAILY HERALD (Jan. 2, 2013), www.dailyherald.com/article/20130102/business/701029869/

operation from 1996-2002, following which Abbott continued to receive a residual payment of six percent (6%) of net sales up through at least 2006.

103.     With Abbott's help, sales of OxyContin went from a mere $49 million in its first full year on the market to $1.6 billion in 2002. Over the life of the co-promotional agreement, Purdue paid Abbott nearly half a billion dollars.

104.     Abbott distributed and marketed other highly addictive opioids as well. ████████
██████████████████████████████████████████████████████ ■ Abbott also distributed Dilaudid (hydromorphone hcl), Vicodin (hydrocodone acetaminophen), Vicoprofen (hydrocodone ibuprofen), and Actiq (fentanyl citrate).[52]

105.     Abbott transacts business in Texas, targeting the Texas market for its products, including the opioids at issue in this lawsuit. Abbott hires employees to service the Texas market. For example, Abbott recently advertised online that it was seeking a Regional Manager for the North Texas area and a Sales Operation Manager to operate out of Austin, Texas. Abbott also directs advertising and informational materials to impact Texas physicians and potential users of Abbott products.

106.     Abbott also benefits from reimbursements by the Texas Medicaid program. Between 2013 and 2017, Texas Medicaid spent nearly $.5 million on Abbott's opioids.[53]

107.     At all relevant times, Abbott has sold and continues to sell prescription opioids in Texas, including in Webb County.[54]

---

[51] ████████████████████████████████████████████████████████████
████████████████

[52] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

[53] *Id.*

[54] ████████████████████████████████████████████████████████████
████████████████████

108.     At all relevant times, the PBM Defendants ensured access to and reimbursement of Abbott's opioids. They listed them as approved reimbursable drugs on their standard national formularies often without quantity limits or preauthorization requirements.

109.     At all times relevant hereto, Abbott promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Texas and Webb County. Between 2013 and 2016, Abbott made payments to promote the sale and use of Vicodin (hydrocodone acetaminophen) and Vicoprofen (hydrocodone ibuprofen).[55]

110.     Abbott and Purdue's conspiring with PBMs to drive opioid use is documented. As described in an October 28, 2016 article from Psychology Today entitled *America's Opioid Epidemic*:

> Abbott and Purdue actively misled prescribers about the strength and safety of the painkiller [OxyContin]. To undermine the policy of requiring prior authorization, they offered lucrative rebates to middlemen such as Merck Medco [now Express Scripts, a defendant herein] and other pharmacy benefits managers, on condition that they eased availability of the drug and lowered co-pays. The records were part of a case brought by the state of West Virginia against both drug makers alleging inappropriate and illegal marketing of the drug as a cause of widespread addiction. … One reason the documents are so troubling is that, in public at least, the drug maker was carefully assuring authorities that it was working with state authorities to curb abuse of OxyContin. Behind the scenes, however, as one Purdue official openly acknowledged, the drug maker was "working with Medco (PBM) [now defendant Express Scripts] to try to make parameters [for prescribing] less stringent.[56]

111.     Upon information and belief, Abbott's and Purdue's practices with Medco (now Defendant Express Scripts), were not confined to West Virginia and has caused harm nationwide, including to Webb County, as alleged herein.

---

[55] Mike Tigas, et al, *Dollars for Docs (AbbVie),* PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/abbvie-inc.

[56] American Society of Addiction Medicine, *America's Opioid Epidemic – Court released documents show drug makers blocked efforts to curb prescribing,* PSYCHOLOGY TODAY (Oct. 28, 2016), https://www.psychologytoday.com/blog/side-effects/201610/america-s-opioid-epidemic

112.    Defendant, MALLINCKRODT PLC, is an Irish public limited company with its corporate headquarters in Staines-upon-Thames, United Kingdom. Several wholly-owned subsidiaries of MALLINCKRODT PLC are licensed as out-of-state prescription drug wholesale distributors and "own label distributors" with the Texas Department of State Health Services.

113.    Defendant, MALLINCKRODT LLC, is a wholly owned subsidiary of MALLINCKRODT PLC and is a Delaware limited liability company with its principal place of business in St. Louis, Missouri. MALLINCKRODT LLC is registered to do business in Texas and has been since 1989.

114.    Defendant, SPECGX LLC is a Delaware limited liability company with its principal place of business in Clayton, Missouri and is a wholly-owned subsidiary of MALLINCKRODT PLC. SPECGX LLC is licensed as an out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services.

115.    MALLINCKRODT PLC, MALLINCKRODT LLC and SPECGX LLC are referred to collectively as "Mallinckrodt."

116.    Mallinckrodt manufactures, markets, sells and distributes pharmaceutical drugs throughout the U.S. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the U.S., based on prescriptions.[57]

117.    Mallinckrodt manufactures and markets Exalgo (extended-release hydromorphone), a brand opioid. Mallinckrodt Inc. acquired the U.S. rights to Exalgo in 2009 and launched it in 2010. Exalgo is still sold and marketed in Texas today.

118.    Mallinckrodt also manufactures and markets the brand opioid Roxicodone (oxycodone hcl), which it purchased in 2012 from Xanodyne Pharmaceuticals. Roxicodone's

---

[57]    MEDTRONIC, *Mallinckrodt Announces Co-Promotion Arrangement for Duexis*, (July 18, 2012), http://newsroom.medtronic.com/phoenix.zhtml?c=251324&p=irol-newsArticle&ID=2004142

30mg blue pill was so widely known for diversion that a route between Florida "pill mills" and illicit markets in other states became known as the "Blue Highway."

119.    Mallinckrodt also manufactured and marketed the brand opioid Xartemis XR (extended-release combination of oxycodone/acetaminophen), which the FDA approved in March 2014.

120.    Mallinckrodt promoted its branded opioid products with its own direct sales force.

121.    At all times relevant hereto, Mallinckrodt promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Texas and Webb County. Between 2013 and 2016, Mallinckrodt made 12,082 payments totaling $378,000 to promote the sale and use of Exalgo (extended-release hydromorphone) and six payments totaling $258,000 to promote the sale and use of fentanyl citrate.[58] During the same period between 2013 and 2016, Mallinckrodt made payments to promote the sale and use of Roxicodone.( oxycodone hcl).[59]

122.    Mallinckrodt is also a leading manufacturer of generic opioids, such as codeine, fentanyl, hydrocodone, hydromorphone, meperidine, morphine, oxycodone, among others. In its 2016 Annual Report/Form 10-K, Mallinckrodt reported that "in calendar 2015, estimated that we received approximately 25% of the U.S. Drug Enforcement Administration's ("DEA") total annual quota for controlled substances that we manufacture." Mallinckrodt reported that "[b]ased on IMS Health data for the same period, our Specialty Generics business had an approximately 23% market share of DEA Schedules II and III opioid and oral solid dose medications."[60]

---

[58] Mike Tigas, et al, *Dollars for Docs (Mallinckrodt),* PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/mallinckrodt-llc.

[59] *Id.*

[60] Mallinckrodt plc, *Annual Report (Form 10-k)* (Nov. 29, 2016).

123.     Mallinckrodt transacts business in Texas, targeting the Texas market for its products, including the opioids at issue in this lawsuit. Mallinckrodt hires employees to service the Texas market. For example, Mallinckrodt has recently advertised for the positions of Acute Care Business Manager and Sales Specialist to operate out of Houston, Texas. Mallinckrodt also directs advertising and informational materials to impact Texas physicians and potential users of Mallinckrodt products.

124.



125.     Mallinckrodt also benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2017, Texas Medicaid spent over $27 million on Mallinckrodt's opioids. This represents approximately 12% of total Texas Medicaid reimbursements for opioids during that time period.[62]

126.



[62] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.



127. ████████████████████████████████████████████

████████████████████████████████████████████████

██████

128.    At all times relevant hereto, the PBM Defendants assured access to and reimbursement of Mallinckrodt's opioids. They listed Mallinckrodt's brand drug Roxicodone or its generic alternative oxycodone as approved reimbursable drugs on their standard national formularies. They imposed no step therapies, pre-authorization requirements, MME or quantity limits on prescriptions until 2014 at the earliest.

129.    Defendant, ENDO HEALTH SOLUTIONS, INC., is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

130.    Defendant, ENDO PHARMACEUTICALS, INC., is a wholly owned subsidiary of ENDO HEALTH SOLUTIONS, INC. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS, INC. has been registered to do business in Texas since 1997. ENDO PHARMACEUTICALS, INC. is also licensed as an out-of-state prescription drug wholesale distributor and "own label distributor" with the Texas Department of State Health Services.

---

63 ████████████████████████████████████████████

64 ████████████████████████████████████████████
███████████████████████████████████████.

131.     Defendant PAR PHARMACEUTICAL COMPANIES, INC. ("Par Pharmaceutical Cos.") is a Delaware corporation with its principal place of business in Chestnut Ridge, New York. Par Pharmaceutical Cos. is a holding company and is an indirect, wholly-owned subsidiary of Endo International plc.

132.     Defendant, PAR PHARMACEUTICAL, INC. ("Par Pharmaceutical") is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical is a wholly-owned subsidiary of Par Pharmaceutical Cos. and holds itself out as "an Endo International Company." Par Pharmaceutical is licensed as an out-of-state prescription drug wholesale distributor by the Texas Department of State Health Services.

133.     Par Pharmaceutical and Par Pharmaceutical Cos. are referred to collectively as "Par." ENDO HEALTH SOLUTIONS, INC. and ENDO PHARMACEUTICALS, INC. and Par are, at times, referred to collectively as "Endo."

134.     Endo develops, markets, and sells prescription drugs, including, but not limited to, the opioids Opana/Opana ER (oxymorphone hcl), Percodan (oxycodone hcl/aspirin), Percocet (oxycodone/acetaminophen), and Zydone (hydrocodone bitartrate/acetaminophen), throughout the U.S., including Texas.

135.     Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012.

136.     Opana ER yielded $1.15 billion in revenue from 2010 to 2013, and it accounted for ten percent (10%) of Endo's total revenue in 2012.

137.     Endo, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc., also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone, among other opioid products across the U.S., including Texas.

138.    Par develops, markets, and sells prescription drugs including the brand opioid Endocet (acetaminophen/oxycodone) and generic opioids such as oxycodone, oxymorphone, hydrocodone, morphine sulfate, and fentanyl citrate, throughout the U.S., including Texas.

139.    At all times relevant hereto, Endo promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Texas and Webb County. Between 2013 and 2016, Endo made 21,483 payments totaling $1.03 million to promote the sale and use of Opana ER (oxymorphone hcl ).[65]

140.



141.    Endo transacts business in Texas, targeting the Texas market for its products, including the opioids at issue in this lawsuit. Endo hires employees to service the Texas market. For example, Endo recently posted online that it was seeking a Sales Representative to work out of Dallas, Texas, and a Senior Specialty Sales Professional to work out of Houston, Texas. Endo also directs advertising and informational materials to impact Texas physicians and potential users of Endo products. Upon information and belief, Endo recently acquired HealthTronics, which is headquartered in Austin, Texas.

[65] Mike Tigas, et al, *Dollars for Docs (Endo),* PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/endo-pharmaceuticals-inc.

[66]

142.     Endo also benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2017, Texas Medicaid spent approximately $47 million on Endo's opioids. This represents approximately over 20% of total Texas Medicaid reimbursements for opioids during that time period.[67]



145.     At all times relevant hereto, the PBM Defendants ensured access to and reimbursement of Endo and Par's opioid products. Then listed them as approved reimbursable drugs on their standard national formularies, often without any quantity limits or pre-authorization requirements; often in preferred tiers.

[67] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

[68]

[69]

146.    Defendant, TEVA PHARMACEUTICALS USA, INC., is a Delaware corporation with its principal place of business in North Wales, Pennsylvania and is an indirectly, wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."), an Israeli corporation. TEVA PHARMACEUTICALS USA, INC. has a Texas taxpayer number and is licensed as an out-of-state prescription drug wholesale distributor by the Texas Department of State Health Services.

147.    Defendant, CEPHALON, INC., is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired Cephalon, Inc.

148.    Defendant, WATSON LABORATORIES, INC., is a Nevada corporation with its principal place of business in Corona, California.

149.    Defendant, ACTAVIS PHARMA, INC. (f/k/a Watson Pharma, Inc.) is a Delaware corporation with its principal place of business in New Jersey.

150.    Defendant, ACTAVIS, LLC, is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

151.    WATSON LABORATORIES, INC., ACTAVIS PHARMA, INC. and ACTAVIS, LLC are wholly-owned indirect subsidiaries of Teva, Ltd., which acquired the companies in 2016. Prior to 2016, each of these companies were subsidiaries of Defendant ALLERGAN, PLC.

152.    TEVA USA, CEPHALON, INC., and WATSON LABORATORIES, INC., ACTAVIS PHARMA, INC., and ACTAVIS, LLC are referred to collectively as "Cephalon."

153.    Cephalon manufactures, promotes, distributes and sells both brand name opioids nationally, and in Webb County, including the following: (a) Actiq (fentanyl citrate), and (b) Fentora (fentanyl buccal tablet). Cephalon also was in the business of manufacturing and selling generic opioids, including, codeine, meperidine, oxycodone, fentanyl and oxymorphone.

154.    At all times relevant hereto, Teva promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Texas and Webb County.

Between 2013 and 2016, Teva made 20,733 payments totaling $2.87 million to promote the sale and use of Fentora (fentanyl buccal tablets) and 420 payments totaling $170,000 for the sale and use of hydrocodone.[70]

155.    Cephalon transacts business in Texas, targeting the Texas market for its products, including the opioids at issue in this lawsuit. Cephalon hires employees to service the Texas market. For example, Cephalon recently advertised online that it was seeking Sales Representatives to operate out of College Station and San Antonio, Texas. Cephalon also directs advertising and informational materials to impact Texas physicians and potential users of their products.

156.    Cephalon also benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2017, Texas Medicaid spent over $7 million on Cephalon's opioids. This represents approximately over 3% of total Texas Medicaid reimbursements for opioids during that time period.[71]

157.



---

[70] Mike Tigas, et al, *Dollars for Docs (Teva)*, PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/teva-pharmaceuticals-usa-inc.

[71] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

158.    At all times relevant hereto, the PBM Defendants ensured access to and reimbursement of Cephalon's opioids.

159.    PBM Defendant OptumRx listed both Actiq and Fentora as approved reimbursable brand drugs on its standard national formularies. In many years, the products had preferred brand status.

160.    Each PBM Defendant included Cephalon's generic opioids on their standard national formularies as approved drugs, often without step therapies, prior authorizations, MME or quantity limits.

161.    Defendant, JOHNSON & JOHNSON, is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Johnson and Johnson Health Care Systems Inc., a wholly owned subsidiary of JOHNSON & JOHNSON is licensed as an out-of-state prescription "own label distributor" by the Texas Department of State Health Services

162.    Defendant, JANSSEN PHARMACEUTICALS, INC., formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc., is a Pennsylvania corporation with is principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON. JANSSEN PHARMACEUTICALS, INC. has been registered to do business in Texas since 1985.

163.    Upon information and belief, JOHNSON & JOHNSON controls the sale and development of JANSSEN PHARMACEUTICALS, INC.'S drugs and JANSSEN PHARMACEUTICALS, INC. profits inure to JOHNSON & JOHNSON's benefit.

164.     JOHNSON & JOHNSON and JANSSEN PHARMACEUTICALS, INC. are collectively referred to as "Janssen."

165.     Janssen is or has been engaged in the manufacture, promotion, distribution, and sale of opioids nationally and in Webb County[73], including the following: (a) Duragesic (fentanyl transdermal), (b) Nucynta (tapentadol) and (c) Nucynta ER (tapentadol extended release). Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014. Prior to 2009, Duragesic accounted for at least $1 billion in annual sales.

166.     ██████████████████████████████████████████
██████████████████████████████████████

167.     Janssen transacts business in Texas, targeting the Texas market for its products, including the opioids at issue in this lawsuit. Janssen hires employees to service the Texas market. For example, Janssen recently advertised online that it was seeking a Clinical Account Specialist to operate out of Houston, Texas. Janssen also directs advertising and informational materials to impact Texas physicians and potential users of their products.

168.     At all times relevant hereto, Janssen promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Texas and Webb County. Between 2013 and 2016, Janssen made 25,606 payments totaling $2.04 million to promote the sale and use of Nucynta (tapentadol).[75]

---

[73] ██████████████████████████████████████
████████████████████████

[74] ██████████████████████████████████████

[75] Mike Tigas, et al, *Dollars for Docs (Janssen)*, PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/janssen-pharmaceuticals-inc.; https://projects.propublica.org/docdollars/company/johnson-johnson-health-care-systems-inc

169. Janssen also benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2017, Texas Medicaid spent over $11 million on Janssen's opioids. This represents nearly 5% of total Texas Medicaid reimbursements for opioids during that time period.[76]

170. █████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

171. At all times relevant hereto, the PBM Defendants have ensured access to and reimbursement of Janssen's opioids.

172. PBM Defendant OptumRx has routinely listed Janssen's Duragesic as an approved reimbursable brand drug on its standard national formularies, often with preferred brand status and without step therapy or pre-authorization requirements. It has also covered the Nucynta products, again without step therapies or pre-authorization requirements and with preferred brand status.

173. PBM Defendant Express Scripts has listed Janssen's Nucynta and Nucynta ER as approved reimbursable brands on its standard national formulary without step therapies, MME or quantity limits or preauthorization requirements until at least 2013.

174. PBM Defendant Caremark also has listed Duragesic and Nucynta products as approved brands on its formularies without quantity or MME limits, step therapies, or prior authorization requirements.

175. Defendant, ALLERGAN PLC, formerly known as Actavis, Inc., and Watson Pharmaceuticals, Inc., is an Irish public limited company with its headquarters and principal place of business in Dublin, Ireland. Several wholly-owned subsidiaries of ALLERGAN PLC are

---

[76] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

[77] ████████████████████████████████████████████████████████

licensed as prescription drug manufacturers, prescription drug distributors and out-of-state prescription drug wholesale distributors and "own label distributors" by the Texas Department of State Health Services

176.     Defendant, ALLERGAN FINANCE, LLC, formerly known as Actavis, Inc. and Watson Pharmaceuticals, Inc., is a Nevada limited liability company with its principal place of business in Parsippany, New Jersey. ALLERGAN FINANCE, LLC is a wholly-owned indirect subsidiary of ALLERGAN PLC.

177.     ALLERGAN PLC uses ALLERGAN FINANCE, LLC to market and sell its drugs in the U.S. Upon information and belief, ALLERGAN PLC exercises control over the marketing and sales efforts and profits from the sale of Allergan products ultimately inure to its benefit. Prior to 2016, ALLERGAN PLC was also the parent company of Defendants WATSON LABORATORIES, INC., ACTAVIS, LLC and ACTAVIS PHARMA, INC. described above.

178.     ALLERGAN PLC and ALLERGAN FINANCE, LLC are collectively referred to as "Allergan."

179.     Allergan manufactures, promotes, sells and distributes opioids, including the branded drugs Kadian (morphine sulfate) and Norco (hydrocodone bitartrate/acetaminophen), and generic opioids such as fentanyl, oxycodone and oxymorphone throughout the U.S., including Texas, and in Webb County. Allergan acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008 and began marketing Kadian in 2009.

180.





181.     Allergan transacts business in Texas, targeting the Texas market for its products, including the opioids at issue in this lawsuit. Allergan hires employees to service the Texas market. For example, Allergan recently advertised online that it was seeking Account Specialists to operate out of Webster and Austin, Texas. Allergan also direct advertising and informational materials to impact Texas physicians and potential users of their products.

182.     Allergan also benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2016, Texas Medicaid spent over $34 million on Allergan's opioids. This represents approximately 16% of total Texas Medicaid reimbursements for opioids during that time period.[79]

183.     ████████████████████████████████

████████████████████████████████████████

████████

    ██  ████████████████

    ██  ██████████████████

    ██  ████████████████

    ██  ████████████████

184.     ████████████████████████████████

████████████████████████████████████

[78] ████████████████████████████████

[79] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

[80] ████████████████████████

[81] ████████████████████████████

185.    At all times relevant hereto, the PBM Defendants ensured access to and reimbursement of Allergan's opioids. Their standard national formularies covered these opioids often without any step therapies, MME quantity limits or pre-authorization requirements; often in preferred tiers.

186.    Defendant, INSYS THERAPEUTICS, INC. ("Insys"), is a Delaware corporation with its headquarters and principal place of business in Chandler, Arizona. Insys has been registered to do business in Texas since 2014. Insys, or subsidiaries wholly owned by Insys, are licensed as prescription drug manufacturers and out-of-state prescription drug "own label distributors" by the Texas Department of State Health Services

187.    Insys manufactures, promotes, distributes and sells prescription opioids such as Subsys (fentanyl sublingual spray). These opioids are manufactured in the U.S. and promoted, distributed, and sold across the U.S. – including in Texas and Webb County.[82] In 2016, Insys made approximately $330 million in net revenue from Subsys.

188.    Insys transacts business in Texas, targeting the Texas market for its products, including the opioids at issue in this lawsuit. Insys maintains a Texas manufacturing facility located in Round Rock, Texas. Insys also hires employees to service the Texas market. For example, Insys recently advertised online that it was seeking Specialty Sales Professional to operate out of Houston, Texas. Insys also direct advertising and informational materials to impact Texas physicians and potential users of their products.

189.    In August of 2018, Insys announced that it had reached a deal in principle to pay at least $150 million to resolve a U.S. Justice Department ("DOJ") investigation into claims that

[82] ████████████████████████████████████████████████
████████████████████████████████

Insys paid doctors kickbacks to prescribe Subsys. The settlement came after the DOJ announced that, as part of its efforts to combat the opioid epidemic, it had joined five whistleblower lawsuits accusing Insys of paying kickbacks to doctors to prescribe Subsys.[83]

190.    Additionally, Insys' founder and owner, John Kapoor, was arrested and charged in 2017 with multiple felonies in connection with an alleged conspiracy to bribe practitioners to prescribe Subsys and defraud insurance companies. Several other former and current Insys managers and executives were previously indicted and have since pleaded guilty for their roles in the alleged conspiracy. This includes former CEO Michael Babich and former Vice President Alec Burlakoff, who are now cooperating with prosecutors in the ongoing criminal trial of John Kapoor and other former Insys executives and managers.

191.    During the trial, Michael Babich and Alec Burlakoff testified that doctors were aggressively targeted for paid speaking opportunities and other perks, including putting doctors' staff members and friends on the Insys payroll, based on how many prescriptions they wrote for the powerful fentanyl spray Subsys. Insys tracked how much money doctors brought in and how much money the company paid the doctors through the speaker program. The difference between the two represented Insys' return on investment ("ROI"), and any doctor with an ROI of less than 2-to-1 would be removed from the speaker program altogether.[84]

192.    Insys tracked prescriptions for a Webb County doctor and noticed he was prescribing more Subsys "[b]ecause he was receiving the payment for the speaker programs in the

---

[83] Nate Raymond et al, *Insys to pay $150 million to settle U.S. opioid kickback probe,* REUTERS (Aug. 8, 2018), https://www.reuters.com/article/us-insys-opioids/insys-to-pay-150-million-to-settle-u-s-opioid-kickback-probe-idUSKBN1KT1G5

[84] Chris Villani, *Insys Thought It 'Owned' Doctors, Former CEO Testifies,* LAW360 (Feb. 13, 2019), https://www.law360.com/articles/1128753/insys-thought-it-owned-doctors-former-ceo-testifies

form of a bribe."[85] Insys paid the Webb county doctor $67,000 in speaking fees, travels and meals in 2013 alone to promote Subsys. The Webb County doctor also received more money from Insys than any other doctor between August and December 2013.[86] The Webb County doctor has since lost his license to practice medicine and is just one example of Insys' highly paid doctors who have recently faced legal or disciplinary consequence arising out of interactions with Insys.

193.    Insys made thousands of payments to physicians nationwide, including in Texas, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids. In 2016, those payments totaled more than $2 million.[87] And between 2013 and 2016, Insys made 81,250 payments to physicians and teaching hospitals concerning the promotion of Subsys, which totaled $18.7 million.[88]

194.    Defendant, AMNEAL PHARMACEUTICALS LLC, is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. AMNEAL PHARMACEUTICALS LLC is licensed as an out-of-state prescription drug wholesale distributor and "own label distributor" by the Texas Department of State Health Services.

195.    Defendant, AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, is a Delaware limited liability company with its principal place of business in Hauppauge, New York. AMNEAL PHARMACEUTICALS OF NEW YORK, LLC is a subsidiary of AMNEAL

---

[85] *Id.*

[86] Katie Thomas, *Using Doctors With Troubled Pasts to Market a Painkiller*, NEW YORK TIMES (Nov. 27, 2014), https://www.nytimes.com/2014/11/28/business/drug-maker-gave-large-payments-to-doctors-with-troubled-track-records html

[87] Pat Milton et al, *Drug company founder John Kapoor arrested for alleged opioid scheme*, CBS NEWS (Oct. 27, 2017), https://www.cbsnews.com/news/drug-company-founder-john-kapoor-arrested-for-alleged-opioid-scheme/

[88] Mike Tigas, et al, *Dollars for Docs (Insys)*, PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/insys-therapeutics-inc.

PHARMACEUTICALS LLC and is licensed as an out-of-state prescription drug wholesale distributor by the Texas Department of State Health Services.

196.    AMNEAL PHARMACEUTICALS LLC and AMNEAL PHARMACEUTICALS OF NEW YORK, LLC are collectively referred to as "Amneal."

197.    Since at least 2008, Amneal has been licensed as an out-of-state manufacturer/distributor with the Texas Department of State Health Services. Upon information and belief, Amneal manufactures, promotes, distributes and/or sells opioids nationally, in Texas, and in Webb County, including many Schedule II controlled substances such as oxycodone, hydrocodone and codeine.

198.    At all times relevant hereto, Amneal promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Texas and Webb County. Between 2013 and 2016, Amneal made payments to promote the sale and use of such drugs as hydrocodone.[89]

199.



---

[89] Mike Tigas, et al, *Dollars for Docs (Amneal),* PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/amneal-pharmaceuticals-llc.

200.    Amneal also benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2017, Texas Medicaid spent over $6.8 million on Amneal's opioids. This represents approximately 3% of total Texas reimbursements for opioids during that time period.[91]

201.    

202.

203.    Defendant, KVK-TECH, INC. ("KVK-Tech") is a Pennsylvania corporation with its principal place of business in Newton, Pennsylvania.

204.    Since at least 2008, KVK-Tech has been licensed as an out-of-state wholesale distributor with the Texas Department of State Health Services. Upon information and belief, KVK-Tech manufactures, promotes, distributes and/or sells opioids nationally, in Texas, and in Webb County,[94] including many Schedule II controlled substances such as oxymorphone and oxycodone.

[91] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

[92]

[93]

[94]

205.    █████████████████████████████████████████████████

████████████████████████████

        █    ████████████████████████

        █    ████████████████████████████

206.    KVK-Tech also benefits from reimbursements by the Texas Medicaid program. Between 2010 and 2017, Texas Medicaid spent over $1 million on KVK-Tech's opioids.[96] These reimbursements represent only a fraction of the total earned by KVK-Tech from its opioid distribution in Texas.

207.    Defendant, MYLAN INC., formerly known as Mylan Laboratories Inc., is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania and is indirectly, wholly owned by Mylan N.V., a publicly-held company.

208.    Defendant, MYLAN PHARMACEUTICALS, INC., is a West Virginia corporation with its principal place of business in Canonsburg, Pennsylvania and is a wholly-owned subsidiary of MYLAN INC. MYLAN PHARMACEUTICALS, INC. has been registered to do business in Texas since 1961 and is also licensed as an out-of-state prescription drug wholesale distributor by the Texas Department of State Health Services.

209.    Defendant, MYLAN INSTITUTIONAL INC., is an Illinois corporation with its principal place of business in Canonsburg, Pennsylvania and is a wholly-owned subsidiary of MYLAN INC. MYLAN INSTITUTIONAL INC. has been registered to do business in Texas since 2007 and is also licensed as a prescription drug manufacturer, prescription drug distributor, and

---

95 ████████████████████████████████████████████████

████████████████████████

96 CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services with facilities throughout Texas.

210.    Defendant, MYLAN TECHNOLOGIES, INC., formerly known as Bertek, Inc., is a West Virginia corporation headquartered in St. Albans, Vermont and is a wholly-owned subsidiary of MYLAN INC.

211.    MYLAN   INC.,   MYLAN   PHARMACEUTICALS,   INC.,   MYLAN INSTITUTIONAL INC. and MYLAN TECHNOLOGIES, INC. are referred to collectively as "Mylan."

212.    Mylan manufactures, promotes, distributes and/or sells opioids nationally, in Texas, and in Webb County,[97] including but not limited to fentanyl, codeine, oxycodone, hydrocodone, morphine and tramadol.

213.    ████████████████████████████████████████████████
████████

214.    Mylan also benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2017, Texas Medicaid spent over $9.7 million on Mylan's opioids. This represents approximately 4% of total Texas reimbursements for opioids during that time period.[99] These reimbursements represent only a fraction of the total earned by Mylan from its opioid distribution in Texas.

---

[97] ████████████████████████████████████

[98] ████████████████████████████████████████
████████████

[99] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

215. █████████████████████████████████████████

████████████████████████████████████████████

██████

　　██　　██████████████████

　　██　　██████████████████

216. █████████████████████████████████████████

████████████████████████████████████████████

██████████

217.　　At all times relevant hereto, Mylan promoted to physicians and teaching hospitals the sale and use of its opioid products throughout the U.S., including in Texas and Webb County. Between 2013 and 2016, Mylan made 1,319 of these payments totaling more than $281,000 to promote the sale and use of fentanyl.[102] Similarly, between 2013 and 2016, Mylan made 50 payments totaling $179,000 to promote the sales and use of morphine sulfate.[103]

218.　　Defendant, HIKMA PHARMACEUTICALS USA INC., formerly known as West-Ward Pharmaceuticals Corp. ("Hikma"), is a Delaware corporation, with its principal place of business in Eatontown, New Jersey. Hikma merged with Roxane Laboratories, Inc. after the latter's acquisition by Hikma Pharmaceuticals PLC. Hikma is currently licensed as an out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services.

---

[100] ████████████████████████████████████████

[101] ████████████████████████████████████████

[102] Mike Tigas, et al, *Dollars for Docs (Mylan),* PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/mylan-pharmaceuticals-inc; https://projects.propublica.org/docdollars/company/mylan-institutional-inc.

[103] Mike Tigas, et al, *Dollars for Docs (Mylan),* PROPUBLICA (June 28, 2018), https://projects.propublica.org/docdollars/company/mylan-pharmaceuticals-inc.

219. Hikma manufactures, promotes, distributes and/or sells opioids nationally, in Texas, and in Webb County[104] including, but not limited, to Roxicet (oxycodone acetaminophen), codeine, meperidine, morphine sulfate, oxymorphone, codeine sulfate, fentanyl, and hydromorphone.[105]

220.



221. Hikma also benefits from reimbursements by the Texas Medicaid program. Between 2006 and 2017, Texas Medicaid spent over $3.6 million on Hikma's opioids. This represents approximately 1.6% of total Texas reimbursements for opioids during that time period.[107] These reimbursements represent only a fraction of the total earned by Hikma from its opioid distribution in Texas.

222. The corporate defendants listed above are all engaged in the manufacturing of opioids. Together with the Purdue Individual Defendants, they are collectively referred to herein as the "Manufacturer Defendants."

---

[104] ████████████████████████████████████████████████████████████

[105] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

[106] ████████████████████████████████████████████████████████████

[107] CMS, *State [Medicaid] Drug Utilization Data*, *supra* note 40.

223.    The failure of all Manufacturer Defendants to effectively monitor and report suspicious orders of prescription opioids, their aggressive misinformation campaign aimed at increasing public consumption of highly addictive opioids, their failure to forthrightly provide accurate information to the U.S. Food and Drug Administration ("FDA"), their failure to adhere to FDA regulations regarding misbranding, their failure to implement measures to prevent the filling of suspicious orders, and their perverse utilization of so-called "patient advocacy" groups to evade FDA regulations concerning consumer drug-marketing foreseeably and purposefully created the opioid epidemic that has caused significant harm to Webb County. Manufacturer Defendants' conduct directly caused a public-health, law-enforcement and socio-economic crisis across this country, including in Webb County.

## C.    DISTRIBUTOR DEFENDANTS

224.    Defendant McKESSON CORPORATION ("McKesson") is a Delaware corporation with its principal place of business in San Francisco, California. McKesson has been registered to do business in Texas since at least 1994 and does substantial business in Texas. McKesson is also licensed as a prescription drug distributor and out-of-state wholesale distributor with the Texas Department of State Health Services.

225.    McKesson is the largest pharmaceutical distributor in North America distributing pharmaceuticals to retail pharmacies and institutional providers in all 50 states, including Texas. McKesson is also one of the largest distributors of opioid pain medications in the country, including Texas. In 2015, McKesson reported a net income in excess of $1.5 billion.

226.    McKesson recognizes and embraces its critical role in protecting public health and drug safety.  In its 2017 Annual Report, McKesson states that it "partner[s] with pharmaceutical manufacturers, providers, pharmacies, governments and other organizations in healthcare **to help**

**provide the right medicines**, medical products **and healthcare services** to the right patients at the right time, **safely** and cost-effectively."[108]

227. According to its 2017 Annual Report, McKesson's "pharmaceutical distribution business operates and serves thousands of customer locations through a network of 27 distribution centers, as well as a primary redistribution center, two strategic redistribution centers and two repackaging facilities, serving all 50 states and Puerto Rico."[109]



228.

229.

---

[108] McKesson Corp, *Annual Report* (2017), https://investor.mckesson.com/sites/mckesson.investorhq.business wire.com/files/report/file/2017_McKesson_Annual_Report_0.pdf (emphasis added).

[109] *Id.*

[110]



230. ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

231.     Defendant CARDINAL HEALTH, INC. ("Cardinal") is an Ohio corporation with its principal place of business in Dublin, Ohio. Cardinal, through its many subsidiaries, including Cardinal Health Care Services, Inc., has been registered to do business in Texas since at least 2008 and are licensed as out-of-state prescription drug wholesale distributors with the Texas Department of State Health Services.

232.     Cardinal distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Texas. Cardinal is one of the largest distributors of opioid pain medications in the country, including Texas.

233.     Cardinal understands its critical role in protecting public health and its broad obligations to communities nationwide, including Webb County.  "At Cardinal Health, our role as a distributor of pharmaceutical products — and **our obligation to society** — is to provide a **safe**,

---

[111] ██████████████████████████████████████████

[112] ██████████████████████████████████████████████
████████████████████████████

cost-efficient **and secure channel to deliver medications of all kinds**, from the hundreds of manufacturers who make them, to the thousands of pharmacies that dispense them."[113]



[113] Cardinal Health, *Annual Report (2017)*, https://s1.q4cdn.com/238390398/files/doc_financials/annual/2017/2017_Cardinal-Health_AR-FINAL.pdf at 7, (emphasis added)

[114] ▮▮▮▮▮▮▮▮▮▮▮



236. ███████████████████████████████████

████████████████████████████████████████████████

███████

237.     Defendant AMERISOURCEBERGEN DRUG CORPORATION ("Amerisource") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. Amerisource has been registered to do business in Texas since at least 1989 and is licensed as prescription drug distributor and out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services.

238.     Amerisource distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Texas. According to its 2016 Annual Report, Amerisource is "one of the largest global pharmaceutical sourcing and distribution services companies, helping both healthcare providers and pharmaceutical and biotech manufacturers improve patient access to products and **enhance patient care**."[117]

239.     Amerisource is one of the largest distributors of opioid pain medications in the country, including Texas.

240.     ████████████████████████████████████

█████████████████████

---

[115] ██████████████████████████████████████

[116] ███████████████████████████████████

[117] AmerisourceBergen, *2016 Summary Annual Report*, http://investor.amerisourcebergen. com/static-files/37daf1ed-4d41-4547-bb87-86d501087dbb (last visited Mar. 13, 2019) (emphasis added).



241.   Amerisource also distributed opioid pain medications directly to Webb County.[119]

242.   ███████████████████████████████████

████████████████████████████████████████████

████████████████

243.   Defendant MORRIS & DICKSON CO., L.L.C. ("Morris & Dickson"), is a Louisiana limited liability company with its principal place of business in Shreveport, Louisiana. Morris & Dickson has been registered to do business in Texas since at least 2004. Morris & Dickson is also licensed as a prescription drug distributor and out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services.

244.   On information and belief, Morris & Dickson is largest, privately owned pharmaceutical distributor in North America. It distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Texas.

245.   ████████████████████████████████████

██████████████████████████





246.

247.

248.    Defendant CVS HEALTH CORPORATION ("CVS Health"), formerly known as CVS Caremark Corporation, is a Delaware corporation with its principal place of business located in Woonsocket, Rhode Island. CVS Health is named as a defendant in its capacities as a distributor, retail and mail order pharmacy (*see* Section D, *infra*), and PBM (*see* Section E, *infra*).

---

121
122
123

249.     Defendant CVS PHARMACY, INC. ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Health is the direct parent company of CVS Pharmacy. CVS Pharmacy has been registered to do business in Texas since at least 2001 and is licensed as a prescription drug distributor and out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services. CVS Pharmacy is named as a defendant in its capacity as a distributor and a pharmacy (*see* Section D, *infra*).

250.     CVS Health and CVS Pharmacy are collectively referred to herein as "CVS."

251.     CVS distributes pharmaceuticals to pharmacies, including its own, and institutional providers to customers in all 50 states.



252.     Between 2006-2014, CVS also distributed opioid pain medications directly to Webb County.[125]

253.     Defendant WALGREENS BOOTS ALLIANCE, INC. ("Walgreens Boots") is a Delaware corporation with its principal place of business in Deerfield, Illinois. Walgreen Boots is named as a defendant in its capacities as a distributor and pharmacy (*see* Section D, *infra*).

254.     Defendant WALGREEN CO. is an Illinois corporation whose principal place of business is at the same location as Walgreens Boots. Walgreens Boots is the parent company of WALGREEN CO. WALGREEN CO. has been registered to do business in Texas since 1984 and

---

[124] ███████████████████████████████████

[125] ███████████████████████████████████████
███████████████████████.

is licensed as a prescription drug distributor and out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services. WALGREEN CO. is named as a defendant in its capacities as a distributor and pharmacy (*see* Section D, *infra*).

255. Walgreens Boots and WALGREEN CO. are collectively referred to as "Walgreens."

256. In 2013, Walgreens and Amerisource announced a "strategic, long-term relationship" which included: a ten-year comprehensive primary pharmaceutical distribution contract; access to generic drugs and related pharmaceutical products through the Walgreens Boots Alliance Development joint venture; and opportunities to accelerate Amerisource's efforts to grow its specialty and manufacturer services businesses domestically and internationally.[126] Under the agreement, Walgreens was also granted equity rights in Amerisource and currently the co-chief operating officer of Walgreen Boots Alliance, Inc. serves as a member of the Board of Directors for Amerisource.[127]

257. Walgreens distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Texas. ▬▬▬▬▬▬▬▬▬▬



[126] AmerisourceBergen, *AmerisourceBergen Announces Strategic, Long-Term Relationship with Walgreens and Alliance Boots* (Mar. 19, 2013), http://investor.amerisourcebergen.com/news-releases/news-release-details/amerisourcebergen-announces-strategic-long-term-relationship

[127] AmerisourceBergen, *Board of Directors*, http://investor.amerisourcebergen.com/ corporate-governance/board-of-directors (last visited Sept. 24, 2018).



258. ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████

258.

259. Defendant WALMART INC., formerly known as Wal-Mart Stores, Inc. ("Walmart"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart has been registered to do business in Texas since at least 1974 and, under information and belief, is licensed as an out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services. Walmart is named as a defendant in its capacities as a distributor and pharmacy (*see* Section D, *infra*).

260. Walmart distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states, including Texas. ██████████████████████

██████████████████████████████████████████



[128] ████████████████████████████████████████████████████

[129] ████████████████████████████████████████████████████████



261.

263.    The distributor defendants listed above are all engaged in the wholesale distribution of opioids. The distributor defendants listed above are collectively referred to herein as the "Distributor Defendants."

264.    The Distributor Defendants purchased opioids from manufacturers, such as the Manufacturer Defendants herein, and sold them to pharmacies throughout Texas, including in Webb County. The Distributor Defendants played an integral role in opioids being distributed across Texas, including in Webb County.



265. The failure of all Distributor Defendants to effectively monitor and report suspicious orders of prescription opioids and to implement measures to prevent the filling of invalid and medically unnecessary prescriptions directly caused a public-health, law-enforcement, and socio-economic crisis across this country, including in Webb County.

## D.     PHARMACY DEFENDANTS

266.    Defendants CVS Health and CVS Pharmacy, identified above in Section C regarding distributors, are also pharmacy defendants.

267.    Defendant, CAREMARK RX, L.L.C., is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CAREMARK RX, L.L.C. is a wholly owned subsidiary of CVS Pharmacy. According to CVS Health's 2016 Annual Report, Defendant CAREMARK RX, L.L.C. is "the parent of [CVS Health]'s pharmacy services subsidiaries, is the immediate or indirect parent of many mail order, pharmacy benefit management, infusion, Medicare Part D, insurance, specialty mail and retail specialty pharmacy subsidiaries, all of which operate in the U.S. and its territories." CAREMARK RX, L.L.C. is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

268.    Defendant CAREMARK, L.L.C., is a California limited liability company whose principal place of business is at the same location as CVS Health. CAREMARK, L.L.C. is a wholly owned subsidiary of CAREMARK RX, L.L.C. CAREMARK, L.L.C. has been registered to do business in Texas since 2007 and is licensed as an out-of-state prescription drug wholesale distributor with the Texas Department of State Health Services.

269.    CAREMARK, L.L.C. is the direct or indirect parent of dozens of limited liability companies all over the U.S. that provide mail-order pharmacy services in the U.S. and in Texas.[133] Many of these CAREMARK, L.L.C. entities are licensed with the Texas Board of Pharmacy and are registered with the DEA to dispense controlled substances, including opioids. CAREMARK, L.L.C. is named as a defendant in its capacities as a retail and mail order pharmacy and PBM (*see* Section E, *infra*).

270.    Defendant, CAREMARK TEXAS MAIL PHARMACY, LLC, doing business as CVS Caremark, is a Texas limited liability company formed in 2003 whose principal place of business is at the same location as CVS Health. CAREMARK TEXAS MAIL PHARMACY, LLC is licensed with the Texas Board of Pharmacy and is registered with the DEA to dispense controlled substances, including opioids.

271.    CVS Health, CVS Pharmacy, CAREMARK RX, L.L.C., CAREMARK RX, L.L.C., and CAREMARK TEXAS MAIL PHARMACY, LLC are collectively referred to as "CVS"

272.    At all relevant times, CVS has sold and continues to sell prescription opioids at its retail pharmacies in Texas and Webb County, or through its mail order pharmacies.[134] Currently, CVS has over 800 licensed pharmacy locations in Texas, including five licensed pharmacy

---

[133] CVS Health Corporation, *Annual Report (Form 10-K)* (Feb. 14, 2018).

[134] ███████████████████████████████████████████████████████████

locations in Webb County, as well as dozens of mail order pharmacies locations that operate in the U.S. and in Texas.[135] In 2018, CVS was the largest U.S. pharmacy by total prescription revenue.[136]

273.    CVS describes itself "a market leader in mail order pharmacy, retail pharmacy, specialty pharmacy, and retail clinics….**that provide unparalleled service and capabilities**."[137]

274.    Defendant, EXPRESS SCRIPTS HOLDING COMPANY, is a Delaware corporation with its principal place of business in St. Louis, Missouri. EXPRESS SCRIPTS HOLDING COMPANY is named as a defendant in its capacities as retail and mail order pharmacy, and PBM (*see* Section E, *infra*).

275.    Defendant ESI MAIL PHARMACY SERVICE, INC., doing business as Express Scripts or ESI Distribution Services, is a Delaware corporation with its principal place of business in St. Louis, Missouri. ESI MAIL PHARMACY SERVICE, INC. is licensed as an out-of-state prescription drug distributor with the Texas Department of State Health Services.

276.    Defendant EXPRESS SCRIPTS PHARMACY, INC., doing business as Catamaran Home Delivery or Express Scripts, is a Delaware corporation with its principal place of business in St. Louis, Missouri.

277.    Both ESI MAIL PHARMACY SERVICE, INC. and EXPRESS SCRIPTS PHARMACY, INC. are subsidiaries of defendant EXPRESS SCRIPTS HOLDING COMPANY. Both are licensed pharmacies with the Texas Board of pharmacies and are registered with the DEA to dispense controlled substances, including opioids.

---

[135] *See* Texas State Board of Pharmacy ("TX BOP"), *License & Registration Verifications*, https://www.pharmacy.texas.gov /dbsearch/default.asp

[136] Drug Channels Institute, *Largest 15 U.S. Pharmacies, by Total Prescription Revenues, 2018,* (last visited Mar. 12, 2018), https://www.drugchannels net/2019/02/the-top-15-us-pharmacies-of-2018-m.html.

[137] CVS Health, *CVS Caremark Announces PBM Succession Plan* (Mar. 30, 2012), https://cvshealth.com/newsroom/press-releases/cvs-caremark-announces-pbm-succession-plan-1 (emphasis added)

278.    EXPRESS SCRIPTS HOLDING COMPANY, ESI MAIL PHARMACY SERVICE, INC. and EXPRESS SCRIPTS PHARMACY, INC. are collectively referred to as "Express Scripts"

279.    On information and belief, at all relevant times, Express Scripts has sold and continues to sell prescription opioids through its mail order pharmacies nationwide, serving patients nationally and in Webb County. Even though it operates no brick and mortar stores, in 2018, Express Scripts was the third largest pharmacy in the U.S. by total prescription revenue.[138]

280.    Defendant, OPTUMRX, INC. ("OptumRx"), is a Delaware corporation with its principal place of business located in Irvine, California. OptumRx operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of OPTUM, INC. OptumRx has been registered to do business in Texas since at least 2010.

281.    OptumRx has several mail-order locations licensed with the Texas Board of Pharmacy and registered with the DEA to dispense controlled substances, including opioids. At all relevant times, OptumRx has sold and continues to sell prescription opioids through its mail order pharmacies in Texas, including in Webb County. In 2018, OptumRx was the fourth largest pharmacy in the U.S. by total prescription revenue.[139]

282.    Defendants Walgreens Boots and WALGREEN CO., identified above in Section C regarding distributors, are also pharmacy defendants and are collectively referred to as "Walgreens."

---

[138] Drug Channels Institute, *Largest 15 U.S. Pharmacies, supra* note 136.

[139] *Id.*

283. At all relevant times, Walgreens has sold and continues to sell prescription opioids at its retail pharmacies in Texas, including in Webb County.[140] Currently, Walgreens has over 700 licensed pharmacy locations in Texas, including three licensed pharmacy locations in Webb County.[141] In 2018, Walgreens was the second largest U.S. pharmacy by total prescription revenues.[142]

284. Defendant Walmart, identified above in Section C regarding Distributors, is also a pharmacy defendant.

285. Defendant WAL-MART STORES TEXAS, LLC ("Walmart Texas") is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart Texas is wholly owned subsidiary of Walmart.[143] Walmart Texas has been registered to do business in Texas since at least 2007.

286. Walmart and Walmart Texas are collectively referred to as "Walmart."

287. At all relevant times, Walmart has sold and continues to sell prescription opioids at its retail pharmacies in Texas, including in Webb County.[144] Currently, Walmart has over 500 licensed pharmacy locations in Texas, including four licensed pharmacy locations in Webb County.[145] In 2018, Walmart was the fifth largest U.S. pharmacy by total prescription revenue.[146]

---

[140] ████████████████████████████████████████████████████████████████████

[141] *See* TX BOP, *License & Registration Verifications*, *supra* note 135.

[142] Drug Channels Institute, *Largest 15 U.S. Pharmacies, supra* note 136.

[143] Walmart, Inc., *Annual Report (Form 10-K)*, (2018), https://www.sec.gov/Archives/edgar/data/104169/000010416918000028/wmt211312018.htm

[144] ████████████████████████████████████████████████████████████████████

[145] *See* TX BOP, *License & Registration Verifications*, *supra* note 135.

[146] Drug Channels Institute, *Largest 15 U.S. Pharmacies, supra* note 136.

288.    The pharmacy defendants listed above are all engaged in the business of retail selling opioids and other drugs. The pharmacy defendants are collectively referred to herein as the "Pharmacy Defendants."

289.    The failure of all Pharmacy Defendants to effectively monitor and report suspicious orders of prescription opioids and to implement measures to prevent filling of improper prescriptions greatly contributed to the vast increase in opioid overuse and addiction.

290.    Pharmacy Defendants' conduct thus directly caused a public-health and law-enforcement crisis across this country, including in Webb County.

291.    As discussed further below, each of the Pharmacy Defendants has consistently failed to comply with its legal obligations concerning opioid diversion, and almost all have paid civil penalties to resolve government allegations regarding opioid diversion.

## E.    PHARMACY BENEFIT MANAGER DEFENDANTS

292.    The Pharmacy Benefit Manager Defendants ("PBM Defendants") are defined below. At all relevant times, the PBM Defendants acted as the gatekeepers of prescription drugs including opioids. Pharmacy benefit managers ("PBMs") establish formularies which govern which drugs are reimbursed and how. They determine quantity (refill) limits and pre-authorization requirements. They negotiate with drug manufacturers to offer preferred drug formulary placement for drugs. They establish reimbursement rates for the drugs dispensed. PBMs earn revenue from at least the following sources: fees from health plans and insurers, rebates and other incentives from drug manufacturers, including administrative fees, service fees, and volume bonuses, and fees from maintaining pharmacy networks.[147]

---

[147] Health Policy Brief, *On behalf of payers, pharmacy benefit managers negotiate rebates from drug makers in exchange for preferred formulary placement*, HEALTH AFFAIRS (Sept. 14, 2017), https://www.healthaffairs.org/do/10.1377/hpb20171409.000178/full/

293.     Defendant, EXPRESS SCRIPTS HOLDING COMPANY, identified as a Pharmacy Defendant in Section (D) above, is also a PBM Defendant.

294.     Defendant, EXPRESS SCRIPTS, INC. ("ESI"), is a Delaware Corporation with its principal place of business located in St. Louis, Missouri. ESI is a wholly-owned subsidiary of Express Scripts Holding Company. ESI has been registered to do business in Texas since at least 1992.

295.     Express Scripts Holding Company and ESI are collectively referred to as "Express Scripts."

296.     In 2012, ESI acquired its rival, Medco Health Solutions Inc., in a $29.1 billion deal. As a result of the merger, Express Scripts was formed and became the largest PBM in the nation, filling a combined 1.4 billion prescriptions for employers and insurers.[148]

297.     By 2015, Express Scripts more than 97% of all retail pharmacies participated in one or more of Express Scripts' networks.[149]

298.     According to the Drug Channels Institute, Express Scripts was the second highest ranking PBM in 2017 with a little under twenty-five percent (25%) of the industry market share.[150]

299.     Glen Stettin, MD, Senior VP, Clinical Research & New Solutions & Chief Innovation Officer, describes Express Scripts business similarly: "It's not just that we keep costs down, it's the way we keep costs down that matters. **We put patients first.**"[151]

---

[148] Peter Frost, *Express Scripts closes $29.1-billion purchase of Medco*, LOS ANGELES TIMES (Apr. 3, 2012), http://articles.latimes.com/2012/apr/03/business/la-fi-medco-20120403

[149] Express Scripts, *Annual Report 2015*, https://expressscriptsholdingco.gcs-web.com/static-files/2a3da22f-dbed-4fee-865d-7e7b97bf698b

[150] Adam J. Fein, Ph.D., *The Outlook for Pharmacy Benefit Management: Evolution or Disruption*, DRUG CHANNELS INSTITUTE (Mar. 5, 2018) http://drugchannelsinstitute.com/files/PBMI-PBM_Outlook-Drug_Channels-Fein-Mar2018-Handouts.pdf, at 2.

[151] Express Scripts, *2016 Commercial Drug Trend Report Executive Summary* (Feb. 2017), https://lab.express-scripts.com/lab/drug-trend-report/~/media/d61abadb45214f71931abb9d1b98096a.ashx at 2 (emphasis added).

300.     Express Scripts acknowledges its key role in public health:

> "Our nation pays a huge price for bad medication-related decisions, and it is clear that the price is even more costly for those at the lowest end of the economic spectrum," said Steve Miller, MD, chief medical officer at Express Scripts. "The good news is that our country can save billions of dollars for patients, employers and the government – **and achieve healthier outcomes – simply by driving better decisions within the pharmacy benefit**."[152]

301.     Express Scripts lists "clinical solutions to improve health outcomes, such as adherence, care coordination and personalized medicine" as the leading service it offers in its PBM capacity.[153]

302.     Express Scripts' commitment to public health and safety is long standing. Back in 2009, George Paz, then President, CEO and Chairman of Express Scripts explained, "[a]t Express Scripts, **our primary focus** is to manage medication therapy and **safety for patients**."[154]

303.     In 2010, Chairman Paz elaborated, "[t]wenty-five years ago, in a small cinder-block building in St. Louis, a handful of visionary entrepreneurs **drafted a plan to prove there was a better way to care for patients while serving clients**…. Today that 5-person company has grown to more than **13,000 employees, all with same passion and commitment as its founders—we continue to make the use of prescriptions (sic) drugs safer** and more affordable for plan sponsors and their members."[155]

[152] Express Scripts, *Poorest U.S. States Rank Among Most Wasteful in Unnecessary Medication-Related Costs* (Apr. 23, 2013), https://expressscriptsholdingco.gcs-web.com/news-releases/news-release-details/poorest-us-states-rank-among-most-wasteful-unnecessary

[153] Express Scripts, *Annual Report 2015*, *supra* note 149.

[154] Express Scripts, *2009 Annual Report*, https://expressscriptsholdingco.gcs-web.com/static-files/3782a688-8a6e-426b-809a-3d8d183cd3ac at 15.

[155] Express Scripts, *2010 Annual Report*, https://expressscriptsholdingco.gcs-web.com/static-files/4b0e2a86-39dd-4955-a6e7-28add9d33e3b at 1.

304.    Chairman Paz further proclaimed, "[t]his year's milestones represent the strength of our business model and **the company-wide commitment to improve health outcomes for patients**, while driving out waste in the pharmacy in the pharmacy benefit."[156]

305.    Express Scripts 2011 Annual Report similarly reported on Express Scripts sophistication and commitment to safety:   "Our staff of **highly trained pharmacists and physicians provides clinical support** for our PBM services.  **These healthcare professionals** are responsible for a wide range of activities including **tracking the drug pipeline; identifying emerging medication-related safety issues** and notifying physicians, clients, and patients (if appropriate); providing drug information services; formulary management; development of utilization management, **safety (concurrent and retrospective drug utilization review) and other clinical interventions**; and/or contacting physicians, pharmacists, or patients."[157]

306.    Express Scripts derives substantial revenue managing pharmacy benefits in Texas through several different means, including, but not limited to, providing services and formulary to the Texas A&M Care Health Plans.[158] During much of the relevant period of this complaint, ESI provided services and formularies to the Teacher Retirement System of Texas.[159]

307.    Current and former employees of the Webb Consolidated Independent School District are members of the Teacher Retirement System of Texas which means they receive their pharmacy benefits from Express Scripts and pursuant to an Express Scripts formulary. Upon

---

[156] *Id.*

[157] Express Scripts, *2011 Annual Report*, https://expressscriptsholdingco.gcs-web.com/static-files/aba85281-8153-4b35-9ee0-638916989332.

[158] The Texas A&M University System, *Prescription Drugs (Express Scripts)* (Jan. 18, 2018), https://www.tamus.edu/business/benefits-administration/employeeretiree-benefits/prescriptions-express-scripts/

[159] *Express Scripts Medicare Prescription Drug Plan (PDP), 2017 Benefit Overview.* https://www.trs.texas.gov/TRS%20Documents/express_script_benefit_overview_2017.pdf

information and belief, this is only one of the many ways in which Express Scripts reimburses for claims in Webb County, including opioids.

308.    At all times relevant hereto, Express Scripts has operated offices throughout Texas, including in Austin and Irving, Texas. Express Scripts publishes employment vacancies related to its Texas PBM business activities on its website.[160]

309.    Express Scripts is also one of the PBMs supporting the delivery of services to the Texas Medicaid program, and Texas Medicaid recipients, including, on information and belief, in Webb County.

310.    Defendants CVS Health and CAREMARK RX, L.L.C., identified in the Distributor and Pharmacy Sections above, are also PBM Defendants.

311.    Defendant, CAREMARKPCS HEALTH, L.L.C., is a Delaware limited liability company doing business as CVS/Caremark and CVS Caremark in Texas and whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of CAREMARKPCS HEALTH, L.L.C. CAREMARKPCS HEALTH, L.L.C. has been registered to do business in Texas since at least 2009.

312.    Defendant, CAREMARK, L.L.C., is a California limited liability company whose principal place of business is at the same location as CVS Health. Defendant, CAREMARKPCS, L.L.C., is a Delaware limited liability company formerly known as AdvancePCS Inc., which was founded in 1996 and is based in Irving, Texas. CAREMARK RX, L.L.C. is the sole member of

---

[160] Express Scripts employment listings in the State of Texas, e.g., (i) Sr. Manager, Software Development Engineer, Austin, Texas (https://careers.express-scripts.com/us/en/job/ESMEUS2769/Sr-Manager-Software-Development-Engineer?jobsource=indeed&utm_source=media&utm_medium=appfeeder&utm_campaign=Bayard&src=JB-10044) (ii) Sr. Technical Manager, Software Development, Austin Texas (https://careers.express-scripts.com/us/en/job/ESMEUS2881/Sr-Technical-Manager-Software-Development?jobsource=indeed&utm_source=media&utm_medium=appfeeder&utm_campaign=Bayard&src=JB-10044); and (iii) Pharmacy Technician (CPhT) – Accredo, Irving, Texas (https://careers.express-scripts.com/us/en/job/ESMEUS2934/Pharmacy-Technician-CPhT-Accredo?jobsource=indeed&utm_source=media&utm_medium=appfeeder&utm_campaign=Bayard&src=JB-10044

both CAREMARK, L.L.C. and CAREMARKPCS, L.L.C. Both CAREMARK, L.L.C. and CAREMARKPCS, L.L.C. are and have been registered to do business in Texas since 2007.

313. Defendants Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C., CAREMARK, L.L.C. and CAREMARKPCS, L.L.C. are collectively referred to as "Caremark."

314. CVS Health describes itself as a "pharmacy innovation company **helping people on their path to better health**. Through our 7,700 retail pharmacies, 900 walk-in medical clinics, a leading pharmacy benefits manager with nearly 65 million plan members, and expanding specialty pharmacy services, **we enable people business and communities to manage health** in more affordable, effective ways. This unique integrated model **increases access to care, delivers better health outcomes** and lowers overall health care costs."[161] In 2016, CVS Health reported an operating income of $10 billion.

315. In the above-referenced September 3, 2014 press release, CVS Health announced its change of name from CVS Caremark Corporation to CVS Health. CVS Health explained that it was changing its name "**to reflect its broader health care commitment** and its expertise in driving the innovations needed to shape the future of health." CVS Health explained that the newly-named company included "its pharmacy benefit management business, which is known as CVS/Caremark." In that same press release, CVS Health touted, "[f]or our patients and customers, **health is everything** and…**we are advising on prescriptions** [and]helping manage chronic and specialty conditions."[162]

---

[161] CVS Health, *CVS Caremark Announces Corporate Name Change to CVS Health to Reflect Broader Health Care Commitment* (Sept. 3, 2014), https://cvshealth.com/newsroom/press-releases/cvs-caremark-announces-corporate-name-change-cvs-health-reflect-broader (emphasis added).

[162] *Id.* (emphasis added).

316.     Caremark has long emphasized its awareness of its critical role in public health. In its 2007 TrendsRx Report, released after its merger with CVS, Caremark declared:

> In an environment **ever more conscious of the importance of the pharmacy benefit to health** and healthcare cost management, our new company is uniquely positioned to serve our PBM customers. As part of CVS Caremark Corporation, Caremark will strive to deliver more cost-effective management for payors; **provide greater access, information and choice** to consumers; and **improve the quality and safety of total healthcare**…
>
> Leaders of business and industry, health plans and government believe that **changing consumer health behaviors** is the key to taming cost growth. **Pharmacy benefit management and pharmacy services will have crucial roles to play in the coming years in this transformation of the healthcare environment.** At CVS Caremark, we look forward to working with you, the clinical community, and your plan participants and members to optimize the use of pharmaceuticals and healthcare services, thereby **improving outcomes** and maximizing the value of your healthcare investment.
>
> The means to reach such a goal are varied and not necessarily complex in concept. They include increasing consumers' disease awareness through health risk assessments, supporting early diagnosis and treatment, as well as the appropriate use of vaccines and immunizations, helping people avoid the emergency room, providing counseling and monitoring to avert adverse drug events, **and following the guidelines of evidence-based medicine – essentially doing what we know works.**
>
> Caremark is uniquely positioned to have a fundamental impact on the lives of those we serve by working to close the "gaps" and help the system and individuals do what works. We can accomplish this with a combination of world-class healthcare services integrated with industry leading pharmacy services and **consumer-focused health advocacy**.[163]

317.     In 2012, Caremark described itself as:

> **the largest pharmacy health care provider in the United States with integrated offerings across the entire spectrum of pharmacy care**. We are a pharmacy innovation company, **uniquely positioned to engage plan members in behaviors that improve their health** and to lower overall health care costs for health plans, plan sponsors and their members. CVS Caremark is a market leader in mail order pharmacy, retail pharmacy,

[163] CVS Caremark, *TrendsRx Report 2007*, 2 (Aug. 2007), https://www.caremark.com/portal/asset/TrendsRxReport_07.pdf

specialty pharmacy, and retail clinics, and is a leading provider of Medicare Part D Prescription Drug Plans. As one of the country's largest pharmacy benefits managers (PBMs), we provide access to a network of more than 65,000 pharmacies, including more than 7,300 CVS/pharmacy® stores that provide **unparalleled service and capabilities. Our clinical offerings include our signature Pharmacy Advisor™ program** as well as innovative generic step therapy and genetic benefit management programs that **promote** more cost effective and **healthier behaviors and improve health care outcomes**.[164]

318. Indeed, throughout the relevant period, CVS Caremark has consistently boasted of its unique ability to influence health outcomes. "With multiple communication channels and greater frequency of member contact than any health care provider, we believe CVS Caremark has a unique opportunity to improve pharmacy care and practice, **[and] support desired behaviors**…"[165]

319. In its 2010 Annual Report it proudly declared, "[w]ith capabilities across the entire spectrum of pharmacy care, **CVS Caremark can drive improved patient outcomes and lower overall health costs more effectively than anyone else in our industry**. More than a leading PBM and drugstore chain, our strengths extend to areas that include retail clinics, Medicare Part D, specialty pharmacy, and pharmacogenomics."[166] And, "[a]t CVS/Caremark, we **are dedicated to delivering the highest level of pharmacy care**. The **health and well-being of plan members is our top priority**."[167]

---

[164] CVS Health, *CVS Caremark Study Finds Integrated Pharmacy-Based Program Improved Diabetes Medication Initiation and Adherence Rates* (Jan. 9, 2012), https://cvshealth.com/newsroom/press-releases/cvs-caremark-study-finds-integrated-pharmacy-based-program-improved-diabetes

[165] CVS Caremark, *Evolving Pharmacy Care*, INSIGHTS (2010), https://www.caremark.com/portal/asset/CVSCaremark_Insights_2010.pdf at 26.

[166] CVS Caremark, *2010 Annual Report*, https://s2.q4cdn.com/447711729/files/doc_financials/annual/cvs-ar-2010.pdf at 11.

[167] CVS/Caremark, *Drug safety bulletin* (Oct. 24, 2014), https://www.caremark.com/portal/asset/WF_Drug_Safety_Info.pdf.

320.    According to the Drug Channels Institute, CVS Health (Caremark) was the highest-ranking PBM in 2017 with over twenty-five percent (25%) of the industry market share.[168] It currently covers more than 94 million lives.[169]

321.    At all times relevant hereto, CVS Health and Caremark offered pharmacy benefit management services nationwide and maintained a national formulary or formularies that are used nationwide, including in Texas.

322.    At all times relevant hereto, CVS Health, through Caremark, derives substantial revenue providing pharmacy benefits in Texas through several different means including, but not limited to, providing services and formulary to the Texas A&M Care Health Plans[170] and the Teacher Retirement System of Texas. At all times relevant hereto, Caremark has served as the PBM for the Texas Association of Counties Health and Employees Benefits Pool[171] and has reimbursed for opioids throughout Texas, including in Webb County.

323.    Caremark is one of the PBMs supporting the delivery of services to the Texas Medicaid program, and Texas Medicaid recipients, including in Webb County.

324.    Defendant, UNITEDHEALTH GROUP INCORPORATED ("UnitedHealth"), a Delaware corporation with its principal place of business located in Minnetonka, Minnesota, is a diversified managed health care company with two business platforms. UnitedHealth serves

---

[168] Fein, *supra* note 150.

[169] CVS Health, *CVS Health at a Glance*, https://cvshealth.com/about/facts-and-company-information (last visited on Aug. 23, 2018).

[170] Tamus, *PharmaCare is Now CVS Caremark,* THE TEXAS A&M UNIVERSITY SYSTEM (Jul 2, 2007), https://news.tamus.edu/pharmacare-is-now-cvs-caremark-caremark/

[171] *See* Texas Association of Counties, *TAC Health and Employee Benefits Pool, Prescription Benefits that Improve Outcomes and Control Your Costs,* https://www.county.org/pool-and-risk-services/group-health/prescription benefits/Pages/default.aspx

approximately 115 million individuals throughout the U.S. For 2016, UnitedHealth reported an operating income of $12.9 billion.

325.    Defendant, OPTUM, INC., is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. OPTUM, INC. is a health services company managing the subsidiaries that administer UnitedHealth's pharmacy benefits, including OPTUMRX, INC. OPTUM, INC. is a wholly-owned subsidiary of United HealthCare Services, Inc., which in turn is a wholly-owned subsidiary of UnitedHealth.

326.    Defendant, OptumRx, identified in the Pharmacy above, is also a PBM defendant. OptumRx operates as the PBM for UnitedHealth. OptumRx has been registered to do business in Texas since at least 2010.

327.    OptumRx describes its business as follows:

> OptumRx is a pharmacy care services company helping clients and more than 66 million members **achieve better health outcomes** and lower overall costs through innovative prescription drug benefits management services, including network claims processing, clinical programs, formulary management and specialty pharmacy care. Leveraging expertise, flexible technology and a network of over 67,000 community pharmacies and state-of-the-art home delivery pharmacies, **OptumRx is putting patients at the center of the pharmacy experience and making health care more connected and less fragmented - ensuring patients get the right medication at the right time at the best cost**. OptumRx is part of Optum, a leading information and technology-enabled health services business dedicated to making the health system work better for everyone…Optum delivers intelligent, integrated solutions that help to modernize the health system **and improve overall population health**. [172]

328.    Optum celebrates its commitment to "overall population health" and "healthy lifestyles." In a December 17, 2015 press release announcing the acquisition of ProHealth, OptumRx proudly declared:

---

[172] UnitedHealth Group, *OptumRx Opioid Risk Management Program Leads to Better Outcomes for Patients and Clients* (Aug. 22, 2017), https://www.unitedhealthgroup.com/newsroom/2017/0822opioidriskmanagement program html

Optum and ProHealth share a goal of **improving the quality and efficiency of health care in local communities**, ... Optum will help ProHealth build upon its success with clinical and administrative support, including access to advanced data, analytic and connectivity solutions that help care providers better collaborate, **coordinate care, and achieve the best possible outcomes. Optum also brings population health management expertise to support better outcomes and healthy lifestyles**….

Optum is a leading information and technology-enabled health services business **dedicated to helping make the health system work better for everyone**. Optum delivers intelligent, integrated solutions to modernize the health system and **improve overall population health**.[173]

329.    OptumRx has long recognized its critical role in addressing prescription drug abuse. After a December 8, 2011 multidisciplinary roundtable discussion on Capitol Hill to explore ways to fight the growing issue of prescription drug fraud, waste and abuse, OptumRx issued a press release that recognized its role in "reduc[ing] costs in our overburdened health care system while **simultaneously protecting the lives of Americans suffering the consequences of an epidemic touching every corner of our nation**." The press release continued, **"[p]harmacy benefit managers can – and do – play an important** role fighting prescription drug fraud, waste and abuse by creating their own programs and tools that can quickly identify irregularities and potential issues," said Joshua Stein of OptumRx.[174]

330.    At all times relevant hereto, OptumRx has derived substantial revenue providing pharmacy benefits in Texas through several different means, including, but not limited to, providing services and formulary through the HealthSelect Prescription Drug Program for the

---

[173] UnitedHealth Group, *ProHealth Physicians Joins Optum to Advance Patient Care in Connecticut* (Dec. 17, 2015), https://www.unitedhealthgroup.com/newsroom/2015/1217prohealthjoinsoptum.html (emphasis added)

[174] UnitedHealth Group, *Policy and Industry Experts Push for Coordinated Solutions to Reduce Prescription Drug Fraud, Waste and Abuse* (Dec. 8, 2011), https://www.unitedhealthgroup.com/newsroom/2011/1208drugfraud.html

Employee Retirement System of Texas[175] and, for at least the years 2015-17, the Public Employee Benefits Alliance (PEBA) of Texas.[176]

331.     OptumRx is one of the PBMs supporting the delivery of services to the Texas Medicaid program and Texas Medicaid recipients, including in Webb County.

332.     According to the Drug Channels Institute, OptumRx (UnitedHealth) was the third highest ranking PBM in 2017 with twenty-two (22%) of the industry market share.[177] Recent OptumRx publications indicate that it provides pharmacy services to 65 million Americans.[178]

## F.     DOE DEFENDANTS

333.     Doe DEFENDANTS 1 to 100 are sued herein under fictitious names because after diligent and good faith efforts their names, identities, and capacities, whether individual, corporate, associate, or otherwise, are presently unknown to Plaintiff. Plaintiff will make the names or identities of said Defendants known to the Court after the information has been ascertained, and all relevant ARCOS data has been produced. Plaintiff is informed and believes, and based thereupon alleges, that each of the Defendants designated herein as a DOE DEFENDANT has taken part in and participated with, and/or aided and abetted, some or all of the other Defendants in some or all of the matters referred to herein and Plaintiff is informed and believes, and on such information and belief alleges, that each of the Defendants named as a DOE is responsible in some manner for the events and occurrences alleged in this Complaint and is liable for the relief sought herein.

---

[175] *See* https://www.ers.texas.gov/

[176]     *See* Public Employee Benefits Alliance, brochure for 2015 Benefit Purchasing Year, http://www.buypeba.org/documents/PEBABrochure.pdf; Public Employee Benefits Alliance, Alliance Alert, http://buypeba.org/documents/AAPBM.pdf

[177] Fein, *supra* note 150.

[178]     OptumRx, *OptumRx: Driving Smarter Health Care Connections,* https://www.optum.com/content/dam/optum/resources/brochures/Rx/OptumRxFact Sheet_Final.pdf

# IV. FACTUAL ALLEGATIONS

## A. BACKGROUND ON PRESCRIPTION OPIOIDS

334.    The term opioid includes (a) all drugs derived in whole or in part from the morphine-containing opium poppy plant such as morphine, laudanum, codeine, thebaine, hydrocodone oxycodone and oxymorphone, and (b) synthetic opioids like fentanyl or methadone.[179]

335.    Prior to the 1990's, doctors used opioid pain relievers sparingly, and only in the short term, for cases of acute injury or illness, during surgery or end-of-life ("palliative") care.[180] Doctors' reluctance to use opioids for an extended period of time was due to the legitimate fear of causing addiction.[181]

336.    Beginning in the late 20th century, however, and continuing through today, the pharmaceutical industry acted to dramatically expand the marketplace for opioids. As set forth below, pharmaceutical actors facilitated this expansion in three ways. *First*, opioid manufacturers engaged in a purposeful misinformation campaign which altered public perception of opioids, and deceived doctors, federal regulators, and the general public about their addictive qualities and efficacy for treatment of chronic pain outside of active cancer or palliative and end-of-life care. *Second*, opioid manufacturers, wholesalers/distributors and pharmacies (including retail and PBM mail-order) flouted their federally imposed requirements to report suspicious opioid orders to the DEA and state agencies. These facilitated an explosion in the illegitimate marketplace for

---

[179] 21 U.S.C. § 812 Schedule II (2012).

[180] Marcia L. Meldrum, *Opioids and Pain Relief: A Historical Perspective,* Vol. 25 PROGRESS IN PAIN RESEARCH AND MANAGEMENT (2003).

[181] *Id.*

prescription opioids. *Third*, PBMs ensured that opioids were widely available and reimbursable (often more so than less addictive alternatives).

337.     As a result of Defendants' wrongful conduct, the number of prescriptions for opioids increased sharply, reaching nearly 250 million prescriptions in 2013, almost enough for every person in the U.S. to have a bottle of pills. This represents an increase of three hundred percent (300%) since 1999.

**B.     THE CDC GUIDELINE OF 2016**

**i.     The CDC Guideline Sets Forth Evidence-Based Recommendations on Opioid Prescribing**

338.     On March 18, 2016, The Centers for Disease Control issued its Guideline for the Treatment of Chronic Pain.[182]

339.     The CDC Guideline provides that:

> *Nonpharmacologic therapy and nonopioid pharmacologic therapy are preferred for chronic pain.* Clinicians should consider opioid therapy only if expected benefits for both pain and function are anticipated to outweigh risks to the patient. If opioids are used, they should be combined with nonpharmacologic therapy and nonopioid pharmacologic therapy, as appropriate….
>
> *Several nonopioid pharmacologic therapies (including acetaminophen, NSAIDs, and selected antidepressants and anticonvulsants) are effective for chronic pain.* In particular, acetaminophen and NSAIDs can be useful for arthritis and low back pain….
>
> Nonopioid pharmacologic therapies are not generally associated with substance use disorder, *and the numbers of fatal overdoses associated with nonopioid medications are a fraction of those associated with opioid medications*….
>
> *Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy* []. *While benefits for pain relief, function, and quality of life*

---

[182] U.S. Centers for Disease Control and Prevention, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 MORBIDITY AND MORTALITY WEEKLY REPORT 1 (2016) ("CDC Guideline").

*with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant….*

The clinical evidence review found insufficient evidence to determine long-term benefits of opioid therapy for chronic pain and found an increased risk for serious harms related to long-term opioid therapy that appears to be dose-dependent.[183]

340. For the treatment of acute pain, the CDC Guideline states that:

Acute pain can often be managed without opioids….[w]hen opioids are used for acute pain, clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain severe enough to require opioids. *Three days or less will often be sufficient; more than seven days will rarely be needed….*[184]

341. The CDC Guideline further recommends that when opioids are used outside of active cancer, palliative and end-of-life care, patients should receive the lowest effective dosage and that "holding dosages <50 MME/day would likely reduce risk among a large proportion of patients who would experience fatal overdose at higher prescribed dosages."[185]

342. The CDC Guideline advises that increasing dosages to ≥ 90 MME/day "should [be] avoid[ed]."[186]

343. Additionally, the CDC Guideline emphasizes the importance of making certain harm-reducing pharmacologic treatments available alongside behavioral therapy to address overdose and addiction. Specifically, the CDC Guideline instructs clinicians to offer naloxone, an opioid antagonist used to quickly reverse severe respiratory depression, when risk factors for

---

[183] *Id.*

[184] *Id.*

[185] *Id.*

[186] *Id.*

opioid overdose are present, including when patients are prescribed dosages of opioids ≥ 50 MME/day.[187]

344. The CDC Guideline further directs clinicians to "offer or arrange evidence-based treatment (usually medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for patients with opioid use disorder."[188] Buprenorphine and methadone "have been found to increase retention in treatment and to decrease illicit opioid use among patients with opioid use disorder involving heroin."[189] And, buprenorphine has been found to prevent relapse in patients with prescription opioid addiction. "Oral or long-acting injectable naltrexone, a long-acting opioid antagonist, can also be used in non-pregnant adults."[190]

345. The CDC also issued supporting materials that briefly reiterate its primary recommendations and emphasize certain key points.[191] All of this reflected the fact that, as

---

[187] *Id.* at 16, 28-29.

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] For example, a two-page prescription opioid fact sheet states expressly that "opioids are not first-line or routine therapy for chronic pain…." *See* CDC, *Guideline for Prescribing Opioids for Chronic Pain,* https://www.cdc.gov/drugoverdose/pdf/ Guidelines_ Factsheet-a.pdf ("CDC Fact Sheet") at 1. (emphasis added). It also states that: "[w]hen opioids are needed for acute pain, prescribe no more than needed" and "[w]hen opioids are used for acute pain….[t]hree days or less will often be sufficient; more than seven days will rarely be needed." *Id.* at 2 (emphasis added). It reaffirms that clinicians should avoid increasing dosage beyond 50 MME/day. *Id.*

Similarly, a four-page summary document, again makes clear: "[n]onopioid therapy is preferred for chronic pain outside of active cancer, palliative, and end-of-life care." *CDC Guideline for Prescribing Opioids for Chronic Pain,* https://www.cdc.gov/drugoverdose/pdf/guidelines_at-a-glance.pdf ("CDC Guideline Summary") at 2. "OPIOIDS ARE NOT FIRST-LINE THERAPY…. Nonpharmacologic therapies and nonopioid medications include: nonopioid medications such as acetaminophen, ibuprofen, or certain medications that are also used for depression or seizures." *Id.* at 3. The CDC Guideline Summary also underscores that the CDC's objective is "Promoting Patient Care and Safety." *Id.* at 1. It highlights on page 1 that:

> [m]any Americans suffer from chronic pain. These patients deserve safe and effective pain management. Prescription opioids can help manage some types of pain in the short term. However, we don't have enough information about the benefits of opioids long term, and we know that there are serious risks of opioid use disorder and overdose—particularly with high dosages and long-term use.

defendants have known all along, there is simply no evidence that long-term opioid use is an effective treatment for chronic pain.

> The few randomized trials to evaluate opioid efficacy for longer than 6 weeks had consistently poor results. In fact, several studies have showed that use of opioids for chronic pain may actually worsen pain and functioning, possibly by potentiating pain perception….
>
> Whereas the benefits of opioids for chronic pain remain uncertain, the risks of addiction and overdose are clear. Although partial antagonists such as buprenorphine may carry a lower risk of dependence, prescriptions opioids that are full mu-opioid receptor agonists – nearly all the products on the market – are no less addictive than heroin. Although abuse-deterrent formulations may reduce the likelihood that patients will inject melted pills, these formulations are no less addictive and do not prevent opioid abuse or fatal overdose through oral intake….
>
> The prevalence of opioid dependence may be as high as 26% among patients in primary care receiving opioids for chronic non-cancer-related pain.[192]

## C. IMPACT ON TEXAS AND WEBB COUNTY

346. While the Defendants have profited from the alarming rate of opioids used in the U.S., communities across the country, especially those in lower-income areas, have suffered. According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that prescription opioid use contributed to 16,651 overdose deaths nationally in 2010; 16,917 in 2011; and 16,007 in 2012. Based on the latest data, nearly two million Americans met criteria for prescription opioid abuse and dependence in 2013.[193] Aggregate costs for prescription opioid overdose, abuse, and dependence were estimated at over $78.5 billion (in 2013 dollars).[194]

---

[192] Thomas R. Frieden, M.D., M.P.H. & Debra Houry, M.D., M.P.H., *Reducing the Risks of Relief – the CDC Opioid-Prescribing Guideline*, 374 The New England Journal of Medicine 16 (2016) at 1501-02 (emphases added).

[193] Wolters Kluwer Health, *Cost of US prescription opioid epidemic estimated at $78.5 billion*, SCIENCE DAILY (Sept. 14, 2016), https://www.sciencedaily.com/releases/2016/09/160914105756.htm

[194] *Id.*

347. While Defendants were reaping billions of dollars in profits from their wrongful conduct, Plaintiff has incurred and continues to incur substantial socio-economic harm. The harm includes, but is not limited to, the costs of increased county services with respect to law enforcement, first responders such as emergency medical services, county health facilities including hospitals and clinics, detention centers and jails, county courts, drug courts, diversion programs, educational programs, foster care, prevention and treatment centers, community outreach programs, equipment and supplies, victim services supports, inmate services including housing, health and support staff, intervention programs together with general societal costs, costs to repair and restore County infrastructure and services, and lost productivity costs.

348. Webb County has had to allocate substantial additional resources through staffing at departments providing all of the services listed above; has incurred substantial increases in overtime; has had to re-allocate personnel to Regional Task Forces, provide additional Mutual Aid (law enforcement assistance to other agencies), training (of staff and Community Partners such as schools, youth groups, private security), and wide-reaching court/judicial-support services.

349. According to the CDC, in Texas there were 2,831 drug overdose deaths in 2016, with opioids being the main driver, a seven percent (7%) percent increase over drug overdose deaths in 2015.[195]

350. The CDC reports that Webb County mortality rates doubled in the ten (10) year period between 2007 and 2016. These drug-related deaths grew steadily from 4-5.9 in 2007 to 10-

---

[195] CDC, *CDC Drug Overdose Data*, https://www.cdc.gov/drugoverdose/data/statedeaths.html (last visited Feb. 15, 2019).

11.9 in 2016, a 50% increase. During the same period the population grew from 234,594 in 2007 to 271,193 in 2016, a mere fifteen percent (15%) increase.[196]

351.    Although these numbers are staggering, they do not fully describe the extent of the impact that the opioid epidemic has had in Texas. Experts say the Texas data is dangerously misleading. "Unfortunately, that [appearance] is a direct result of bad data collection," said Mark Kinzly, co-founder of the Texas Overdose Naloxone Initiative. "Out of 254 counties in the state of Texas, the CDC will only report on nine of those counties because of how the data is reported."[197]

352.    As Operation Naloxone director Lucas Hill explains, "there is a grave underreporting of opioid overdoses in rural areas, because they believe justices of the peace are unable to differentiate between causes of respiratory failure."[198]

353.    Texas underreporting of opioid related deaths is confirmed by the University of Texas at Austin. "The rates per 100,000 for Texas counties vary. Only 9 counties had reliable overdose death rates per 100,000 for opiates according to 2014 data from CDC, but they provide evidence of the extent of the opiate overdose problem in the largest Texas counties."[199]

354.    There are several factors that point to the severity of the opioid crisis in Texas. Texas has four out of the top five cities for prescription painkiller abuse in the nation, and the state

---

[196] CDC, *Drug Poisoning Mortality Rates in the United States, 1999-2016* (Jan. 11, 2018), https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality/

[197] Chase Karacostas*, Scale of opioid epidemic in Texas likely obscured by bad data, experts say,* THE DAILY TEXAN (Nov. 17, 2017), http://www.dailytexanonline.com/2017/11/17/scale-of-opioid-epidemic-in-texas-likely-obscured-by-bad-data-experts-say

[198] *Id.*

[199] Prof. Jane C. Maxwell, Ph.D., *Brief Report on the Current Epidemic of Drug Poisoning Death*s, THE UNIVERSITY OF TEXAS AT AUSTIN SCHOOL OF SOCIAL WORK, https://socialwork.utexas.edu/dl/files/cswr/institutes/ari/pdf/opioid-overdose-2014.pdf (last visited Mar. 15, 2019).

is second in the U.S. in terms of health care costs associated with opioid abuse. In sum, the scale of the opioid epidemic in Texas is likely obscured by incomplete public data. [200]

355.    Researchers have flagged opioids as one possible factor in Texas' staggering rise in women's deaths during and shortly after pregnancy.[201] "The state has the country's highest rate of maternal mortality, which includes deaths during pregnancy and childbirth and in the year following delivery. Maternal mortality nearly doubled between 2010 and 2014, and the latest data show the leading cause is a drug overdose. Additionally, the number of neonatal abstinence syndrome cases, in which babies are born dependent on a drug, has continued to rise."[202]

356.    The State's Maternal Mortality and Morbidity Task Force has been conducting an in-depth investigation into the death records of women to try to understand the state's high maternal death rate. The Task Force's latest report, released on September 29, 2017, revealed new data showing that drug overdose was the leading cause of pregnancy-associated deaths (women who die two months to one year after giving birth) between 2012 and 2015.[203]

357.    Four of the country's 25 worst cities for opioid abuse rates are in Texas: Texarkana (#10), Amarillo (#13), Odessa (#15), and Longview (#17). Again, this leads researchers such as Robin Ross to conclude "[i]t is important to note that the state does not currently have reliable data that tracks the number of people who die year-to-year because of a drug overdose in general,

---

[200] Karacostas, *supra* note 197.

[201] Jim Malewitz, *Amid opioid investigation, Texas and other states demand drug company documents*, THE TEXAS TRIBUNE (Sept. 19, 2017), https://www.texastribune.org/2017/09/19/amid-opioid-investigation-texas-and-other-states-demand-drug-company-d/

[202] Robyn Ross, *How Texas Is Trying to Stay Ahead of the Opioid Epidemic*, ALCADE (Jan. 1, 2018), http://alcalde.texasexes.org/2018/01/how-texas-is-trying-to-stay-ahead-of-the-opioid-epidemic/

[203] Center for Public Policy Priorities, *Measuring and Responding to the Texas Opioid Crisis*, CPPP BLOG, http://bettertexasblog.org/2017/11/measuring-and-responding-to-the-texas-opioid-crisis/ (last visited Mar. 15, 2019).

largely due to an inconsistent system of investigating and reporting causes of death. It is very likely the number of overdose deaths in the state is underreported."[204]

358.   To experts like Lisa Ramirez, the Texas Targeted Opioid Response project director for the Health and Human Services Commission, these numbers suggest an under-the-radar opioid problem the state would do well to recognize. "'The misconception that Texas does not have an opioid problem is dangerous and a myth we need to address,' Ramirez says. 'If we're not prepared, the problem will definitely get worse in Texas.'"[205]

359.   "In Texas, there is no reliable data of how many people die year-to-year because of drug overdoses in general. That's largely because the state has a hodge-podge system about how deaths are investigated and reported."[206]

360.   In all events, retail drug summary reports publicly available through the DEA's ARCOS confirm that the south-central region of Texas including Webb County is experiencing the same startling trend of soaring opioid use as is seen nationwide. The ARCOS Data table below reflects transactional data for selected opioid drugs submitted by the drug manufacturers and distributors doing business in the Texas region including Webb County. The volume of selected opioid drugs distributed in the Texas region, including Webb County, between 2006 and 2016 reflects a one hundred twenty-six percent (126%) increase, dramatically outpacing the population growth for the same period, which according to U.S. Census estimates amounted to only a twenty percent (20%) increase.[207]

---

[204] *Id.*

[205] Ross, *supra* note 202.

[206] Ashley Lopez, *Opioid Crisis Is Killing Texas Mother, Task Force Finds,* KUT 90.5 (Sept. 29, 2017), http://kut.org/post/opioid-crisis-killing-texas-mothers-task-force-finds

[207] The ARCOS public transactional data reflected in this chart includes the following drugs categorized as opioids: codeine, buprenorphine, dihydrocodeine, oxycodone, hydromorphone, hydrocodone, levorphanol, meperidine



**Webb County Region Annual Opioid Use Derived From ARCOS Data**

**D.    PARTICULARS REGARDING EACH DEFENDANT GROUP'S ROLE IN THE OPIOID EPIDEMIC**

    **i.    Manufacturer Defendants' Campaign of Deception**

        **a.    Manufacturer Defendants' Campaign to Normalize Widespread Opioid Use**

361.    Unsatisfied with the market for opioid use in the context of acute and palliative care, during the 1980s and 1990s, Manufacturer Defendants introduced new opioid drugs and began promoting their use for chronic pain therapy in an effort to increase the number of people taking opioids.

---

(pethidine), methadone, morphine, opium (powdered), oxymorphone, alfentanil, remifentanil, sufentanil base, tapentadol, and fentanyl base.

362.     Those new drugs included, but were not limited to Purdue's MS Contin (introduced 1987) and OxyContin (1995); Janssen's Duragesic (1990), Nucynta (2008), and Nucynta ER (2011); Cephalon's Actiq (1998) and Fentora (2006); Endo's Opana and Opana ER (2006); and Insys' Subsys (2012).

363.     Recognizing the enormous financial possibilities associated with expanding the opioid market, the Manufacturer Defendants rolled out a massive and concerted campaign to misrepresent the addictive qualities of their product, and to push opioids as safe, effective drugs for the treatment of chronic pain associated with conditions such bad backs, arthritis, headaches and the like.

364.     In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or minimize the risks of opioids while overstating the benefit of using them for chronic pain. As just one example, on information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

365.     Further, each Defendant promoted the use of opioids for chronic pain through sales representatives who visited individual doctors and medical staff in their offices and small group speaker programs. Defendants devoted massive resources to direct such sales contacts with doctors. In 2014 alone, Defendants spent $168 million on detailing branded opioids to doctors, including $108 million by Purdue, $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Allergan. These amount to twice as much as Defendants spent on detailing in 2000. Other manufacturers who also promoted their opioid sales by making payments to doctors and teaching hospitals include Rhodes, Abbott, Insys, Mallinckrodt, Mylan, and Amneal.

366.    The deceptive marketing schemes included, among others, (a) the hiring of certain physicians, "hired guns," to pollute the marketplace with false information regarding the efficacy and risks of opioids for chronic pain treatment; (b) false or misleading materials, speaker programs, webinars, and brochures by purportedly neutral third parties that were really designed and distributed by the Manufacturer Defendants; (c) false or misleading direct, branded advertisements and marketing materials; and (d) the misuse of treatment guidelines.

367.    Manufacturer Defendants' misinformation campaign worked as intended. Across the country, demand for prescription opioids exploded including in Webb County. Doctors and medical professionals, swayed by Manufacturer Defendants' sophisticated propaganda machine, began prescribing prescription opioids for ailments ranging from headaches to neck pain to fibromyalgia. That unleashed a wave of addiction – just as defendant knew and intended – increasing the demand for opioids yet further. Manufacturer Defendant profits soared.

### b.    The Manufacturer Defendants' Hired Guns

### (1)    Dr. Portenoy and Webster

368.    Manufacturer Defendants' campaign of deception regarding the addictive nature of opioids was rooted in two pieces of purportedly "scientific" evidence. The first piece of evidence was a five-sentence letter to the editor published in 1980 in the New England Journal of Medicine. The letter was drafted by Hershel Jick, a doctor at Boston University Medical Center, with the help of a graduate student, Jane Porter. It noted, anecdotally, that a review of "current files" did not indicate high levels of addiction among hospitalized medical patients who received narcotic preparation treatment. In full, the letter reads:

> Recently, we examined our current files to determine the incidence of narcotic addiction in 39,946 hospitalized medical patients who were monitored consecutively. Although there were 11,882 patients who received at least one narcotic preparation, there were only four cases of reasonably well-documented addiction in patients who had no history of

addiction. The addiction was considered major in only one instance. The drugs implicated were meperidine in two patients, Percodan in one, and hydromorphone in one. We conclude that despite widespread use of narcotic drugs in hospitals, the development of addiction is rare in medical patients with no history of addiction.[208]

369.     The second major piece of "evidence" used by Manufacturer Defendants was a 1986 study by Dr. Russell Portenoy in the medical journal *Pain*. The study, which had a patient cohort of merely 38 patients, claimed that opioids could be used for long periods of time to treat non-cancer related chronic pain without any risk of addiction. The rationale behind the study was that patients in pain would not become addicted to opioids because their pain drowned out the euphoria associated with opioids. As such, the study concluded that opioids should be freely administered to patients with fibromyalgia, headaches, finicky backs, and a host of other issues. According to Portenoy and his co-author, Dr. Kathleen Foley, "opioid maintenance therapy can be a safe, salutary and more humane alternative … in those patients with intractable non-malignant pain and no history of drug abuse."[209] Portenoy's study also cited Jick's one-paragraph letter to the New England Journal of Medicine.

370.     Dr. Portenoy's study dovetailed perfectly with Manufacturer Defendants' marketing strategy and, within a decade, Dr. Portenoy was financed by "at least a dozen companies, most of which produced prescription opioids."[210]

371.     Dr. Portenoy went on to serve as one of the pharmaceutical industry's most vocal advocates, regularly appearing at conferences and gatherings of medical professionals to promote the use of opioids for chronic, long-term pain.

---

[208] *Addiction rare in patients treated with narcotics*, 302(2) NEW ENG. J. MED. 123 (Jan. 10, 1980).

[209] Portenoy RK, Foley KM, *Chronic use of opioid analgesics in non-malignant pain: report of 38 cases*, 25 PAIN 171 (1986).

[210] Barry Meier, *Pain Killer: A Wonder Drug's Trail of Addiction and Death* (St. Martin's Press 2003).

372. The Manufacturer Defendants disseminated fraudulent and misleading messages to reverse the popular and medical understanding of opioids and risks of opioid use. They disseminated these messages directly, through their sales representatives, in speaker groups led by physicians the Manufacturer Defendants recruited for their support of their marketing messages, through unbranded marketing and through industry-funded front groups.

373. These statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from the FDA and CDC based on that same evidence.

374. Hired guns like Dr. Portenoy promoted opioid analgesics and the myth that opioids could be liberally prescribed for non-cancer related chronic pain, without any risk of addiction.

375. Others like Dr. Portenoy would speak at academic conferences to primary care physicians in an effort to destigmatize opioids and encouraged liberal prescription of narcotics for the treatment non-cancer related chronic pain. They claimed that opioid analgesics have no "ceiling dosage" in that prescribing physicians should increase dosages for patients as high as necessary to treat non-cancer related chronic pain. Invariably, the key piece of "data" cited in support of the proposition that opioids could be safely used to treat chronic pain was the New England Journal of Medicine article.

376. Defendants also paid Dr. Lynn Webster, the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah, to promote opioids. Dr. Webster was President of the American Academy of Pain Medicine ("AAPM") in 2013. He is a Senior Editor of *Pain Medicine*, the same journal that published Endo special advertising supplements touting Opana ER. Dr. Webster was the author of numerous continuing medical education programs ("CMEs") sponsored by Cephalon, Endo and Purdue. At the same

time, Dr. Webster was receiving significant funding from the Manufacturer Defendants (including nearly $2 million from Cephalon).

377. In the years that have followed, both the New England Journal of Medicine letter and Dr. Portenoy's 1986 study have been expressly disavowed. Neither actually demonstrates that opioids can be safely prescribed for long-term, chronic pain.

378. In a taped interview in 2011, Dr. Portenoy admitted that the information Manufacturer Defendants were pushing was false. "I gave innumerable lectures in the late 1980s and '90s about addiction that weren't true," Dr. Portenoy told a fellow doctor in 2010. "It was the wrong thing to do."[211]

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite. I would cite 6 to 7 maybe 10 different avenues of thought or evidence, **none of which represents real evidence**. And yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in total and feel more comfortable about opioids in a way they hadn't before … Because the primary goal was to de-stigmatize, **we often left evidence behind**."

> **It was clearly the wrong thing to do** and to the extent that some of the adverse outcomes now are as bad as they have become in terms of endemic occurrences of addiction and unintentional overdose death, it's quite scary to think about how the growth in that prescribing driven by people like me led, in part, to that occurring.[212]

379. As to the New England Journal of Medicine letter, Dr. Jick, in an interview with Sam Quinones decades after the letter was published, stated: "[t]hat particular letter, for me, is very near the bottom of a long list of studies that I've done. It's useful as it stands because there's

---

[211] Thomas Catan and Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, THE WALL STREET JOURNAL (Dec. 17, 2012), https://www.wsj.com/articles/SB10001424127887324478304578173342657044604

[212] Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT rare,* YOUTUBE (OCT. 30, 2011), https://www.youtube.com/watch?v=DgyuBWN9D4w (Live interview with Dr. Russell Portenoy) (emphases added).

nothing else like it on hospitalized patients. But if you read it carefully, it does not speak to the level of addiction in outpatients who take these drugs for chronic pain."[213]

380. The New England Journal of Medicine itself has since disavowed the letter, stating "[the letter] was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy."[214] "We believe," the journal provided, "that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy."[215]

### (2) Defendant-Funded Organizations

381. Manufacturer Defendants also funded multiple organizations to advocate for the use of opioids to treat chronic pain. The names of the organizations suggest neutrality, but they were anything but. They included the American Pain Foundation ("APF"); the American Academy of Pain Management (which received funding from Manufacturer Defendants Endo, Janssens, and Purdue); the American Pain Society ("APS"), the American Geriatrics Society ("AGS"), and the Pain Care Forum ("PCF").

### (A) The American Pain Foundation

382. The most prominent nonparty advocate for opioids, funded by Defendants, was the American Pain Foundation ("APF"). APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo alone provided more than half that funding; Purdue was next, at $1.7 million.

---

[213] Harrison Jacobs, *This one-paragraph letter may have launched the opioid epidemic*, BUSINESS INSIDER (Mar. 26, 2016), http://www.businessinsider.com/porter-and-jick-letter-launched-the-opioid-epidemic-2016-5

[214] 376 New Eng. J. Med. 2194, 2194–95 (2017).

[215] *Id.*

383.     APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television, and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Texas consumers, physicians, patients, and third-party payers.

384.     Dr. Perry Fine (an opioid advocate from the University of Utah who received funding from Janssen, Cephalon, Endo, and Purdue), Dr. Portenoy, and Dr. Scott Fishman (an advocate the University of California who authored *Responsible Opioid Prescribing*, a publication sponsored by Cephalon and Purdue), all served on APF's board and reviewed its publications. Another board member, Lisa Weiss, was an employee of a public relations firm that worked for both Purdue and APF.

385.     In 2009 and 2010, more than eighty percent (80%) of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.

386.     APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. It was often called upon to provide "patient representatives" for Defendants' promotional activities, including for Purdue's "Partners Against

Pain" and Janssen's "Let's Talk Pain." But in reality, APF functioned as an advocate for the interests of Defendants, not patients. Indeed, as early as 2011, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

387.    APF caught the attention of the U.S. Senate Finance Committee in May 2012 as the Committee sought to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation raised red flags as to APF's credibility as an objective and neutral third party; Defendants stopped funding it. Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."[216]

### (B)    The American Academy of Pain Medicine

388.    The American Academy of Pain Medicine ("AAPM"), with the assistance, prompting, involvement, and funding of Defendants, issued treatment guidelines and sponsored and hosted CME programs for doctors essential to Defendants' deceptive marketing of chronic opioid therapy.

389.    AAPM has received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate in activities and conferences. Defendants Endo, Purdue, Cephalon, and Actavis were members of the council.

390.    AAPM was viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its corporate

---

[216] Charles Ornstein and Tracy Weber, *Senate Panel Investigates Drug Companies' Ties to Pain Groups*, WASH. POST ( May 8, 2012), https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-pain-groups/2012/05/08/gIQA2X4qBU_story.html

events, and distributed its publications. The conferences sponsored by AAPM promoted opioids – 37 out of roughly 40 sessions at one conference alone were opioid-focused.

391.    AAPM's presidents have included the same opioid advocates mentioned above, *i.e.* Drs. Fine, Portenoy, Webster and Fishman. Dr. Fishman, a past AAPM president, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are ... small and can be managed."[217] Past AAPM president, Dr. Perry Fine of Utah, has admitted to serving on the advisory boards of Actavis and Purdue and to serving as a paid consultant to Janssen and Mylan. 82 Dr. Webster admits that he has served on an advisory board for Mallinckrodt.

392.    AAPM's staff understood that they and their industry funders were engaged in a common task. Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid advocates within the organization.

### (C)    The Pain Care Forum

393.    On information and belief, Defendants also combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project with the stated goals of offering "a setting where multiple organizations can share information" and "promote and support taking collaborative action regarding federal pain policy issues." APF President Will Rowe described the forum as "a deliberate effort to positively merge the capacities of industry, professional associations, and patient organizations."

394.    PCF is comprised of representatives from opioid manufacturers and distributors (including Cephalon, Endo, Janssen, and Purdue); doctors and nurses in the field of pain care; professional organizations (including AAPM, APS, and American Society of Pain Educators);

---

[217] Paula Moyer, *The Current State of Pain Management: An Expert Interview with Scott M. Fishman, M.D.*, [Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis], MEDSCAPE (2005), http://www.medscape.org/viewarticle/500829

patient advocacy groups (including APF and the American Chronic Pain Association); and other like-minded organizations, almost all of which received substantial funding from Defendants.

395. PCF, for example, developed and disseminated "consensus recommendations" for a Risk Evaluation and Mitigation Strategy ("REMS") for long-acting opioids that the FDA mandated in 2009 to communicate the risks of opioids to prescribers and patients. This was critical because a REMS that went too far in narrowing the uses or benefits or highlighting the risks of chronic opioid therapy would undermine Defendants' marketing efforts. On information and belief, the recommendations claimed that opioids were "essential" to the management of pain, and that the REMS "should acknowledge the importance of opioids in the management of pain and should not introduce new barriers." Defendants worked with PCF members to limit the reach and manage the message of the REMS, which enabled them to maintain, not undermine, their deceptive marketing of opioids for chronic pain.

396. All of these purportedly neutral, industry-funded organizations took aggressive stances to convince doctors and medical professionals that America was suffering from an epidemic of untreated pain – and that opioids were the solution. Their efforts were successful nationwide, including in Webb County.

### c. The Manufacturers' False and Misleading Direct Advertising and Marketing of Opioids

397. The Manufacturer Defendants have intentionally made false and misleading statements regarding opioids in their advertising and marketing materials disseminated nationwide, including in Webb County. They have, among other things, (1) downplayed the serious risk of addiction; (2) created and promoted the imaginary concept of "pseudoaddiction", advocating that when signs of actual addiction begin to appear, the patient should be treated with more opioids; (3) exaggerated the effectiveness of screening tools to prevent addiction; (4) claimed

that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher dosages; (6) described their opioid products as "steady state" – falsely implying that these products are less likely to produce the high and lows that fuel addiction – or as less likely to be abused or result in addiction; (7) touted the effectiveness of screening or monitoring patients as a strategy for managing opioid abuse and addiction; (8) stated that patients would not experience withdrawal if they stopped using their opioid products; (9) stated that their opioid products are effective for chronic pain without disclosing the lack of evidence for the effectiveness of long-term opioid use; and (10) stated that abuse-deterrent formulations are tamper- or crush-resistant and harder to abuse or misuse.

398.    The Manufacturer Defendants have also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Manufacturer Defendants' claims.

399.    Manufacturer Defendants engaged in deceptive direct-to-physician marketing, promoting the use of opioids for chronic pain through controlled and trained sales representatives who visited individual doctors and medical staff in their offices and small group speaker programs.

400.    On information and belief, throughout the relevant time period these sales representatives have spread (and may continue to spread) misinformation regarding the risks and benefits of opioids to hundreds of thousands of doctors.

401.    Actavis was notified by the FDA in 2010 that certain brochures were "false or misleading because they omit and minimize the serious risks associated with the drug, broaden and fail to present the limitations to the approved indication of the drug, and present unsubstantiated superiority and effectiveness claims." The FDA also found that "[t]hese violations

are a concern from a public health perspective because they suggest that the product is safer and more effective than has been demonstrated."[218]

402.    Through these means, and likely others still concealed, the Manufacturer Defendants collaborated to spread deceptive messages about the risks and benefits of long-term high-dose opioid use in patient education brochures and pamphlets, websites, ads and other marketing materials

403.    For example:

(a)    Actavis's predecessor caused a patient education brochure, Managing Chronic Back Pain, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009 and beyond.

(b)    Documents from a 2010 sales training indicate that Actavis trained its sales force that individualization of opioid therapy depended on increasing doses until patient reports adequate analgesia and to set dose levels on the basis of patient need, not on a predetermined maximal dose. Actavis further counseled its sales representatives that the reasons some physicians had for not increasing doses indefinitely were simply a matter of physician comfort level, which could be overcome or used as a tool to induce them to switch to Actavis's opioid, Kadian.

(c)    Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which suggests that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative prescriptions, or theft. This publication is available today.[219]

(d)    Cephalon sponsored a CME written by KOL Dr. Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, which was offered online by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids that include aspirin and acetaminophen are less effective to treat breakthrough pain because of dose limitations.

(e)    Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become

---

[218] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf

[219] *See* https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf

addicted." Upon information and belief, another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

(f)     Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem."

(g)     Endo sponsored a website, painknowledge.com, through APF and NIPC, which claimed in 2009 that opioids may be increased until you are on the right dose of medication for your pain, and once that occurs, further dose increases would not occur. Endo funded the site, which was a part of Endo's marketing plan, and tracked visitors to it.

(h)     Endo distributed a patient education pamphlet edited by KOL Dr. Russell Portenoy titled *Understanding your Pain: Taking Oral Opioid Analgesics.* In Q&A format, it asked: If I take the opioid now, will it work later when I really need it? The response was: The dose can be increased. You won't 'run out' of pain relief.

(i)     Janssen reviewed and distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

(j)     Janssen currently runs a website, *Prescriberesponsibly.com* (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated."[220]

(k)     Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]." This publication is still available online.[221]

(l)     Consistent with the Manufacture Defendants' published marketing materials, upon information and belief, detailers for the Manufacturer Defendants in Texas have minimized or omitted and continue to minimize or omit any discussion with doctors or their medical staff in Texas about the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

(m)     Endo, on information and belief, has distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients

---

[220] *See* http://www.prescriberesponsibly.com/articles/opioid-pain-management

[221] *See* http://s3.documentcloud.org/documents/277603/apf-policymakers- guide.pdf

with physically demanding jobs like construction worker and chef, misleadingly implying that the drug would provide long-term pain-relief and functional improvement

(n)     On information and belief, Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

(o)     The New York Attorney General ("NY AG") found in its settlement with Purdue that through March 2015, the Purdue website *In the Face of Pain* failed to disclose that doctors who provided testimonials on the site were paid by Purdue,[222] and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.[223]

404.     The Manufacturer Defendants falsely instructed doctors and patients that the signs of addiction should not be seen as warnings but are actually signs of undertreated pain and should be treated by prescribing more opioids. The Manufacturer Defendants called this phenomenon "pseudoaddiction" and falsely claimed that pseudoaddiction is substantiated by scientific evidence. Dr. Webster was a leading proponent of this notion, stating that the only way to differentiate the two was to increase a patient's dose of opioids.[224]

405.     Other examples of the Manufacturer Defendant's advocacy for the fictional concept of "pseudoaddiction" include, but are not limited to:

---

[222] *See New York State Office of the Attorney General, A.G. Schneiderman Announces Settlement with Purdue Pharma That Ensures Responsible and Transparent Marketing Of Prescription Opioid Drugs By The Manufacturer* (August 20, 2015), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-purdue-pharma-ensures-responsible-and-transparent (last visited December 20, 2017)

[223] The New York Attorney General, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the New York Attorney General found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that…opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Upon information and belief, Endo continues to make these false statements elsewhere.

[224] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain*, MEDGENMED (2007).

(a)     Documents from a 2010 sales training indicate that Actavis trained its sales force to instruct physicians that aberrant behaviors like self-escalation of doses constituted pseudoaddiction.

(b)     Cephalon and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name", "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. The 2012 edition of *Responsible Opioid Prescribing* remains for sale online.[225]

(c)     On information and belief, Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain *is under-treated.*...Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

(d)     Endo distributed copies of a book by KOL Dr. Lynn Webster entitled *Avoiding Opioid Abuse While Managing Pain* (2007). Endo's internal planning documents describe the purpose of distributing this book as to increase the breadth and depth of the Opana ER prescriber base. The book claims that when faced with signs of aberrant behavior, the doctor should regard it as pseudoaddiction and thus, increasing the dose *in most cases should be the clinician's first response.*

(e)     Endo spent $246,620 to buy copies of FSMB's *Responsible Opioid Prescribing* (2007), which was distributed by Endo's sales force. This book asserted that behaviors such as requesting drugs by name, demanding or manipulative behavior, seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction.

(f)     Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

(g)     A Purdue presentation for doctors entitled *Medication Therapy Management* (November 2007) recited what had been the consensus view for decades: "Many medical students are taught that if opioids are prescribed in high doses or for a prolonged time, the patient will become an addict." Purdue then assured doctors that this traditional concern about addiction was wrong – that patients instead suffer from "pseudoaddiction" because "opioids are frequently prescribed in doses that are inadequate."

(h)     A Purdue pamphlet entitled *Clinical Issues in Opioid Prescribing* (2008) urged doctors to look for pseudoaddiction:

---

[225] *See* Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2d ed. 2012).

"A term which has been used to describe patient behaviors that may occur when pain is undertreated. Patients with unrelieved pain may become focused on obtaining medications, may "clock watch," and may otherwise seem inappropriately "drug-seeking." Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated."

Purdue again urged doctors to prescribe higher doses, stating that opioids "are frequently underdosed – or even withheld due to a widespread lack of information…about their use among healthcare professionals."

(i)　　In another pamphlet, *Providing Relief, Preventing Abuse: A reference guide to controlled substances prescribing practices* (2008), Purdue admonished doctors that "[u]ndertreatment of pain is a serious problem" and "pain should be treated aggressively." Purdue stated: "Fact[] About Addiction: 'Misunderstanding of addiction and mislabeling of patients as addicts results in unnecessary withholding of opioid medications.'"

(j)　　Purdue released a second edition of *Providing Relief, Preventing Abuse* (2011), which continued to urge higher doses, and added a new deception about the scientific "literature":

"The term pseudoaddiction has emerged in the literature to describe the inaccurate interpretation of [drug-seeking] behaviors in patients who have pain that has not been effectively treated."

The revised pamphlet failed to disclose that none of the "literature" it cited included scientific or medical evidence supporting pseudoaddiction as a diagnosis separate from addiction. Nor did it disclose that all of the cited "literature" was linked to organizations and doctors paid by Purdue.

(k)　　Purdue also urged doctors to prescribe higher doses in a Purdue-sponsored book, *Responsible Opioid Prescribing* (2011), which again suggested that patients who appear to be addicted were instead "receiving an inadequate dose" and needed more drugs. In Purdue's *Opioid Clinical Management Guide* (2009), Purdue told doctors that the greatest risk of addiction was giving patients *too little* of its addictive drugs: "The primary risk factor for misuse is uncontrolled or inadequately treated pain."

(l)　　Purdue distributed to physicians at least as of November 2006, and posted on its unbranded website, *Partners Against Pain*, a pamphlet copyrighted 2005 and titled *Clinical Issues in Opioid Prescribing*. This pamphlet included a list of conduct including illicit drug use and deception it defined as indicative of pseudoaddiction or untreated pain. It also states: Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when *pain is undertreated*. Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be *distinguished from true addiction* in that the behaviors resolve when the pain is effectively treated.

(m)     Purdue sponsored FSMB's *Responsible Opioid Prescribing* (2007), which taught that behaviors such as requesting drugs by name, demanding or manipulative behavior, seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction. Purdue also spent over $100,000 to support distribution of the book.

(n)     Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which states: Pseudo-addiction describes patient behaviors that may occur when *pain is undertreated*. Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated.

(o)     Upon information and belief, Purdue sponsored a CME program titled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse." In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long acting opioid.

406.    However, Defendants' own hired gun has now conceded that pseudoaddiction is fictional. Dr. Webster has acknowledged that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[226.]

407.    The CDC Guideline also reject the concept of pseudoaddiction. The CDC Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer-term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."[227]

408.    The Manufacturer Defendants also falsely claimed that there were addiction risk screening tools – such as patient contracts, urine drug screens, and other similar strategies – that allowed them to reliably identify and safely prescribe opioids to patients predisposed to addiction.

---

[226] John Fauber, *Painkiller Boom Fueled by Networking*, MILWAUKEE WISC. J. SENTINEL (Feb. 18, 2012).

[227] CDC Guideline, *supra* note 182.

409.    In addition, the Manufacturer Defendants widely spread misleading information about the risks of addiction associated with increasing dosages of opioids over time, and downplayed the risks created by the tolerance for opioids that patients would develop after consuming the drugs over a period of time.

410.    For example,

(a)    On information and belief, Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction."

(b)    Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available online.[228]

(c)    Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

(d)    Endo distributed a pamphlet edited by an opioid advocate entitled Understanding Your Pain: Taking Oral Opioid Analgesics (2004 endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . .You won't 'run out' of pain relief."[229]

(e)    Janssen, on information and belief, sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

(f)    On information and belief, Purdue's In the Face of Pain website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will. Purdue's website urged patients to "overcome" their "concerns about addition." Testimonials on the

---

[228] *See* https://assets.documentcloud.org/documents/277605/apf- treatmentoptions.pdf

[229] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

website that were presented as personal stories were in fact by Purdue consultants whom Purdue had paid to promote its drugs.

(g)     Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages. This publication is still available online.[230]

(h)     In 2007, Purdue sponsored a CME entitled *Overview of Management Options* that was available for CME credit and available until at least 2012. It taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

(i)     Purdue sponsored a 2011 webinar taught by Dr. Lynn Webster, titled *Managing Patient's Opioid Use: Balancing the Need and Risk.* This publication taught prescribers that screening tools, urine tests, and patient agreements have the effect of preventing overuse of prescriptions and overdose deaths.

(j)     Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, APF and others argued to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[231]

411.    Purdue secretly determined that pushing patients to higher doses would keep them on opioids longer. Purdue developed tactics specifically to keep patients hooked on opioids longer, which it called by the euphemism: "*Improving the Length of Therapy*" – sometimes abbreviated as "LOT" or "LoT." Purdue taught its employees that there is "a direct relationship" between getting patients on higher doses and keeping them on Purdue's opioids longer. Purdue's internal marketing plan showed a graph that broke down exactly how getting patients on higher doses of opioids would get more patients to stay on drugs longer:

---

[230] *See* http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf

[231] Brief of the American Pain Foundation (APF), the National Pain Foundation, and the National Foundation for the Treatment of Pain in Support of Appellant and Reversal of the Conviction, *United States v. Hurowitz*, No. 05-4474 (4th Cir. Sept. 8, 2005) at 9



*Purdue internal strategy presentation from 2012*

Purdue's sales representatives promoted higher doses, but they did not tell doctors and patients that the higher doses were a scheme to trap patients on Purdue's drugs.

412.    To "extend average treatment duration," Purdue deceptively claimed that patients' becoming dependent on its drugs was not dangerous or deadly, but "normal." Purdue taught doctors that: "Healthcare professional should recognize that tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not the same as addition." Purdue deceptively claimed that physical dependence on its opioids was "a normal physiologic response" and "an expected occurrence," and no more dangerous that "many classes of medications" that are not addictive, including drugs used to treat high blood pressure.

413.    Purdue set as one of its "key messages" that "data support the use of opioids beyond 90 days and maintained through 52 weeks."

414.    Purdue's internal "10-year plan" highlighted its discovery that a "patient savings card" program led to the result that: "more patients remain on OxyContin after 90 days." Giving out discounts could have cut Purdue's revenue *if* patients took opioids for a short time. But Purdue determined that its savings cards worked like a teaser rate on a long-term and very high-stakes mortgage. According to Purdue's internal analysis, the savings cards had "the highest ROI" in the entire "OxyContin Marketing Mix." The Return On Investment for Purdue was 4.25, so that every $1,000,000 Purdue gave away in "savings" came back to Purdue as "$4,280,000 in revenue, because patients stayed on dangerous opioids longer.



*Purdue internal strategy presentation from 2011*

415.    Keeping more patients on opioids longer than 90 days was one of Purdue's "2011 Highlights." Purdue's directors and CEO were briefed specifically on "emails targeted towards HCPs practicing" in individual states to push the savings cards. But it was a public health disaster. It has been found that patients who stayed on prescription opioids for more than 90 days were ***thirty times more likely to die of an overdose.***

416.    Purdue aimed to "drive" patients to higher doses and longer periods on drugs so completely that it could control how many kilograms of its opioids were used in the U.S. within 2%:

> Drive appropriate titration and length of therapy with continuing patients, to maintain total Kg within 2% of forecast

*Purdue internal strategy presentation from 2012*

417.    When Purdue's sales representatives talked with doctors about how to dose its drugs, and when Purdue sent "savings cards" to patients, Purdue did not disclose that higher doses and "savings" were designed to keep patients on its drugs longer. Purdue did not disclose that its promotion to doctors was designed to "drive" the among of drugs consumed by Americans to within 2% of its desired profit. Purdue did not disclose that its business target would cause many more patients to get addicted and die.

418.    Purdue's campaign to "extend average treatment duration" succeeded. A national study of tens of thousands of medical and pharmacy claims records published in the Journal of General Internal Medicine found that two-thirds of patients who took opioids for 90 days were still taking opioids five years later.

419.    All these claims conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[232]

420.    The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients nationwide,

---

[232] CDC Guideline, *supra* note 182.

and in Webb County, would look to opioids first for the treatment of chronic pain. The Manufacturer Defendants deceptively describe the risks from NSAIDs while failing to disclose the risks from opioids.[233] The PBM Defendants structured their standard baseline national formularies accordingly, making it harder to access less addictive pain treatments.

421. The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The Manufacturer Defendants and their PBM allies had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on actual medical evidence that conclusively expose the known falsity of the Manufacturer Defendants' misrepresentations, and the harm caused by the PBM complicity in intentionally building formularies that promoted, in effect, opioid use.

422. Notwithstanding their knowledge, in order to maximize profits, the Manufacturer Defendants continued to advocate in the false and deceptive manners described herein with the goal of increasing opioid use, purposefully ignoring the foreseeable consequences of their activity in terms of addiction and public health throughout the U.S., and in Webb County.

---

[233] *See, e.g.*, Charles E. Argoff, MD, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, PAIN MEDICINE NEWS AND ENDO, http://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf (last visited De. 19, 2017) (describing massive gastrointestinal bleeds from long-term use of NSAIDs and recommending opioids).

423. Each of the following misrepresentations was created with the intent and expectation that, by omitting the known, serious risks of chronic opioid therapy, including the risks of addiction, abuse, overdose, and death, and emphasizing or exaggerating risks of competing products, prescribers and patients would be more likely to choose opioids. Defendants and their third-party allies routinely ignored the risks of chronic opioid therapy. These include (beyond the risks associated with misuse, abuse, and addiction): hyperalgesia, a known serious risk associated with chronic opioid analgesic therapy in which the patient becomes more sensitive to certain painful stimuli over time; hormonal dysfunction; decline in immune function; mental clouding, confusion, and dizziness; increased falls and fractures in the elderly; neonatal abstinence syndrome (when an infant exposed to opioids prenatally withdraws from the drugs after birth); and potentially fatal interactions with alcohol or benzodiazepines, which are used to treat post-traumatic stress disorder and anxiety (disorders frequently coexisting with chronic pain conditions).

424. Despite these serious risks, Defendants asserted or implied that opioids were appropriate first-line treatments and safer than alternative treatments, including NSAIDs such as ibuprofen (Advil, Motrin) or naproxen (Aleve). Which NSAIDs can pose significant gastrointestinal, renal, and cardiac risks, particularly for elderly patients, Defendants' exaggerated descriptions of those risks were deceptive in themselves, and also made their omissions regarding the risks of opioids all the more striking and misleading. Defendants and their third-party allies described over-the-counter NSAIDs as life threatening and falsely asserted that they were responsible for 10,000-20,000 deaths annually (more than opioids), when the real number is closer to 3,200. This description of NSAIDs starkly contrasted with their representation of opioids, for which the listed risks were nausea, constipation, and sleepiness (but not addiction, overdose, or death). Compared with NSAIDs, opioids are responsible for roughly four times as many fatalities

annually. In addition, as published March 6, 2018 in JAMA, the first randomized controlled clinical trial demonstrated that opioids are no more effective in treating pain over a 12 month period than NSAIDs.

425. As with the preceding misrepresentations, Defendants' false and misleading claims regarding the comparative risks of NSAIDs and opioids had the effect of shifting the balance of opioids' risks and purported benefits. While opioid prescriptions have exploded over the past two decades, the use of NSAIDs has declined during that same time.

426. Each of the following reflects Defendants' deceptive claims and omissions about the risks of opioids, including in comparison to NSAIDs:

     (a)    Documents from a 2010 sales training indicate that Actavis trained its sales force that the ability to escalate doses during long-term opioid therapy, without hitting a dose ceiling, made opioid use safer than other forms of therapy that had defined maximum doses, such as acetaminophen or NSAIDs.

     (b)    Actavis also trained physician-speakers that maintenance therapy with opioids can be safer than long-term use of other analgesics, including NSAIDs, in older persons.

     (c)    Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which taught patients that opioids differ from NSAIDs in that they have no ceiling dose and are therefore the most appropriate treatment for severe pain. The publication attributed 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if taken for more than a period of months, with no corresponding warning about opioids.

     (d)    Endo distributed a case study to prescribers titled *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*. The study cites an example, meant to be representative, of a patient with a massive upper gastrointestinal bleed believed to be related to his protracted use of NSAIDs (over eight years), and recommends treating with opioids instead.

     (e)    Endo sponsored a website, painknowledge.com, through APF and NIPC, which contained a flyer called *Pain: Opioid Therapy*. This publication included a list of adverse effects from opioids that omitted significant adverse effects like hyperalgesia, immune and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. Endo continued to provide funding for this website through 2012, and closely tracked unique visitors to it.

(f)　　Endo provided grants to APF to distribute *Exit Wounds* (2009), which omitted warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. *Exit Wounds* also contained a lengthy discussion of the dangers of using alcohol to treat chronic pain but did not disclose dangers of mixing alcohol and opioids.

(g)　　Janssen sponsored a patient education guide titled *Finding Relief: Pain management for Older Adults* (2009), which its personnel reviewed and approved and its sales force distributed. This publication described the advantages and disadvantages of NSAIDs on one page, and the myths/facts of opioids on the facing page. The disadvantages of NSAIDs are described as involving stomach upset or bleeding, kidney or liver damage if taken at high doses or a long time, adverse reactions in people with asthma, and can increase the risk of heart attack and stroke. The only adverse effects of opioids listed are upset stomach or sleepiness, which the brochure claims will go away, and constipation.

(h)　　Janssen also sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines. Janssen's label for Duragesic, however, states that use the benzodiazepines may cause respiratory depression, low blood pressure, and profound sedation or potentially result in coma.

(i)　　Purdue also sponsored APF's *Exit Wounds* (2009), which omits warnings of the risk of interactions between opioids and benzodiazepines, which would increase fatality risk. APF distributed copies of *Exit Wounds* nationwide. *Exit Wounds* also misleadingly claimed: "Long experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."

(j)　　Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which advised patients that opioids differ from NSAIDs in that they have no ceiling dose and are therefore the most appropriate treatment for severe pain. The publication attributes 10,000 to 20,000 deaths annually to NSAID overdose. *Treatment Options* also warned that risks of NSAIDs increase if taken for more than a period of months, with no corresponding warning about opioids.

(k)　　Purdue sponsored a CME issued by the American Medical Association in 2003, 2007, 2010, and 2013, and the 2013 version is still available for CME credit. The CME, *Overview of Management Options*, was edited by KOL Dr. Russell Portenoy, among others, and taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses.

### d.　　Manufacturer Defendants' Misuse of Treatment Guidelines

427.　Treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy. They are relied upon by doctors, especially the general practitioners and family doctors targeted by Defendants, who are neither experts nor trained in the treatment of chronic pain. Treatment guidelines not only directly inform doctors' prescribing practices, but are

cited throughout the scientific literature and referenced by third-party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment guidelines with doctors during individual sales visits including visits throughout Texas and Webb County.

### (1) Federation of State Medical Boards (FSMB)

428. The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the U.S. The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians. The FSMB finances opioid- and pain-specific programs through grants from Defendants.

429. Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies" and taught not that opioids could be appropriate in limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

430. A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including in this district.

431. The publication of *Responsible Opioid Prescribing* was backed largely by drug manufacturers. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards (and through the boards, to practicing doctors). The FSMB website describes the

book as the "leading continuing medication (CME) activity for prescribers of opioid medications."[234]

432. Defendants relied on 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient relationship and prescription decisions were documented. FSMB turned doctors' fear of discipline on its head: doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain.

### (2) AAPM/APS Guidelines

433. American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013. In 1997, AAPM issued a "consensus" statement, *The Use of Opioids for the Treatment of Chronic Pain*, that endorsed opioids to treat chronic pain and claimed that the there was little risk of addiction or overdose in pain patients. [235] The Chair of the committee that issued the statement, Dr. J. David Haddox, was at the time a paid speaker for Purdue. The sole consultant to the committee was Dr. Portenoy. The consensus statement, which also formed the foundation of the 1998 Guidelines, was published on the AAPM's website and remained until 2011 and was taken down only after a doctor complained, though it lingers on the internet elsewhere.

434. AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines") and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members

---

[234] Scott M. Fishman, *Responsible Opioid Prescribing*, WATERFORD LIFE SERVICES (2007)

[235] *The Use of Opioids for the Treatment of Chronic Pain*, APS & AAPM (1997), http://opi.areastematicas.com/generalidades/OPIOIDES.DOLORCRONICO.pdf (last visited Mar. 31, 2016).

who drafted the 2009 Guidelines, including Dr. Portenoy and Dr. Fine, received support from Defendants Janssen, Cephalon, Endo, and Purdue.

435. The 2009 Guidelines promote Opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache and Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited 732 times in academic literature, were disseminated nationwide and in Texas during the relevant time period, were reprinted in the *Journal of Pain* and are still available online.

436. Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions.

437. The extent of Defendants' influence on treatment guidelines is demonstrated by the fact that independent guidelines – the authors of which did not accept drug company funding – reached very different conclusions.

438. The 2012 Guidelines for *Responsible Opioid Prescribing* in Chronic Non- Cancer Pain, issued by the American Society of Interventional Pain Physicians ("ASIPP"), warned that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it." ASIPP's Guidelines further advise that "therapeutic opioid use, specifically

in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain." ASIPP recommends long-acting opioids in high doses only "in specific circumstances with severe intractable pain" and only when coupled with "continuous adherence monitoring, in well-selected populations, in conjunction with or after failure of other modalities of treatments with improvements in physical and functional status and minimal adverse effects."[236]

439.    Similarly, the 2011 Guidelines for the Chronic Use of Opioids, issued by the American College of Occupational and Environmental Medicine, recommend against the "routine use of opioids in the management of patients with chronic pain," finding "at least moderate evidence that harms and costs exceed benefits based on limited evidence."[237]

440.    The Clinical Guidelines on Management of Opioid Therapy for Chronic Pain, issued by the U.S. Department of Veterans Affairs ("VA") and Department of Defense ("DOD") in 2010, notes that their review revealed a lack of solid evidence-based research on the efficacy of long-term opioid therapy.[238]

---

[236] Laxmaiah Manchikanti, et al., American Society of Interventional Pain Physicians (ASIPP) *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain: Part 1, Evidence Assessment*, 15 PAIN PHYSICIAN (Special Issue) S1-S66; *Part 2 – Guidance*, 15 Pain Physician (Special Issue) S67-S116 (2012).

[237] *American College of Occupational and Environmental Medicine's Guidelines for the Chronic Use of Opioids* (2011).

[238] Management of Opioid Therapy for Chronic Pain Working Group, VA/DoD Clinical Practice Guideline for Management of Opioid Therapy for Chronic Pain (May 2010), http://www.healthquality.va.gov/guidelines/Pain/cot/COT_312_Full- er.pdf

ii. **Manufacturer, Distributor and Pharmacy Defendants Failed to Comply with The Controlled Substances Act, 21 U.S.C. § 801 et seq. and the Texas Controlled Substance Act, TCSA § 481.001 et seq.**

441. All Defendants are subject to the statutory requirements of the Controlled Substances Act, 21 U.S.C. § 801 et seq. (the "CSA"), the Texas Controlled Substances Act, TCSA § 481.001 et seq. (the "TCSA"), and their implementing regulations.

442. The opioid epidemic was further fueled by Defendants' failure to follow the specific mandates in the CSA and TCSA requiring them to help ensure that highly addictive drugs are not diverted to illegal use. Much of the harm caused by the opioid epidemic could have been, and should have been, prevented if Defendants had fulfilled their duties set by statute and common law. Defendants, who operate at every level of the opioid supply chain, had an obligation and duty to act. They did not – and the country, including Webb County, paid the price.

443. On information and belief, Defendants knowingly, recklessly, and/or negligently supplied suspicious quantities of prescription opioids to obviously suspicious physicians and pharmacies in and around Webb County, without disclosing suspicious orders as required by regulations and otherwise circumventing their statutory obligations under federal and state law.

444. Defendants' refusal to report and investigate suspicious orders had far-reaching effects. The DEA is required to annually set production quotas for regulated drugs. In the context of opioids, however, the DEA has cited the difficulty of determining an appropriate production level to ensuring that adequate quantities are available for legitimate medical use. That is because there are no direct measures available to establish legitimate medical need. The DEA's difficulty in setting production quotas was compounded by the fact that the Manufacturer and Distributor Defendants failed to report suspicious orders of opioids and failed to maintain effective controls against diversion. Defendants' deliberate failures thus prevented the DEA from realizing the full extent of opioid diversion for years

445. Defendants could have (and should have) reported and stopped the flow of prescription opioids into the black market. But Defendants intentionally, recklessly, and/or negligently failed to investigate, report, and halt suspicious orders. Accordingly, as a direct result of Defendants' misconduct, substantial and dangerous quantities of prescription opioids were illegally diverted to and overprescribed in and around Webb County.

446. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[239]

447. Recognizing that highly addictive drugs like opioids can be easily abused and diverted to the black market, Congress set forth two relevant controls on such drugs in the CSA.

448. First, the DEA sets limits on the quantity of Schedule II controlled substances – such as opioids – that may be produced in the U.S. in any given year.[240] The DEA determines these quotas based on a variety of data including sales, production, inventories, and exports. The DEA can and does lower quotas as a means of addressing abuse and diversion.

449. Second, Congress anticipated that highly addictive prescription drugs like opioids could be abused and diverted to the black market. The CSA thus sought to combat diversion of prescription narcotics by providing for a closed system of drug distribution in which manufacturers, wholesalers/distributors and retail pharmacies must register with the DEA. Every registrant, in turn, is charged with being vigilant in deciding whether a customer, be it a pharmacy, wholesaler, or end customer, can be trusted to deliver or use controlled prescription narcotics only

---

[239] H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572.
[240] *See* 21 U.S.C. § 826(a); 28 C.F.R. § 0.100.

for lawful purposes.[241] Specifically, every registrant is required to "maintain effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."[242]

450.     In particular, the CSA and its implementing regulations require all registrants to (1) report suspicious orders of prescription opioids to the DEA, and (2) perform required due diligence prior to filling any suspicious orders.[243] A "suspicious order" is defined as including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[244]

451.     The CSA and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the U.S. From the outset, Congress recognized the importance of preventing the diversion of drugs from legitimate to illegitimate uses. The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.[245]

452.     The CSA categorizes controlled substances in five schedules.

453.     Schedule II contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence" but nonetheless have "a currently acceptable medical use in treatment."[246]

---

[241] 21 U.S.C. § 823(e).

[242] 21 U.S.C. § 823(b)(1).

[243] See 21 U.S.C. § 823(b)(1); 21 C.F.R. § 1301.74(b).

[244] 21 C.F.R. § 1301.74(b).

[245] See 21 U.S.C. § 841(a).

[246] 21 U.S.C. § 812(b)(2).

454.     Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use."[247]

455.     Schedule IV contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.[248]

456.     Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused.[249]

457.     The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized by the CSA. 21 U.S.C. § 841(a)(1).

458.     Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA. 21 U.S.C. § 822(a). A registrant is only permitted to dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]." 21 U.S.C. § 822(b).

459.     Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.[250]

460.     Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a

---

[247] 21 U.S.C. § 812(b)(3).

[248] 21 U.S.C. § 812(b)(4).

[249] 21 U.S.C. § 812(b)(5).

[250] *See generally* 21 C.F.R. pt. 1306.

physician, except in an emergency.[251] Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner.[252]

461.    Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA.[253]

462.    A prescription, whether written or oral, is legally valid under the CSA only if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[254] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment…is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the personal knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."[255]

463.    As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[256] Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

---

[251] 21 U.S.C. § 829(a).

[252] 21 U.S.C. § 829(b).

[253] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

[254] 21 C.F.R. § 1306.04(a).

[255] *Id.* (emphasis added).

[256] *Id.*

464.     Moreover, "[a] prescription for a controlled substance may **only** be filled by a pharmacist, **acting in the usual course of his professional practice** and either registered individually, or employed in a registered pharmacy…"[257]

465.     Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensation would be in accordance with a generally accepted objective standard of practice, *i.e.* "the usual course of his professional practice" of pharmacy.[258]

466.     Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose.[259]

467.     This requires a pharmacist to use sound professional judgment in determining the legitimacy of a controlled substance prescription, which includes paying attention to the number of prescriptions issued, the number of dosage units prescribed, the doctor writing the prescription, and whether the drugs prescribed have a high rate of abuse. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.

468.     In addition, the Code of Federal Regulations requires all registrants – including defendant manufacturers, wholesalers/distributors and pharmacies – to "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[260]

---

[257] 21 C.F.R. § 1306.06 (emphasis added).

[258] *Id.*

[259] *See* 21 C.F.R. §§ 1306.04, 1306.06.

[260] 21. C.F.R. § 1301.74(b).

469.    Similarly, the TCSA § 481.067 et seq. provides, in part, that "a person who is registered with the Federal Drug Enforcement Administration to manufacture, distribute, analyze, or dispense a controlled substance shall keep records and maintain inventories in compliance with recordkeeping and inventory requirements of federal law and with additional rules the board or director adopts."[261] The TCSA defines a "person" as "an individual, corporation, government, business trust, estate, trust, partnership, association, or any other legal entity."[262]

470.    The TCSA § 481.128 provides for civil penalties in commercial matters if a "registrant or dispenser" violates the TCSA. This includes if a registrant "distributes, delivers, administers or dispenses a controlled substance in violation" of the TCSA or federal law, "refuses or fails to make, keep, or furnish a record, report, notification, order form, statement, invoice, or information required by this chapter," or "refuses or fails to maintain security required by this chapter or a rule adopted under this chapter."[263]

471.    Failure to comply with the TCSA constitutes negligence *per se*.

472.    Defendants failed to comply with the TCSA.

473.    In the instant case, the TCSA requires that the Defendants know their customers, which includes, an awareness of the customer base, knowledge of the average prescriptions filled each day, the percentage of controlled substances compared to overall purchases, a description of how the dispenser fulfills its responsibilities to ensure that prescriptions filled are for legitimate medical purposes, and identification of physicians and bogus centers for the alleged treatment of pain that are the dispenser's most frequent prescribers.

---

[261] TCSA § 481.067(a).

[262] TCSA § 481.002(33).

[263] TCSA §§ 481.128(a)(1)(2)(9).

474. Defendants have failed to diligently respond to the suspicious orders which Defendants have filled.

475. Defendants have failed to provide effective controls and procedures to guard against diversion of controlled substances in contravention of Texas law.

476. Defendants have willfully turned a blind eye toward the actual facts by regularly distributing large quantities of controlled substances to retailers and dispensers who are serving a customer base comprised of individuals who are themselves abusing and/or dealing prescription medications, many of whom are addicted and all of whom can reasonably be expected to become addicted.

477. Defendants negligently acted with others by dispensing controlled substances for illegitimate medical purposes, operating bogus pain clinics which do little more than provide prescriptions for controlled substances and thereby creating and continuing addictions to prescription medications in this state.

478. Defendants have, by their acts and omissions, proximately caused and substantially contributed to damages to Webb by violating Texas law, by creating conditions which contribute to the violations of Texas laws by others, and by their negligent and/or reckless disregard of the customs, standards and practices within their own industry.

479. Webb has suffered and will continue to suffer enormous damages as the proximate result of the failure by Defendants to comply with the TCSA.

480. Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

481. Defendants are in a class of a limited number of parties that can legally sell and distribute opioids, which places it in a position of great trust by Webb.

482.     The trust placed in Defendants by Webb through the license to distribute opioids in Webb creates a duty on behalf of Defendants to prevent diversion of the medications it supplies to illegal purposes.

483.     A negligent and/or intentional violation of this trust poses distinctive and significant dangers to the County from the diversion of opioids for non-legitimate medical purposes and addiction to the same by consumers.

484.     Defendants were negligent in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers.

485.     Defendants are required to exercise a high degree of care and diligence to prevent injury to the public form the diversion of opioids during distribution.

486.     Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business.

487.     Defendants are in exclusive control of the management of the opioids distributed to pharmacies and drug stores in and around Webb.

488.     Webb is without fault and the injuries to the County would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the distributions of opioids.

489.     Plaintiff is within the class of persons the TCSA was intended to protect.

490.     The harm that has occurred is the type of harm that the TCSA were intended to guard against.

491.     Defendants breached their duties by failing to take any action to prevent or reduce the distribution of the opioids.

492. As a direct and proximate result of Defendants' negligence per se, Webb has suffered and continues to suffer the socio-economic harm described herein.

493. Defendants were negligent in failing to monitor and guard against third-party misconduct and participated and enabled such misconduct.

494. Defendants were negligent in failing to monitor against diversion of opioid pain medications.

### a. Manufacturer Defendants

495. Manufacturer Defendants are required to design and operate a system to detect suspicious orders, and to report such orders to law enforcement.[264] They have not done so.

496. Upon information and belief, Manufacturer Defendants collected, tracked, and monitored extensive data concerning suspicious physicians and pharmacies, obtained from Distributor Defendants who supplied the Manufacturer Defendants with distribution data in exchange for rebates or other incentives so Manufacturer Defendants could better drive sales.

497. In return for these incentives, the distributor identified to the manufacturer the product, volume and the pharmacy to which it sold the product.

498. For example, IMS Health (now known as IQVIA) furnished Purdue and other Manufacturer Defendants with detailed information about the prescribing habits of individual doctors and the ordering habits of individual pharmacies.

499. The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion, but instead they utilized the data to understand which regions and which doctors to target through their sales force.

---

[264] *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

500.     With the knowledge of improper diversion, Manufacturer Defendants could have but failed to report each instance of diversion to the DEA, as they were required to do, instead rolling out marketing campaigns to churn its prescription opioid sales.

501.     Indeed, upon information and belief, Manufacturer Defendants withheld from the DEA information about suspicious orders – and induced others to do the same – to obfuscate the extent of the opioid epidemic. Upon information and belief, Manufacturer Defendants knew that if they or the other defendants disclosed suspicious orders, the DEA would become aware that many opioids were being diverted to illegal channels, and would refuse to increase the production quotas for opioids.

502.     The Department of Justice has recently confirmed the suspicious order obligations clearly imposed by federal law,[265] fining Mallinckrodt $35 million for failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements.[266] Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report suspicious orders for controlled substances – orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S. pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[267] Mallinckrodt agreed that its "system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy

---

[265] *See* 21 U.S.C. § 823(a)(1); 21 C.F.R. § 1301.74(b)

[266] *See* U.S. Dep't of Justice, *Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations* (Jul. 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders

[267] *Id.* (internal quotation omitted).

Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007."[268]

503.     Purdue also unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Through its extensive network of sales representatives, Purdue had and continues to have knowledge of the prescribing practices of thousands of doctors and could identify doctors who displayed red flags for diversion such as those whose waiting rooms were overcrowded, whose parking lots had numerous out-of-state vehicles, and whose patients seemed young and healthy or homeless. Using this information, Purdue has maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs.[269] Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the *Los Angeles Times*,[270] Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager

---

[268] 2017 Settlement Agreement between the United States of America and Mallinckrodt, plc, at p. 2-3, https://www.justice.gov/usao-edmi/press-release/file/986021/download

[269] *See* Scott Glover and Lisa Girion, *OxyContin maker closely guards its list of suspect doctors*, LOS ANGELES TIMES (Aug. 11, 2013), http://articles.latimes.com/2013/aug/11/local/la-me-rx-purdue-20130811

[270] *See* Harriet Ryan et al., *More than 1 million OxyContin pills ended up in the hands of criminal and addicts. What the drugmaker knew*, LOS ANGELES TIMES (Jul. 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/

described internally as "an organized drug ring." In doing so, Purdue protected its own profits at the expense of public health and safety.

504.     In 2016, the New York Attorney General found that, between January 1, 2008 and March 7, 2015, Purdue's sales representatives, at various times, failed to timely report suspicious prescribing and continued to detail those prescribers even after they were placed on a "no-call" list.[271]

505.     As Dr. Mitchell Katz, director of the Los Angeles County Department of Health Services, said in a *Los Angeles Times* article, "[a]ny drug company that has information about physicians potentially engaged in illegal prescribing or prescribing that is endangering people's lives has a responsibility to report it."[272] The New York Attorney General's settlement with Purdue specifically cited the company for failing to adequately address suspicious prescribing. Yet, on information and belief, Purdue continues to profit from the prescriptions of such prolific prescribers.

506.     Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the New York Attorney General found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

---

[271] *See* NY Purdue Settlement, at 6-7, https://ag.ny.gov/pdfs/Purdue-AOD-Executed.pdf

[272] Glover and Girion, *supra* note 269.

507.    The New York Attorney General also found that, in certain cases where Endo's sales representatives detailed prescribers who were convicted of illegal prescribing of opioids, those representatives could have recognized potential signs of diversion and reported those prescribers but failed to do so.

508.    On information and belief, the other Manufacturer Defendants have engaged in similar conduct in violation of their responsibilities to prevent diversion.

509.    The Manufacturer Defendants' actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids into Webb County and caused direct harm to the County.

### b.    Distributor Defendants

510.    The same legal duties to prevent diversion and to monitor, report, and prevent suspicious orders of prescriptions opioids that were incumbent upon the Manufacturer Defendants are also legally required of the Distributor Defendants under federal and state law.

511.    All opioid distributors are required to maintain effective controls against opioid diversion. They are required to create and use a system to identify and report to law enforcement downstream suspicious orders of controlled substances, such as orders of unusually large size, orders that are disproportionate, orders that deviate from a normal pattern, and/or orders of unusual frequency. To comply with these requirements, distributors must know their customers, must conduct due diligence, must report suspicious orders, and must terminate orders if there are indications of diversion.

512.    Under the CSA, anyone authorized to handle controlled substances must track their shipments. The DEA's ARCOS is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from the point of manufacture through distribution to the point of sale. ARCOS accumulates data on distributors'-controlled substances and

transactions, which are then used to identify diversion. Each person or entity that is registered to distribute controlled substances such as opioids must report each acquisition and distribution transaction to the DEA.[273] Each registrant must also maintain a complete, accurate and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of.

513.    Each registrant must also comply with the security requirements to prevent diversion set forth in 21 C.F.R. § 1301.71.

514.    The DEA has provided guidance to distributors on how to combat opioid diversion. On information and belief, since 2006 the DEA has conducted one-on-one briefings with distributors regarding downstream customer sales, due diligence, and regulatory responsibilities. On information and belief, the DEA also provides distributors with data on controlled substance distribution patterns and trends, including data on the volume and frequency of orders and the percentage of controlled versus non-controlled purchases. On information and belief, the DEA has also hosted conferences for opioid distributors and has participated in numerous meetings and events with trade associations.

515.    On September 27, 2006 and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring and the responsibilities and obligations of registrants to prevent diversion.

516.    As part of the legal obligation to maintain effective controls against diversion, the distributor is required to exercise due care in confirming the legitimacy of each and every order prior to filling. Circumstances that could be indicative of diversion include ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs;

---

[273] *See* 21 U.S.C. § 827; 21 C.F.R. § 1304.33.

ordering a disproportionate amount of controlled substances versus non-controlled prescription drugs; ordering excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors.

517.     Reporting an order as suspicious will not absolve a distributor of responsibility if the distributor knew, or should have known, that the prescription opioids were being diverted. Indeed, reporting a suspicious order and then filling said order with knowledge it may be suspicious constitutes a failure to maintain effective controls against diversion under 21 U.S.C. §§ 823 and 824.

518.     On information and belief, the Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," emphasizing the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines stated: "[a]t the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

519.     Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

520.     On their face, these assurances – of identifying and eliminating criminal activity and curbing the opioid epidemic – create a duty for the Distributor Defendants to take reasonable measures to do just that.

521. Despite their duties to prevent diversion, the Distributor Defendants have knowingly or negligently allowed diversion.[274] The DEA has repeatedly taken action to attempt to force compliance, including 178 registrant actions between 2008 and 2012, 76 orders to show cause issued by the Office of Administrative Law Judges, and 41 actions involving immediate suspension orders.[275] The Distributor Defendants' wrongful conduct and inaction have resulted in numerous civil fines and other penalties, including:

(a)     In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the Country, resulting in millions of doses of controlled substances being diverted. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer.

(b)     In a 2017 Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150,000,000.

(c)     On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion.

(d)     On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

---

[274] Scott Higham and Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, WASH. POST (Oct. 15, 2017), https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/; Lenny Bernstein, David S. Fallis, and Scott Higham, *How drugs intended for patients ended up in the hands of illegal users: 'No one was doing their job,'* WASH. POST (Oct. 22, 2016), https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html

[275] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, The Drug Enforcement Administration's Adjudication of Registrant Actions 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf (last visited Jan. 8, 2018)

(e)     On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion.

(f)     On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion.

(g)     In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the U.S.[276]

(h)     On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

(i)     In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states.

(j)     In December 2016, the Department of Justice announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act.[277] On information and belief, in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year.

(k)     In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center in Florida amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies.[278]

(l)     In 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.

---

[276] Lenny Bernstein and Scott Higham, *Cardinal Health fined $44 million for opioid reporting violations*, WASH. POST (Jan. 11, 2017), https://www.washingtonpost.com/national/health-science/cardinal-health-fined-44-million-for-opioid-reporting-violations/2017/01/11/4f217c44-d82c-11e6-9a36-1d296534b31e_story.html?utm_term=.0c8e17245e66

[277] Press Release, United States Dep't of Justice, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act,* U.S. DEP'T OF JUST. (Dec. 23, 2016), https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act

[278] *AmerisourceBergen Plant license pulled*, BOSTON NEWS (Apr. 25, 2007), http://archive.boston.com/news/education/higher/articles/2007/04/25/amerisourcebergen_plant_license_pulled/

522.    Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

523.    Once the DEA started to enforce suspensions of registrations to distribute controlled substances, rather than comply, manufacturers and defendants spent at least $102 million to undermine the DEA's ability to do so.

524.    On February 19, 2014, acting at the behest of industry lobbyists, U.S. Representative Tom Marino introduced the "Ensuring Patient Access and Effective Drug Enforcement Act" as a supposed effort to define "imminent danger" in the 1970 act. A DEA memo noted that this bill would essentially destroy the agency's power to file an immediate suspension order of any suspicious drug shipments.

525.    This bill required that the DEA show the company's actions had demonstrated a "substantial likelihood of an immediate threat," whether in death, serious bodily harm or drug abuse, before a suspension order can be sought. It also gave drug companies the ability to submit "corrective action" plans before any penalties could be issued. The law essentially made it more difficult for the DEA to halt any suspicious narcotic shipments before opioids are diverted to the illegal black market.

526.    The Distributor Defendants' failure to prevent the foreseeable injuries from opioid diversion created an enormous black market for prescription opioids, which extended to Webb County. Each Distributor Defendant knew or should have known that the opioids reaching Webb County were not being consumed for medical purposes alone and that the amount of opioids flowing to Webb County was far in excess of what could be consumed for medically necessary purposes.

527.     The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Webb County; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using common sense.

528.     It was reasonably foreseeable to Defendants that their conduct in flooding the market in and around Webb County with highly addictive opioids would lead to the epidemic that has caused such harm to Plaintiff.

529.     The Distributor Defendants were aware of widespread prescription opioid abuse in and around Webb County, but, on information and belief, they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas and in such quantities, and with such frequency that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

530.     If the Distributor Defendants adhered to the mandated controls to guard against diversion, Webb County would have avoided significant injury.

531.     The Distributor Defendants made enormous profits over the years based on the diversion of opioids into Webb County.

532.     The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to Webb County showed an intentional or reckless disregard for the safety of Webb County. Their conduct poses a continuing threat to the health, safety, and welfare of Webb County.

### c.     The Retail and PBM Mail-Order Pharmacy Defendants

533.     Pharmacy Defendants earned profits by flooding the country with prescription opioids. They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries. Yet, instead of taking any meaningful action to stem the flow of opioids into the communities, they continued to participate in the oversupply and profit from it.

534.     Each of the Pharmacy Defendants does substantial business throughout the U.S., and is licensed to practice pharmacy in Texas. This business includes the distribution and dispensing of prescription opioids.

535.     Texas law expressly acknowledges that the practice of pharmacy is regulated "in the public interest" and that the practice of pharmacy "affects the public health, safety and welfare."[279] It provides that: "[i]t is a matter of public interest and concern that the practice of pharmacy merits and receives the confidence of the public."[280] The purpose of the Texas Pharmacy Act is to "promote, preserve and protect the public health and safety."[281]

---

[279] TX. PHARMACY ACT, TEX. OCC. CODE ANN. § 551.002(a).

[280] *Id.* at (b).

[281] *Id.* at (c).

536.     A person may not practice pharmacy in the State of Texas unless the person holds a license to practice pharmacy under the Texas Pharmacy Act.[282]  Each Pharmacy Defendant named herein has registered and is licensed by the Texas Pharmacy Board.

537.     ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████  The Pharmacy Defendants failed to take meaningful action to stop this diversion despite their knowledge of it, and contributed substantially to the diversion problem.

538.     The Pharmacy Defendants developed and maintained extensive data on the opioids they distributed and dispensed. Though this data, Pharmacy Defendants had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the country, and in Webb County. They used the data to evaluate their own sales activities and workforce. On information and belief, the Pharmacy Defendants also provided Manufacturer Defendants with data regarding, *inter alia*, individual doctors in exchange for rebates or other forms of consideration. The Pharmacy Defendants' data is a valuable resource that they could have used to help stop diversion, but failed to do so.

### (1)     The Pharmacy Defendants Have a Duty to Prevent Diversion

539.     Each participant in the supply chain of opioid distribution, including the Pharmacy Defendants, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring and reporting suspicious activity.

---

[282] TX. PHARMACY ACT Sec. 558.001(a); TEX. OCC. CODE § 560.001(a).

540. The Pharmacy Defendants, including PBM mail-order pharmacies and retail pharmacies, like manufacturers and other distributors, are registrants under the CSA. 21 C.F.R. § 1301.11. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[283] In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Because pharmacies themselves are registrants under the CSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

541. The Pharmacy Defendants owe a duty under both federal law[284] and Texas Law, to monitor, detect, investigate, refuse to fill, and report suspicious orders which the Pharmacy Defendants knew or should have known were likely to be diverted in and around Webb County.

542. From the outset of the relevant period through 2016, the Pharmacy Defendants were required to submit certain robust data to the Texas Department of Public Safety, designed to track each controlled substance prescription filled by the pharmacy.[285] TEX. ADMIN. CODE §§ 13.75 & 13.77 implemented Texas' Prescription Drug Monitoring Program, or "PMP," which was created in 1982 to monitor Schedule II controlled substance prescriptions. In 2016, administration of the PMP was transferred from the Department of Public Safety to the Texas State Board of Pharmacy, where these same pharmacy obligations previously set forth in TEX. ADMIN. CODE §§ 13.75 & 13.77 remain in force.[286]

---

[283] See 21 C.F.R. § 1301.71(a).

[284] 21 U.S.C. § 823; 21 CFR 1301.74

[285] TEX. ADMIN. CODE §§ 13.75 & 13.77 (2013).

[286] See TEX. ADMIN. CODE §§ 315.6 & 315.7.

543.     Under Texas law, moreover, pharmacies are responsible for filling and dispensing only prescriptions for legitimate medical purposes, and this responsibility is equal to the responsibility of prescribers to only prescribe controlled substances for legitimate medical purposes.[287]

544.     The DEA, among others, has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies how to identify suspicious orders and other evidence of diversion.

545.     Pharmacies have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose.

546.     Suspicious pharmacy orders include orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and duration, among others.

547.     Additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing

---

[287] TEX. HEALTH & SAFETY CODE § 481.129.

different handwriting. Typically, these attributes are easy to detect and easily recognizable by pharmacies.

548.    The industry guidance tells pharmacists how to recognize: (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other similar red flags.

549.    Suspicious pharmacy orders are red flags for if not direct evidence of diversion.

550.    Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the Pharmacy Defendants themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, or oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

551.    According to industry standards, federal and state law, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

552.    The Pharmacy Defendants' failure to fulfill their duty to disclose the required PDP and other data to the relevant Texas authorities is evidenced in part by, on information and belief, the fact that Texas' PMP data for the prescriptions at issue is far less robust than the corresponding ARCOS data. The Pharmacy Defendants' failure to do so is especially harmful to the public given that manufacturers and distributors have routinely disclosed ARCOS data only to the DEA, not to any Texas state or local agency, and given that a large percentage of diversion takes place at the local point of sale. Throughout the relevant period, the Texas and Webb County have been unable to rely upon the Pharmacy Defendants to provide them with critical data that would help these governmental entities do their part to combat the epidemic.

553.     Pharmacy Defendants, through their words or actions set forth in news reports and other public documents, have acknowledged these risks and assured the public that issues affective public health and safety are their highest priority.

554.     In 2015, CVS publicly stated that, that abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities.

555.     Similarly, in 2016, Walgreens issued a press release captioned "Walgreens Leads Fights against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Death."

556.     Despite knowing and even warning of these risks, Pharmacy Defendants recklessly or negligently permitted diversion to occur. In failing to take adequate measures to prevent substantial opioid-related injuries to the nation, Pharmacy Defendants have breached their duties under federal and state statute and regulations, under the reasonable care standard of Texas common law (including violating a voluntarily-undertaken duty to the public which they have assumed by their own words and actions), and professional duties under the relevant standards of professional practice.

557.     Pharmacy Defendants were on notice of their ongoing negligence or reckless misconduct towards the nation in part because of their history of being penalized for violating their duties in other jurisdictions.

558.     Despite their legal obligations in common law, and as registrants under the CSA, the TCSA and the Texas Health and Safety Code, the Pharmacy Defendants failed to meet their obligations and allowed widespread diversion to occur – and they did so knowingly. They knew they made money by filling prescriptions. They knew they made money by making it easy for

doctors to refer patients to them to fill drug prescriptions, not by making it difficult for doctors to refer patients to them to fill prescriptions.

559.    Upon information and belief, performance metrics and prescription quotas adopted by the Pharmacy Defendants for their retail stores contributed to their failure. For instance, under CVS's Metrics System, pharmacists are directed to meet high goals that make it difficult, if not impossible, to comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or customer safety. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year. The result is predictable: opioids flowed out of Pharmacy Defendants and into communities throughout the country. The Pharmacy Defendants had no incentive to stop the outflow, and every financial incentive to further it. Their policies and practices remained in place even as the epidemic raged.

560.    Upon information and belief, Plaintiffs allege that the Pharmacy Defendants also failed to adequately use data available to them to identify doctor who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

561.    Upon information and belief, Plaintiffs allege that the Pharmacy Defendants failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

562.    Upon information and belief, Plaintiffs allege that the Pharmacy Defendants also failed to conduct adequate internal or external audits of their opioid sales to identify patterns

regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they failed to take any meaningful action as a result.

563. Upon information and belief, Plaintiffs allege that the Pharmacy Defendants also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

564. The Pharmacy Defendants were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

565. In failing to take adequate measures to prevent substantial opioid-related injuries that have affected Webb, Pharmacy Defendants have breached their duties under the "reasonable care" standard and their professional duties under the relevant standards of professional practice.

566. It was reasonably foreseeable to Pharmacy Defendants that filling invalid or suspicious prescriptions for opioids would cause harm to Webb.

567. It was reasonably foreseeable to Pharmacy Defendants that, when unintended users gain access to opioids, tragic yet preventable harm will result, including the type of harm for which Webb seeks redress.

568. At all relevant times, Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing full well they could take measures to substantially eliminate their complicity in opioid diversion

569. At all relevant times, Pharmacy Defendants engaged in these activities, and continue to do so, knowing full well that Webb would be harmed thereby and would be constrained to provide essential County services in response, including paying for additional law enforcement services, social services, and emergency services.

570. It was foreseeable to Pharmacy Defendants that Webb would be forced to bear substantial expenses and suffer serious socio-economic harm as a result of Pharmacy Defendants' acts.

571. Pharmacy Defendants were on notice of their ongoing negligence or intentional misconduct, in part because of their history of being penalized for violating their duties and legal requirements in other jurisdictions.

572. The Pharmacy Defendants each have one or more pharmacies that fill prescriptions for opioids which are operating within or in close proximity to Webb County, or are sending prescriptions to Webb County via their mail service.

### (2) Multiple Enforcement Actions against the Retail Pharmacy Defendants Confirms Their Compliance Failures.

573. The Pharmacy Defendants have long been on notice of their failures to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Several of the Pharmacy Defendants have been repeatedly penalized for their illegal prescription opioid practices. In consideration of a reasonable opportunity for further investigation and discovery, Plaintiff alleges that based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, national policies and inadequate control practices of the Pharmacy Defendants.

### (A) CVS

574. CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. CVS manages medications for more than 92 million lives at over 9,900 retail locations. CVS could be a force for good in connection with the opioid crisis, but like other Defendants and contrary to their public pronouncements, CVS sought profits over patient safety.

575.     CVS is a repeat offender; the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the DOJ. It nonetheless appears to have treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

576.     As recently as July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.[288]

577.     This fine was preceded by numerous others throughout the country.

578.     In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA by filling prescriptions with no legitimate medical purpose.[289]

579.     In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.[290]

580.     In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription

---

[288] Press Release, U.S. Attorney's Office E. Dist. of Cal., *CVS Pharmacy Inc. Pays $5M to Settle Alleged Violations of the Controlled Substance Act*, U.S. DEP'T OF JUST. (July 11, 2017), https://justice.gov/usao-edca/pr/cvs-pharmacy-inc-pays-5m-settle-alleged-violationscontrolled-substance-act.

[289] Press Release, U.S. Attorney's Office Dist. of Md., *United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. DEP'T OF JUST. (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-millionsettlement-agreement-cvs-unlawful-distribution-controlled.

[290] Press Release, U.S. Attorney's Office Dist. of Conn., *CVS Pharmacy Pays $600,000 to Settle Controlled Substances Act Allegations*, U.S. DEP'T OF JUST. (Oct. 20, 2016), https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlled-substances-actallegations.

monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.[291]

581.    In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances – mostly addictive painkillers – more than 500 times between 2011 and 2014.[292]

582.    In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The U.S. alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.[293]

583.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescriptions opioids, "based on prescriptions that had not been issued for legitimate medical purposed by a health care provider acting in the usual course of professional practice." CVS also

[291] Dialynn Dwyer, *CVS will pay $795,000, strengthen policies around dispensing opioids in agreement with state*, BOSTON.COM (Sept. 1, 2016), https://www.boston.com/news/localnews/2016/09/01/cvs-will-pay-795000-strengthen-policies-around-dispensing-opioids-inagreement-with-state.

[292] Press Release, U.S. Attorney's Office Dist. of Mass., *CVS to Pay $3.5 Million to Resolve Allegations that Pharmacies Filled Fake Prescriptions*, U.S. DEP'T OF JUST. (June 30, 2016), https://www.justice.gove/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filledfake-prescriptions.

[293] Press Release, U.S. Attorney's Office Dist. of R.I., *Drug Diversion Claims Against CVS Health Corp. Resolved with $450,000 Civil Settlement*, U.S. DEP'T OF JUST. (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need.[294]

584.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations that in the State of Texas it had filled 153 prescriptions written by a doctor whose controlled-substances registration within the Texas Department of Public Safety had expired.[295] The alleged violations of the Comprehensive Drug Abuse Prevention and Control Act occurred in the spring and summer of 2012.

585.    In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.[296]

586.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.[297]

### (B)    Walgreens

587.    Walgreens is the second-largest retail pharmacy store chain in the U.S. behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more

---

[294] Press Release, U.S. Attorney's Office M. Dist. of Fla., *United States Reaches $22 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances*, U.S. DEP'T OF JUST. (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution.

[295] Patrick Danner, *H-E-B, CVS Fined Over Prescriptions*, SAN ANTONIO EXPRESS-NEWS (Sept. 5, 2014), http://www.expressnews.com/business/local/article/H-E-BCVSfined-over-prescriptions-5736554.php.

[296] Andrew Knittle, *Oklahoma pharmacy board stays busy, hands out massive fines at time*, NEWSOK (May 3, 2015), http://newsok.com/article/5415840.

[297] Press Release, U.S. Attorney's Office W. Dist. of Okla, *CVS to Pay $11 Million to Settle Civil Penalty Claims Involving Violations of Controlled Substances Act*, U.S. DEP'T OF JUST. (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civilpenaltyclaims-involving-violations-controlled.

than 8,000 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

588.     Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history -- $80 million – to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black market sales.[298]

589.     As part of the settlement, Walgreens admitted that it failed to uphold its obligations as a DEA registrant regarding the above-described conduct.[299]

590.     The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

591.     Walgreens' Florida operations highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011 – more than ten times the average amount.[300]

592.     The subject pharmacies increased their orders over time, in some cases as much as 60% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet, Walgreens corporate officers not only turned a blind eye, but provided pharmacists with incentives through a bonus program that compensated

---

[298] Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties Under the Controlled Substances Act*, U.S. DEP'T OF JUST. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-recordsettlement-80-million-civil-penalties-under-controlled.

[299] *Id.*

[300] Order to Show Cause and Immediate Suspension of Registration, *In the Matter of Walgreens Co.* (Drug Enf'd Admin. Sept. 13, 2012).

them based on the number of prescriptions filled at the pharmacy. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not document our own potential noncompliance," underscoring Walgreen's attitude that profit outweighed compliance with the CSA or the health of communities.[301]

593.    Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on the number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.[302]

594.    The six retail pharmacies in Florida that received the suspicious drug shipments from the Jupiter Distribution Center, in turn, filled customer prescriptions that they knew or should have known were not for legitimate use.[303]

---

[301] *Id.*

[302] *Id.*

[303] *Id.*

595.     Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).[304]

596.     The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk. As a result, Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.[305]

### d.     PBMs Ensured that Opioids Were Regularly Prescribed and Flooded the Market.

597.     PBMs operate mail order pharmacies subject to federal and state regulations, as described above. In addition, PBMs serve as middlemen between the defendant drug manufacturers and the availability of opioids. PBMs design plans and offer standard baseline national formularies that determine what drugs: (a) will be available (or not available) to patients; (b) for what diagnosis, efficacious or otherwise; (c) in what quantities; (d) at what co-pay; (e) what level of authorization will be required; and (f) what less addictive pain treatments, drugs or OUD treatments will not be available, or will be harder to access.

598.     PBMs collude with manufacturers who pay fees in the form of rebates, administrative fees, service fees, and other incentives in order to maximize utilization to the financial benefit of the PBMs and manufacturers. This leads to more prescriptions and more pills available to the general public, many of which find their way to the black market.

599.     PBMs have the ability to limit the number of pills available, the number of refills processed, and the duration of opioid therapy. PBMs were well aware that as a result of their

---

[304] *Walgreens to pay $200,000 settlement for lapses with opioids*, APhA (Jan. 25, 2017), https://www.pharmacist.com/article/walgreens-pay-200000-settlement-lapses-opioids.

[305] *Id.*

standard baseline plan design, formulary placement, and drug utilization management, more addictive opioids would enter the marketplace and more addicts would be created. Yet, notwithstanding their repeated commitment to protect health and safety, they chose to give preferential treatment to the most addictive opioids, install hurdles to less-addictive alternatives and failed to cover, or made it difficult to access, necessary medicines associated with Medication Assisted Treatment (MAT) for OUD.

600.    PBMs not only control the majority of this country's prescriptions through their benefit plan design and formulary management, they generate massive profits from that work. PBMs are paid by drug companies to move product. "[N]early one third of all expenditures on branded drugs in 2015 were eventually rebated back. And, most of these rebates directly benefited the PBM."[306] In addition to rebates, PBMs negotiate the payment of administrative fees, volume bonuses, service fees and other forms of consideration from manufacturers. The PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary development and plan design.

601.    The power of the PBMs has evolved over time. Originally mere claims processors, PBMs now play a major role in managing pharmaceutical spending and enhancing health benefits for end-users. Express Scripts President and CEO Tim Wentworth explains that its business has "evolved from straightforward claims adjudication to providing complex care."[307] Drug manufacturers recognize the power of the PBMs to drive utilization.

---

[306] Wayne Winegarden, *To Improve Pharmaceutical Pricing, Reform PBMs And Fix Health Care's Systemic Problem*s, FORBES (Apr. 4, 2017), https://www.forbes.com/sites/econostats/2017/04/04/to-improve-pharmaceutical-pricing-reform-pbms-and-fix-health-cares-systemic-problems/#4da58c5a3322

[307] Express Scripts, *2017 Annual Report*, https://expressscriptsholdingco.gcs-web.com/static-files/76a9c03e-2e6b-4f6b-80de-fe80d4ebc826 (last viewed Mar. 15, 2019) at 11.

602.     PBMs quietly became an integral part of the pharmaceutical supply chain – that is, the path a drug takes from the manufacturing facility to a bathroom medicine cabinet – following the passage of the Medicare Modernization Act in 2003.

603.     Today, the PBM Defendants manage the drug benefits for nearly 95% of the population.[308] They drive what drugs are covered by virtually all health insurance providers for over 260 million people. PBMs made almost $260 billion last year.[309] In 2015 they covered most of the 4 billion retail prescriptions that were covered in the U.S.[310] They are key participants and play a crucial role in the administration of prescription drugs.[311]

604.     PBM influence results from the lack of competition in the PBM space. Market concentration is an important indicator of a company's ability to earn extraordinary returns, and several segments in the U.S. pharmaceutical distribution system are highly concentrated.[312]

605.     In this environment, the top three PBMs have substantial if not exclusive control over the dissemination of opioids. In concert with drug manufacturers who give them rebates and other financial incentives,[313] their plan design determines which drugs will be paid for, reimbursed, or covered by public and private pharmacy benefit plans, allowing the drugs to enter the marketplace to be abused.

[308] Hoffman-Eubanks, *supra* note 16.

[309] John Breslin, *Health care experts call for more transparency into PBMs*, PATIENTDAILY (Dec. 20, 2017), https://patientdaily.com/stories/511298841-health-care-experts-call-for-more-transparency-into-pbms

[310] Lydia Ramsey and Skye Gould, *A huge pharma middleman just lost its biggest customer — and it shows how drug pricing really works*, BUSINESS INSIDER (Apr. 25, 2017), http://www.businessinsider.com/express-scripts-esrx-anthem-not-renewing-pbm-2017-4

[311] Health Policy Brief, *supra* note 147.

[312] Neeraj Sood, Tiffany Shih, Karen Van Nuys, Dana Goldman, *Follow the Money: The Flow of Funds In the Pharmaceutical Distribution System*, HEALTH AFFAIRS, Jun. 13, 2017, https://www.healthaffairs.org/do/10.1377/hblog20170613.060557/full/

[313] Health Policy Brief, *supra* note 147.

606.     The harm caused by the PBMs is not just monetary: "[t]he PBMs and insurers are harming the health of patients with chronic and rare diseases by limiting access and charging them retail for drugs they buy at deep discounts."[314] PBMs also fail to control quantities, or numbers of refills for highly addictive drugs and ignore or neglect their assorted publicly stated commitments to ensure patient wellness, as described in the Party section above and throughout this complaint.

607.     PBMs also provide discount drug cards so individuals can directly purchase medications without going through insurance companies. This allows individuals to fill multiple prescriptions while avoiding the oversight that insurance coverage brings, thus fueling the epidemic. PBMs allow this loophole because they are paid for every prescription filled in this manner.

608.     Thus, people with chronic pain are at the mercy of PBMs, yet PBMs make it easier to access opioids than less-addictive pain medication, because opioids are generally cheaper than non-opioid alternatives. According to a study by the New York Times and ProPublica of 35.7 million people on Medicare prescription drug plans, in the second quarter of 2017 only one-third of them had access to pain medication less addictive than opioids.[315]

609.     Even when they were asked to limit accessibility to opioids, PBMs refused. In 2001, when officials in the West Virginia state employee health plan tried to get Purdue, which manufactured OxyContin, to require pre-authorization, Purdue refused.[316] Using the financial *quid*

[314] Jonathan Wilcox, *PBMs Must Put Patients First*, Huffington Post (Feb. 28, 2017), https://www.huffingtonpost.com/entry/pbms-must-put-patients-first_us_58b60bd8e4b02f3f81e44dcc

[315] Katie Thomas and Charles Ornstein, *Amid Opioid Crisis, Insurers Restrict Pricey, Less Addictive Painkillers*, The New York Times (Sep. 17, 2017), https://www.nytimes.com/2017/09/17/health/opioid-painkillers-insurance-companies.html?mwrsm=Email.

[316] David Armstrong, *Drug maker thwarted plan to limit OxyContin prescriptions at dawn of opioid epidemic*, Stat (Oct. 26, 2016), https://www.statnews.com/2016/10/26/oxycontin-maker-thwarted-limits/

*pro quo* it had with the West Virginia PBM, it paid Merck Medco (now Express Scripts) to prevent insurers from limiting access to the drug. This practice was consistent nationwide.

610.     The strategy to pay Merck Medco extended to other big pharmacy benefit managers and to many other states, according to a former Purdue official responsible for ensuring favorable treatment for OxyContin. The payments were in the form of "rebates" paid by Purdue to the companies. In return, the pharmacy benefit managers agreed to make the drug available without prior authorization and with low copayments.

611.     "That was a national contract," Bernadette Katsur, the former Purdue official, who negotiated contracts with pharmacy benefit managers, said in an interview. "We would negotiate a certain rebate percentage for keeping it on a certain tier related to copay or whether it has prior authorization. We like to keep prior authorization off of any drug."[317]

612.     PBMs are "driving patients to opioids, away from abuse-deterrent form (ADF) and less addictive forms of opiates through formulary and pricing strategies."[318]

613.     ADF opioids are more difficult to physically alter (crushing to snort or dissolving to inject) and therefore are less prone to abuse.[319] The three major PBMs carry at most 3 of the 10 FDA approved ADF opioids, while CVS Caremark, which has nearly 90 million members, carries

---

[317] *Id.*

[318] Charles L. Bennett MD PhD MPP, *Do you have pain, cancer, or diabetes? Your PBM may now be your doctor for these illnesses,* Collabrx (Dec. 27, 2017), http://www.collabrx.com/pain-cancer-diabetes-pbm-may-now-doctor-illnesses/

[319] Peter J. Pitts, *Pharmacy benefit managers are driving the opioid epidemic*, SW News Media (Nov. 21, 2017), http://www.swnewsmedia.com/shakopee_valley_news/news/opinion/guest_columns/pharmacy-benefit-managers-are-driving-the-opioid-epidemic/article_2f6be2a1-c7a3-5f8d-9f3e-_61d29d25c84b.html

none.[320] A study by Tufts CSSD found that ninety-six percent (96%) of all prescription opioids were non-ADF in 2015.[321]

614.    Making matters worse, in addition to making it easy to obtain generic highly addictive opioids, PBMs make it **harder** to obtain **treatment**. The NY Times/ProPublica study found that insurers have erected more hurdles to approving addiction treatments than for the addictive substances themselves.[322]

615.    A 2008 study by the Mayo Clinic[323] found that patients who were weaned off opioids and followed a non-drug treatment experienced less pain than when they were on opioids and had improved functioning. Some plans cover these costs but other do not.[324]

616.    There are steps the PBMs could take. They could make it easier to access other non-addictive forms of pain relief. They could require doctors to start treating pain first with non-opioid pain medications as recommended by the CDC and turn to opioids as a last resort. They could cover alternative, non-medication treatments for pain. They could make addiction treatment more accessible. They could make their pricing more transparent so everyone could see if they were being improperly influenced by manufacturers to make choices for financial, not medical reasons.

617.    The PBMs do none of this, in direct contravention of their consistent bold public pronouncements of commitment to public health and safety, as described herein.

618.    The PBM claims of commitment to public health and safety are credible and made the express purpose of inducing public trust and reliance.

---

[320] Bennett, *supra* note 318.

[321] Pitts, *supra* note 319.

[322] Thomas and Ornstein, *supra* note 315.

[323] *See* https://www.ncbi.nlm.nih.gov/pubmed/18804915

[324] Barry Meier and Abby Goodnough, *New Ways To Treat Pain Meet Resistance*, THE NEW YORK TIMES (Jun. 22, 2016), https://www.nytimes.com/2016/06/23/business/new-ways-to-treat-pain-without-opioids-meet-resistance.html?mcubz=1,

619.     The PBMs are managed by highly-sophisticated and knowledgeable health care providers with lengthy professional histories that provide them particular expertise with evidenced based therapies, drug efficacy and clinical solutions.  It is precisely because of their sophistication and expertise that the PBM Defendants dominate the market and have the control that they do. The PBMs' secret agreements with the Manufacturer Defendants and the fact that their conduct is entirely at odds with their public pronouncements are not visible in the ordinary course.

620.     The PBMs' behavior is particularly egregious and subjects them to liability given their admitted and demonstrated ability to influence utilization and given that that they have acknowledged they are "uniquely positioned" to help address a national epidemic that they were instrumental in creating.  More than any other defendant, the PBMs have the power – with a few burdenless formulary edits – to dramatically impact the flow of opioids into our communities, including Webb County.  Were the PBMs to satisfy their own assurances to the public, and to control- as they easily could- the instrumentality that has harmed so many- the damage caused by defendants' purposeful scheme would have been avoided or substantially reduced.

iii.     **The CDC Guideline Can Be Readily Implemented by the PBMs, as Their Own Statements Acknowledge**

621.     The CDC Guideline readily translates into coverage guidelines that can and should already have been implemented by PBMs. Indeed, the PBM Defendants have vocally embraced the CDC Guideline as applicable to their practices and now market themselves (falsely) as offering opioid management programs that are CDC consistent.

622.     The CDC Guideline makes clear that opioids should be dispensed only rarely for chronic pain, thereby endorsing a form of utilization management known as "step therapy," whereby a clinician must attempt to treat a condition with one therapy before an alternative will be covered. Specifically, the CDC Guideline provides that: "[n]onpharmacologic therapy and

nonopioid pharmacologic therapy are preferred for chronic pain," and that "[s]everal nonopioid pharmacologic therapies (including acetaminophen, NSAIDs, and selected antidepressants and anticonvulsants) are effective for chronic pain."[325] The CDC Fact Sheet similarly states that "opioids are not first-line or routine therapy for chronic pain."[326]

623.    Consistent with the CDC Guideline, the PBM Defendants can impose step therapy rules that require clinicians to first treat chronic pain with nonpharmacologic and/or nonopioid pharmacologic therapy and only prescribe opioids if these therapies are ineffective. They have not. Even Defendant Purdue Pharma has now acknowledged that step therapy should precede opioid use for chronic pain.[327]

624.    The CDC Guideline stresses that opioids should be dispensed sparingly for acute pain, affirming that a three-day supply will be adequate for most patients suffering from acute pain and that "only rarely" will seven days be needed.[328]

625.    The PBM Defendants can implement this recommendation by imposing a default three-day quantity limit on opioid prescriptions for acute pain, and only covering a seven-day quantity subject to strict prior authorization approval. They have not. Indeed, in this vein, a number of States and State Medicaid programs have taken it upon themselves to impose three to five-day limits on opioid prescriptions.[329]

---

[325] CDC Guideline, *supra* note 182 at 16-17.

[326] CDC Fact Sheet, *supra* note 191 at 1.

[327] *See* Purdue Pharma, *We make prescription opioids. And we want to limit their use,* https://www.purduepharma.com/corporate-social-responsibilities/ongoing-efforts-to-help-address-the-opioid-crisis/open-letter/ (last visited Aug. 24, 2018).

[328] CDC Guideline, *supra* note 325 at 16, 24, *et seq.*

[329] *See, e.g.,* Florida (Fla. Stat. Ann. § 456.44 (2018)), Tennessee (Tenn. Code Ann. §63-1-164 (2018)), Kentucky (KY H.B. 333 (amending Ky. Rev. Stat. Ann. §218A.205, 2017)), Minnesota (SF 2a (2017)), New Jersey (N.J. Stat. Ann. § 24:21-15.2 (N.J. 218th First Annual Sess., L. 2018, c. 54 (except c. 48) and J.R. 5)), North Carolina (Strengthen Opioid Misuse Prevention Act of 2017, H.B. 243, N.C. Sess. Laws 2017-74 (N.C. 2017) (enacted)) and Arizona (Arizona Opioid Epidemic Act, 2018 S.B. 1001/H.B. 2001, 2018 Ariz. Sess. Laws 284 (Ariz. 2018) (enacted)).

626.	Whether for acute or chronic pain, the CDC Guideline provides key dosage benchmarks that can be incorporated into PBM formularies. Consistent with the recommendation that "Clinicians…should carefully reassess evidence of individual benefits and risks when increasing dosage to ≥ 50 [MME]/day, and…should avoid increasing dosage to ≥ 90 MME/day," PBMs can require prior authorization to increase dosages to ≥ 50 MME/day and exclude coverage for dosages ≥ 90 MME/day.[330]

627.	The CDC Guideline endorses expanding access to pharmacologic treatments for opioid overdose and OUD. The CDC points out that "patient cost can be a barrier to buprenorphine treatment because insurance coverage of buprenorphine for opioid use disorder is often limited."[331] Physician surveys also identify prior authorization and quantity limits[332] as frequent barriers to such treatments.[333]

628.	The PBM Defendants can help expand access by ensuring that they cover the range of treatments currently available (*i.e.*, naloxone, methadone, buprenorphine, and naltrexone) and eliminate prior authorization requirements and quantity limits for all those treatments that are covered. The have not.

629.	The PBMs' own documents confirm the important role they play in implementing the CDC Guideline. For example, nearly one year after the CDC Guideline was issued, Caremark

---

[330] CDC Guideline, *supra* note 325 at 16.

[331] *Id.* at 32.

[332] The CDC has issued guidance subsequent to March 2016 clarifying that the CDC Guideline dosage thresholds "are based on overdose risk when opioids are prescribed for pain and should not guide dosing of medication-assisted treatment for opioid use disorder." CDC, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf (last visited Aug. 29, 2018)

[333] Troy Parks, *AGs called on to help stop prior authorization for MAT,* AMA WIRE (Feb. 8, 2017), https://wire.ama-assn.org/ama-news/ags-called-help-stop-prior-authorization-mat; David Kan, MD, DFASAM, *Insurance Barriers to Accessing Treatment of Opioid Use Disorders Identified by California Physicians,* CALIFORNIA SOCIETY OF ADDICTION MEDICINE, Nov. 2016, https://www.csam-asam.org/ sites/default/files/pdf/misc/insurance_barriers_mat_2016_final.pdf.

publicly acknowledged that, **"[p]harmacy benefit managers (PBMs) play an important role in implementing the CDC [G]uideline, and helping ensure access and patient safety"** and assured its customers that it had "taken a thoughtful, evidence-based approach to implementing the CDC guideline into our utilization management (UM) criteria with consideration of the needs of those with chronic pain, as well as the potential for harm from these powerful medications."[334] Caremark also assured the public that its, **"UM criteria reinforce [the CDC] principles and encourage appropriate use of opioids by patients and prescribers. They provide coverage that fosters safe use of opioids, consistent with the … CDC [G]uideline**, to support plans helping members on their path to better health."[335]

630.    Express Scripts similarly boasts that its Advanced Opioid Management program "is based on CDC prescribing guidelines" and "promot[es] greater compliance with CDC guidelines."[336]

631.    OptumRx likewise claims that its "utilization management edits are tightly aligned with Centers for Disease Control (CDC) prescribing guidelines."[337]

632.    Unfortunately, however, the PBM Defendants' statements of concern are hollow and their assurances of fostering "safe use of opioids" consistent with the CDC Guideline are false.

---

[334] CVS Health, *The Balancing Act, Helping Ensure Appropriate Access to Opioids While Minimizing Risk*, INSIGHTS FEATURE (Feb. 28, 2017), https://payorsolutions.cvshealth.com/insights/balancing-act at 4 (emphasis added).

[335] *Id.* at 5 (emphasis added).

[336] Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients* (Jan. 11, 2018), http://lab.express-scripts.com/lab/insights/drug-safety-and-abuse/reducing-inapprop riate-selection -and-excessive-dispensing-of-opioids at 1.

[337]    OptumRx, *OptumRx Opioid Risk Management* (2018), https://www.accesskent.com/Benefits/pdf/Opioid-Brochure.pdf, at 2.

The PBM Defendants' utilization management criteria – to this day and despite all their talk – fall far short of meeting the CDC Guideline.[338]

### iv. The PBMs Are Still Not Controlling Opioid Usage Consistent with the CDC Guideline

633. All public statements to the contrary, none the PBM Defendants' opioid management programs or standard formularies are consistent with the CDC Guideline or their own promotional materials.

634. None require step therapy or prior authorization prior to reimbursing for the most commonly prescribed immediate-release opioids. None impose three-day quantity limits on any opioids when prescribed for acute pain. None limit dosages to ≤ 50 MME/day absent prior authorization or exclude coverage of dosages ≥ 90 MME/day. None uniformly cover all four types of pharmacologic treatment for OUD overdose and addiction without financial or procedural barriers.

635. In short, the PBMs may be finally saying "all the right things" when it comes to acknowledging the dangers of opioids and the need for tight controls. But the unfortunate reality is that three years after the CDC Guideline was issued, the PBM Defendants still have not uniformly installed available edits to their standard plan designs that are in line with the CDC Guideline, their own documents and all currently available medical literature.

636. Each of the PBM Defendants' current standard formularies and opioid management programs are examined in detail below:

---

[338] Researchers at the Johns Hopkins Bloomberg School of Public Health concur. Their June 22, 2018 study *Prescription Drug Coverage for Treatment of Low Back Pain Among US Medicaid, Medicare Advantage, and Commercial Insurers* found widespread failures to apply evidenced-based utilization management rules to discourage opioid use including failures to impose quantity limits and prior authorization and failures to require step therapies. Dora H. Lin, MHS, et al, JAMA NETWORK OPEN (Jun. 22, 2018), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2685625

### a. Caremark

637. According to the Drug Channels Institute, CVS Health (Caremark) was the highest-ranking PBM in 2017 with over twenty-five percent (25%) of the industry market share.[339] It currently covers more than 94 million lives.[340]

638. Caremark says the following about its "Formulary Development and Management":

> Development and management of drug formularies is an integral component in the pharmacy benefit management (PBM) services CVS Caremark provides to health plans and plan sponsors. Formularies have two primary functions: 1) *to help the PBM provide pharmacy care that is clinically sound* and affordable for plans and their plan members; and 2) to help manage drug spend through the appropriate selection and use of drug therapy.[341]

639. Caremark has three basic formularies: Standard Control, Advanced Control, and Value.[342] A wholly owned subsidiary (SilverScript) also manages two basic formularies for Medicare Prescription Drug Plans ("PDPs"), Choice and Plus.[343] Each of Caremark's basic formularies include opioids.

640. Contrary to the CDC Guideline, Caremark's Standard Control formulary contains no step therapies, prior authorization requirements or quantity limits for opioids on its face. It imposes no three-day limitations for acute pain. It does not limit the use of opioids for chronic pain

---

[339] Adam J. Fein, Ph.D., *The Outlook for Pharmacy Benefit Management: Evolution or Disruption*, DRUG CHANNELS INSTITUTE, Mar. 5, 2018http://drugchannelsinstitute.com/files/PBMI-PBM_Outlook-Drug_Channels-Fein-Mar2018-Handouts.pdf, at 2.

[340] CVS Health, *CVS Health at a Glance*, https://cvshealth.com/about/facts-and-company-information (last visited on Aug. 23, 2018).

[341] CVS Caremark, *Formulary Development and Management at CVS Caremark* (Mar. 25, 2018), https://www.caremark.com/portal/asset/FormDevMgmt.pdf at 1 (emphasis added).

[342] CVS Health, *Formulary Management*, https://payorsolutions.cvshealth.com/programs-and-services/cost-management/formulary-management (last visited Mar. 15, 2019) at 3.

[343] SilverScript, *Overview of 2018 SilverScript Plans*, https://www.silverscript.com/learn/plans-overview.aspx (last visited on Aug. 23, 2018)

outside active cancer, end-of-life and palliative care. The prescribing guide for the Standard Control formulary refers clinicians to 2017 prescribing guidelines, but even those do not require nonopioid step therapies for treatment of chronic pain or three-day limits for acute pain.

641.     Caremark's standard formularies do not cover any naltrexone treatments and it is unclear what utilization management or cost-sharing requirements may apply.

642.     Caremark's Standard Control formulary does not cover the higher strength prescription dosages of the following nonopioid pharmacological options, useful in many step therapies: ibuprofen, topical lidocaine, amitriptyline, doxepin, desipramine, diflunisal, choline magnesium trisalicylate, salsalate, etodolac, sulindac, indomethacin, celecoxib, meclofenamate and nabumetone.

643.     Caremark's Advanced Control formulary contains no step therapies, prior authorization requirements or quantity limits for opioids on its face.

644.     The Advanced Control formulary does not include many of the following prescription nonopioid pain treatment alternatives: capsaicin, diflunisal, choline magnesium trisalicylate, salsalate, etodolac, sulindac, indomethacin, meclofenamate and nabumetone.

645.     Caremark's Value Formulary contains no step therapies for any immediate release opioids. It has prior authorization requirements for some opioids, but not the most widely used opioids: hydrocodone-acetaminophen, oxycodone-acetaminophen and codeine-acetaminophen.[344]

---

[344]     *See* NIH, National Institute on Drug Abuse, *Most Commonly Used Addictive Drugs*, https://www.drugabuse.gov/publications/media-guide/most-commonly-used-addictive-drugs ("commonly prescribed opioids include hydrocodone (e.g., Vicodin), oxycodone (e.g., OxyContin), morphine, fentanyl, and codeine."); *see also,* Theodore J. Cicero; Matthew S. Ellis; Hilary L. Surratt; Steven P. Kurtz, *Factors influencing the selection of hydrocodone and oxycodone as primary opioids in substance abusers seeking treatment in the United States,* 154 PAIN 12 at 2639–2648 (2013) ("Our results showed that oxycodone and hydrocodone were the drugs of choice in 75% of all patients.").

646.    The Value Formulary points to the same lax 2017 opioid prescribing guidelines. In contrast, this formulary imposes both prior authorization and/or quantity limits on the majority of pharmacologic treatments for opioid addiction and overdose. The Value formulary (like Caremark's other commercial offerings) excludes an array of nonopioid pain relief options including: topical lidocaine, choline magnesium trisalicylate, salsalate, indomethacin, celecoxib and meclofenamate.

647.    Caremark's Medicare PDP formularies have no prior authorization requirements for opioids except fentanyl-related products, and no step therapies for any opioids. As with Caremark's other formularies, they impose dosage and quantity limits but these exceed the CDC Guideline's recommendations for MME per day.

648.    Caremark sets a 360 tabs/30 day limit for all strengths of Hydrocodone-acetaminophen (5-325mg, 7.5-325mg, 10-325mg), one of the most widely overprescribed opioids.[345] But even at the lowest dosage (5mg), this exceeds the CDC-recommended dosage limit of 50 MME/day.

649.    The following chart explains how Caremark's current hydrocodone Medicare quantity limits far exceed the CDC Guideline with respect to this highly abused drug:

---

[345] Seago S, Hayek A, Pruszynski J, Newman MG, *Change in prescription habits after federal rescheduling of hydrocodone combination products*, 29(3) PROCEEDINGS (BAYLOR UNIVERSITY MEDICAL CENTER) 268-270 (2016) ("hydrocodone/acetaminophen products are by far the most popular formulation and were the most frequently prescribed drug from 2007 to 2011."); *see also¸* Lydia Ramsey, *The 10 most popular prescription drugs in the US*, BUSINESS INSIDER, Dec. 28, 2017, https://www.businessinsider.com/common-popular-prescription-drugs-us-2017-7 ("Vicodin is the most popular drug in the US").

| Hydrocodone-acetaminophen, 360 tab per 30 days | Strength | MME[346] | Tabs/day | MME/day |
|---|---|---|---|---|
| 5-325mg | 5mg | 1.0 | 12 | **60 MME** |
| 7.5-325mg | 7.5mg | 1.0 | 12 | **90 MME** |
| 10-325mg | 10mg | 1.0 | 12 | **120 MME** |

650.  Caremark is similarly lax when it comes to imposing limits on the other most commonly prescribed opioid – oxycodone-acetaminophen.[347] Caremark's current Medicare quantity limits of 360 tablets/30 days for the 5-325mg, 7.5-325mg, and 10-325mg strengths of Oxycodone completely ignore the CDC Guideline.

| Oxycodone-acetaminophen, 360 tab per 30 days | Strength | MME[348] | Tabs/day | MME/day |
|---|---|---|---|---|
| 5-325mg | 5mg | 1.5 | 12 | **90 MME** |
| 7.5-325mg | 7.5mg | 1.5 | 12 | **135 MME** |
| 10-325mg | 10mg | 1.5 | 12 | **180 MME** |

651.  Caremark applies the same limits to the widely used acetaminophen-codeine, again ignoring the CDC Guideline.

| Acetaminophen-codeine, 400 tablets per 30 days | Strength | MME[349] | Tabs/day | MME/day |
|---|---|---|---|---|
| 300-30mg | 30mg | 0.15 | 13.33 | **59.99 MME** |
| 300-60mg | 60mg | 0.15 | 13.33 | **119.97 MME** |

652.  Additionally, Caremark's Medicare PDP formularies impose quantity limits and/or prior authorization requirements on the majority of pharmacologic treatments for opioid addiction

---

[346] CMS Conversion Chart, *Opioid Oral Morphine Milligram Equivalent (MME) Conversion Factors,* CENTERS FOR MEDICARE & MEDICAID SERVICES, Aug. 2017, https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Opioid-Morphine-EQ-Conversion-Factors-Aug-2017.pdf

[347] *See* U.S. Department of Health & Human Services, Office of Inspector General, *Opioids in Medicare Part D: Concerns about Extreme Use and Questionable Prescribing*, HHS OIG DATA BRIEF, OEI-02-17-00250 (July 2017) at 2 ("The most commonly prescribed opioids were tramadol, hydrocodone-acetaminophen (including the brand-name version, Vicodin), and oxycodone-acetaminophen (including the brand-name version, Percocet).")

[348] *See* CMS Conversion Chart, *supra* note 346.

[349] *Id.*

and overdose thereby limiting access. These treatments, including generics, are also all listed on Tier 3 or higher of the formulary. This designation is associated with copays of at least $35 or coinsurance rates typically exceeding 33%.

653.    Even with its new Opioid Utilization Management Program, Caremark does not require step therapy as a pre-condition for coverage of immediate-release opioids.[350] Caremark does not impose three-day limits on opioids prescribed for acute pain, or require prior authorization when opioids are prescribed for chronic pain. Caremark limits the quantity of opioids prescribed per day, but only to 90 MME/day,[351] a quantity the CDC says, should be avoided.[352] Caremark does not require prior authorization prior to covering immediate-release opioids (*i.e.*, hydrocodone-acetaminophen, oxycodone-acetaminophen, codeine-acetaminophen). And, Caremark merely allows for an "emergency supply" of buprenorphine-naloxone products while it processes prior authorization, rather than broadly waiving such requirements.[353]

### b.    Express Scripts

654.    Express Scripts "provides pharmacy benefits to 83 million members. Of these, more than 27 million obtain their pharmacy benefit coverage through one of Express Scripts' standard formularies and more people use the [Express Scripts'] National Preferred Formulary than any other formulary in the U.S."[354]

---

[350] CVS Caremark, *CVS Caremark Opioid Quantity Limits Pharmacy Reference Guide* (Jan. 2018), https://www.caremark.com/portal/asset/Opioid_Reference_Guide.pdf

[351] *Id.*

[352] CDC Guideline, *supra* note 325 at 16, 22, 23.

[353] CVS Health, *The Balancing Act, Helping Ensure Appropriate Access to Opioids While Minimizing Risk*, INSIGHTS FEATURE (Feb. 28, 2017), https://payorsolutions.cvshealth.com/insights/balancing-act at 6.

[354] *See* Express Scripts, *The Value of Active Pharmacy Management: Express Scripts 2018 National Preferred Formulary*, 2018, https://www.multivu.com/_players/English/81495241-express-scripts-national-preferred-formulary-2018/ at 1.

655.     Express Scripts explains that their standard formularies are "governed by our National Pharmacy & Therapeutics Committee (the 'P&T Committee'), a panel of independent physicians and pharmacists in active clinical practice, representing a variety of specialties and practice settings and typically with major academic affiliations."[355]

656.     Express Scripts touts that the "the P&T Committee considers the drug's safety and efficacy," and the company "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy."[356] Express Scripts further states that, "we re-evaluate our National Preferred Formulary on an annual basis. We look at the formulary first from a clinical perspective to ensure that it provides access to safe and effective medications in all therapy classes."[357]

657.     And yet, to this day, and notwithstanding the CDC Guideline and everything that is now known about the addictive properties of opioids and opioid over-prescribing, every standard commercial Express Scripts formulary contains no restrictions whatsoever on the majority of opioids covered – no quantity limits, no step therapies, no prior authorization requirements.

658.     Express Scripts recently updated its National Preferred Formulary to exclude coverage for two long-acting opioid oral analgesics (Opana ER and Oxycodone ER) and two narcotic analgesics (Buprenorphine Patches and Butrans) but, even there, Express Scripts presents no fewer than six "preferred alternatives," each of which are highly addictive opioids available in extended-release forms.

---

[355] Express Scripts, *2017 Annual Report*, *supra* note 307.

[356] *Id.*

[357] Express Scripts, *Smart Formulary Management* (Jan. 2, 2014), http://lab.express-scripts.com/lab/insights/drug-options/smart-formulary-management at 2 (emphasis added).

659. The National Preferred Formulary indicates that certain naloxone (Narcan nasal spray) and buprenorphine (Suboxone Sublingual Film and Zubsolv sublingual tablets) treatments are available, but does not list any methadone or naltrexone treatments.

660. Despite its articulated commitment to step therapies, the Express Scripts National Preferred formulary does not cover numerous highly effective prescription nonopioids including: doxepin, desipramine, diflunisal, choline magnesium trisalicylate, etodolac, sulindac, indomethacin, and meclofenamate.

661. Express Scripts' Medicare PDP formularies are likewise lax. They impose prior authorization requirements for certain opioids but most immediate-release opioids are not subject to step therapy or prior authorization requirements. The quantity and dosage limits in place exceed the CDC Guideline.

662. The following charts explains how Express Scripts' current hydrocodone and oxycodone Medicare quantity limits far exceed CDC Guidance with respect to these highly abused drugs:

| Hydrocodone-acetaminophen, 372 tablets per 31 days | Strength | MME[358] | Tabs/day | MME/day |
|---|---|---|---|---|
| 5-325mg | 5mg | 1.0 | 12 | 60 MME |
| 7.5-325mg | 7.5mg | 1.0 | 12 | 90 MME |
| 10-325mg | 10mg | 1.0 | 12 | 120 MME |

| Oxycodone-acetaminophen, 372 tablets per 31 days | Strength | MME[359] | Tabs/day | MME/day |
|---|---|---|---|---|
| 5-325mg | 5mg | 1.5 | 12 | 90 MME |
| 7.5-325mg | 7.5mg | 1.5 | 12 | 135 MME |
| 10-325mg | 10mg | 1.5 | 12 | 180 MME |

---

[358] *See* CMS Conversion Chart, *supra* note 346.

[359] *Id.*

663.     Express Script's Medicare PDP formularies impose prior authorization and/or quantity limits on the majority of covered pharmacologic treatments for opioid addiction and overdose thereby limiting access. These treatments are listed on Tiers 2 through 4 of the formularies, indicating that at least some non-nominal cost-sharing is required.

664.     As in the commercial contexts, the Express Scripts Medicare formulary does not include a number of the following prescription nonopioids useful in a step therapy context: choline magnesium trisalicylate, indomethacin, meclofenamate and nabumetone.

665.     Even with its Advanced Opioid Management Program, Express Scripts does not impose a three-day limit for first-time users dealing with acute pain; does not require step therapy prior to covering immediate-release opioids; and does not require prior authorization for immediate-release opioids.[360] Express Scripts limits the dosage of opioids prescribed per day, but only to 200 MME/day, **more than double the dosage which the CDC Guideline says should be avoided.**[361] Moreover, Express Scripts' program – self-described as a "comprehensive solution" that "significantly reduces inappropriate selection and excessive dispensing of opioids," particularly for those taking an opioid for the first time[362] – reportedly has a fee of $0.30 PMPM. For a client with 10,000 members, this translates to a yearly cost of approximately $36,000 – a significant amount.

---

[360] *See* Express Scripts, *Putting the brakes on the opioid epidemic* (accessed Mar. 13, 2019) https://my.express-scripts.com/opioids.html; Nicholas Hamm, *Express Scripts Limits Opioid Prescriptions*, DRUG TOPICS (Aug. 17, 2017), http://www.drugtopics.com/clinical-news/express-scripts-limits-opioid-prescriptions; Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients* (Jan. 11, 2018), http://lab.express-scripts.com/lab/insights/drug-safety-and-abuse/reducing-inapprop riate-selection -and-excessive-dispensing-of-opioids

[361] *See* Hamm, *Express Scripts Limits Opioid Prescriptions, supra* note 360 at 1.

[362] *See* Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients, supra* note 360 at 1.

666.    Nowhere does any Express Scripts formulary advise that opioids are inappropriate for chronic pain treatment outside active cancer, end-of-life or palliative care.

667.    Virtually every opioid analgesic on every Express Scripts formulary (commercial or Medicare) is available through its mail order pharmacy. Mail order pharmacies are used most commonly for maintenance drugs and the treatment of chronic conditions.[363] The CDC made clear three years ago that opioids are not proven effective for treatment of chronic pain outside active cancer, end of life, or palliative care.

### c.    OptumRx

668.    According to the Drug Channels Institute, OptumRx (UnitedHealth) was the third highest ranking PBM in 2017 with twenty-two (22%) of the industry market share.[364] Recent OptumRx publications indicate that it provides pharmacy services to 65 million Americans.[365]

669.    OptumRx offers five basic formularies,[366] each of which includes opioids. OptumRx's 2018 Generic Centric Formulary appears to have no limits whatsoever surrounding the coverage of opioids.

670.    OptumRx's other commercial formularies require prior authorization only on some opioids, not including the most popular immediate-release drugs. They also do not appear to

---

[363] James Chan, PharmD, PhD; and O. Kenrik Duru, MD, MSHS, *Safety and Effectiveness of Mail Order Pharmacy Use in Diabetes,* AJMC (Nov. 2013) at 882-887 ("Mail order pharmacies are widely used to deliver medications in the United States, with up to one-third of chronic illness medications delivered by mail."); *see also* Constance Horgan, Brigid Goody, David Knapp, and Leslye Fitterman, *The Role of Mail Service Pharmacies,* HEALTH AFFAIRS (Fall 1990) at 67 ("One such alternative is mail service pharmacies, which generally concentrate on processing new and renewal prescriptions for maintenance drugs through the mail.")

[364] Adam J. Fein, Ph.D., *supra* note 339.

[365] OptumRx, *OptumRx: Driving Smarter Health Care Connections* (2015), https://www.optum.com/content/dam/optum/resources/brochures/Rx/OptumRxFactSheet_Final.pdf at 1.

[366] OptumRx, *Formulary and drug lists* (June 5, 2018), https://professionals.optumrx.com/resources/formulary-drug-lists.html

require step therapy for immediate-release opioids or an across the board three-day limit for acute pain treatment. They do not advise against the dispensing of opioids for chronic pain.

671.     OptumRx currently limits immediate-release opioids for patients new to opioid therapy to 49 MME a day; however, patients not new to opioid therapy may receive 90 MME per day,[367] a limit the CDC Guideline recommends should avoided.

672.     OptumRx's Medicare PDP formularies do not appear to have any prior authorization requirements for most long-acting opioids or widely used opioids such as hydrocodone/acetaminophen, oxycodone/acetaminophen and codeine/acetaminophen, instead imposing prior authorization requirements for only a very limited number of immediate-release branded opioids. These formularies have very few quantity limits, as well, including no apparent limits on the popular opioids identified above. Without such quantity limits, OptumRx does not appear to limit Medicare reimbursement for acute pain treatment to three days.

673.     OptumRx offers its OptumRx Opioid Risk Management program for an additional fee. Only through enrollment in that program, for extra money, will its commercial customers receive services that OptumRx's falsely claims are compliant with the CDC Guideline. Even in its Opioid Risk Management Program, OptumRx does not appear to limit acute treatment to three-days and does not require step therapy for opioid treatment of chronic pain.[368]

674.     Upon information and belief, the initial Webb County complaint marked the first pleading in the Country to identify PBMs as among those bearing responsibility for the opioid scheme. The omission of PBMs from most legal efforts to address the opioid crisis has been noted. "Drugmakers, pharmaceutical distributors, pharmacies and doctors have come under intense

---

[367] *Id.*

[368] *OptumRx Opioid Risk Management, supra* note 337.

scrutiny in recent years, but the role that insurers – and the pharmacy benefit managers that run their drug plans – have played in the opioid crisis has received less attention."[369]

675.    As one news outlet described it, "[o]ne overlooked culprit worsening the epidemic, however, comes straight from our health care system: pharmacy benefit managers, or PBMs. To improve their bottom line, they're blocking access to prescriptions that can help prevent overdoses."[370]

676.    In sum, because PBMs are the intermediary between drug manufacturers, pharmacies, and ultimately patients, these companies influence everything from pharmacy reimbursements, to what drugs are covered under formularies. In these ways, the PBMs drive which drugs enter the marketplace. Their fingerprints are on nearly every opioid prescription filled and they profit in myriad ways on every pill.

677.    PBMs' complicity in the overall fraudulent scheme is knowing and purposeful. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements and other hurdles that would slow down flow. A review of the defendant PBM formularies as alleged herein, confirms that they include all of the opioids at issue in this case, often in preferred tiers, without quantity limits or prior authorization requirements.

678.    Given their control over customer behavior, market power and "unique[] position[]," in the marketplace,[371] as alleged herein, the PBMs' new opioid management programs – flawed though they are – are beginning to impact opioid flow **for participating customers**.

[369] Thomas and Ornstein, *supra* note 315.

[370] Pitts, *supra* note 319.

[371] OptumRx, *Confronting the Opioid Epidemic* (2018), https://www.optum.com/resources/library/opioid-e-book.html?s3=rxopioid at 9.

679. For example, Caremark describes how clients who:

> implemented our opioid utilization management program in 2017 had a number of positive results, including that the number of patients new to opioid therapy with an acute condition who received more than a seven day supply of an opioid *decreased 70 percent*. For those clients, the number of patients new to opioid therapy who receive a seven-day supply or less **is now nearly 94 percent.**[372]

680. Express Scripts similarly boasts of its ability to influence opioid usage among customers paying for its new opioid management plan:

> In the first 90 days since the program began on September 1, 2017, we observed a nearly 60% reduction in the average days supply for patients receiving an opioid prescription for the first time, from 18.6 days supply per prescription claim before the launch of the program, to 7.5 days supply per claim after the start of the program….
>
> Nearly 96% of patients prescribed an opioid for the first time started with a 7-day supply or less.[373]

681. OptumRx likewise proclaims that since launching its Opioid Risk Management program on July 1, 2017 with 400 clients (out of 65 million served)[374] it has "delivered the following improvements: [i] 82 percent decrease in prescriptions above the CDC guideline recommended dose of 50mg morphine equivalent dose (MED) per day for first-fill acute prescriptions; [ii] 65 percent decrease in prescriptions for first-fill acute opioid treatment written above the maximum 7-day supply; [iii] 68 percent decrease in prescriptions for current chronic

---

[372] CVS Health, *Utilization Management Strategies to Address the Opioid Crisis* (Feb. 28, 2018), https://cvshealth.com/thought-leadership/utilization-management-strategies-to-address-the-opioid-crisis at 1 (emphases added).

[373] Express Scripts, *Express Scripts Significantly Reduces Inappropriate Selection and Excessive Dispensing of Opioids for New Patients, supra* note 360 at 1.

[374] *See* Alex Reger, *Heath Insurers and Pharmacy Benefit Managers: Information on Size, CEO Salaries, and Fiduciary Relationships,* Research Report - Office of Legislative Research (Conn.), Mar. 1, 2018 at 3.

opioid utilizers issues for >90mg MED; and [iv] 14 percent reduction in average dose across all opioid prescriptions."[375]

682.    The PBM Defendants admitted and demonstrated control over utilization of the highly addictive opioids at the heart of this national health crisis which requires them to contribute to the damages and injunctive relief sought by Plaintiff through this action.

## V.    THE INAPPLICABILITY OF TEXAS' LIABILITY OF NONMANUFACTURING SELLERS STATUTE

683.    The Texas Liability of Nonmanufacturing Sellers statute provides that "[a] seller that did not manufacture a product is not liable for harm caused to the claimant by the product" under certain circumstances.[376] This limited immunity provision is inapplicable to the claims in the instant case because, *inter alia*, the claims brought in this lawsuit do not fall within the definition of a product liability action, because the claims brought under this lawsuit are subject to one or more statutory exceptions to § 82.003, and because the immunity conferred in § 82.003 does not extend to illegal drug diversionary conduct.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

684.    Defendants' conduct has continued from the early 1990s through today, and is still ongoing. The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants has not ceased. The public nuisance remains unabated.

---

[375] Optum, *OptumRx Opioid Risk Management Program Leads to Better Outcomes for Patients and Clients* (Aug. 22, 2017), https://www.optum.com/about/news/optumrx-risk-management-program-leads-to-better-outcomes.html at 1.

[376] *See* TEX. CIV. PRAC. & REM. CODE § 82.003.

685.     Defendants are equitably estopped from relying upon a statute of limitations defense. In Texas, the statute of limitations is tolled if, as occurred here, the defendant fraudulently concealed the existence of the claim. Only when the plaintiff discovers or could have discovered the claim through reasonable diligence does the clock start again.

686.     Here, Defendants undertook efforts to purposefully conceal their unlawful conduct, by manipulating and distorting public information, knowledge, and facts; negligently and recklessly failing to make public or otherwise produce nonpublic information, over which the Defendants had exclusive possession, dominion, and control, that would have revealed the truth; and by deliberately and fraudulently concealing the truth.

687.     Defendants had in their possession and control reports that those treated with opioids in clinical trials exhibited behaviors indicating that the Manufacturer Defendants' opioids were addictive; data suggesting or proving that large amounts of opioids were being diverted from legitimate, legal channels and used for medical treatment; and information that specific doctors and pharmacies were engaged in an illegal pattern of conduct that was designed to provide, in exchange for monies, opioids to persons who did not suffer from FDA approved indications.

688.     Defendants purposely concealed their wrongful conduct, including by assuring the public and governmental authorities that they were complying with their obligations and were acting to prevent diversion and drug abuse. The Defendants were aware of the falsity of their misrepresentations because they were aware of their own history of conduct which included repeated breaches of such duties.

689.     Manufacturer Defendants also misrepresented the impact of their behavior by providing the public with false information about opioids and have continued to use Front Groups and third parties to minimize the risks of Defendants' conduct.

690.     PBM Defendants fraudulently hid their financial relationships with Manufacturer Defendants, making it impossible for Webb County to discover the PBM Defendants' role in promoting opioids through reasonable diligence.

691.     The financial relationships between the PBM and Manufacturer Defendants remain notoriously opaque even to the present day.

692.     As alleged herein in detail, the PBM Defendants are also falsely representing that their new opioid management programs are compliant with the 2016 CDC Guideline; they are not.

693.     Defendants have also concealed and prevented discovery of information, including data from the ARCOS database, that will confirm their identities and the extent of their wrongful and illegal activities.

694.     Defendants also lobbied Congress and actively attempted to halt DEA investigations and enforcement actions and to subvert the ability of agencies to regulate their conduct.[377] As a result, there was a sharp drop in enforcement actions and the standard for the DEA to revoke a distributor's license was raised.

695.     Because the Defendants concealed the facts surrounding the opioid epidemic, Webb County did not know of the existence or scope of the Defendants' misconduct and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

696.     Defendants intended that their false statements and omissions be relied upon.

697.     Defendants knew of their wrongful acts and had material information pertinent to their discovery, but concealed that information from the public, including Webb County. Only

---

[377] *See* Scott Higham and Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, WASH. POST (Oct. 15, 2017), https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/?utm_term=._b0e09d99ae80

Defendants knew of their widespread misinformation campaign and of their repeated, intentional failures to prevent opioid diversion.

698.    Defendants cannot claim prejudice due to a late filing because this suit was filed upon discovering the facts essential to the claim. Indeed, the full existence, extent, and damage of the opioid crisis and those responsible, including the PBMs, has yet to come to light and will only be fully understood after Plaintiff has had an opportunity to obtain discovery.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### PUBLIC NUISANCE
### (AGAINST ALL DEFENDANTS)

699.    Webb County re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

700.    Texas law prohibits the maintenance of a public nuisance. Under common law, a public nuisance may result from intentional conduct, negligent conduct, or conduct that is unusually hazardous, abnormal, or out of place considering the surroundings. A public nuisance adversely impacts an entire community or a significant portion of the public. Therefore, a cause of action for public nuisance exists where a defendant's abnormally hazardous conduct negatively affects the community at large. The public nuisance complained of herein results predictably from the over-saturation and unlawful availability of highly dangerous opioids in Webb County as a result of Defendants' unreasonable, intentional, unlawful, abnormal, reckless and negligent conduct.

701.    Defendants manufactured, sold, promoted, distributed, and/or reimbursed for prescription opioids in a manner that created, or assisted in creating, a public nuisance that is harmful and injurious to the County as described herein.

702.     The Manufacturer Defendants knew or should have known that their promotion of highly addictive opioids would create a public nuisance:

(a)     Manufacturer Defendants have engaged in massive production, promotion, and distribution of opioids for use in Webb County;

(b)     Manufacturer Defendants' actions created and expanded the market for opioids, promoting their wide use for pain management;

(c)     Manufacturer Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the highly addictive nature of the drugs;

(d)     Manufacturer Defendants knew that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

703.     The Manufacturer Defendants' actions were a substantial factor in making opioids widely available and widely used. The Manufacturer Defendants' actions were a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain. Without the Manufacturer Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

704.     The Manufacturer Defendants also knowingly, intentionally, recklessly, and/or negligently funneled massive quantities of prescription opioids to physicians and other prescribers who they knew or should have known wrote suspicious prescriptions and/or wrote prescriptions for known abusers of prescription opioids.

705.     The Manufacturer Defendants knowingly, intentionally, recklessly, and/or negligently disseminated prescription opioids to distributors who they knew or should have known failed to implement effective controls and procedures to guard against theft, diversion, and abuse of prescription opioids.

706.     The Manufacturer Defendants also knowingly enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills" known for providing opioids to known drug abusers, and known drug dealers, knowing that such opioids would be illegally trafficked and abused.

707.     The Manufacturer Defendants knowingly and intentionally conspired with and incentivized the PBM Defendants to design plans and place opioids on PBMs formularies in ways that encouraged utilization of these highly addictive drugs, and discouraged utilization of less addictive alternatives. The Manufacturer Defendants and PBMs intentionally created plans without proper controls on these highly addictive products, irrespective of medical necessity, and knowingly their actions would result in widespread and unnecessary overuse.

708.     The Distributor and Pharmacy Defendants' nuisance-causing activities include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of prescription opioids, and failing to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids.

709.     The Distributor and Pharmacy Defendants also knowingly and intentionally enabled and/or failed to prevent the illegal diversion of prescription opioids into the black market, including "pill mills," knowing that such opioids would be illegally trafficked and abused in manners that would predictably harm Webb County and municipalities nationwide.

710.     The PBM Defendants knowingly and intentionally designed benefit plans and standard national formularies that would maximize opioid utilization.

711.     The PBM Defendants knowingly, intentionally, recklessly and negligently failed to manage these plans to minimize the use and abuse of opioids.

712.     The PBM Defendants knowingly and intentionally chose to include opioids on their formularies that they knew were highly addictive and dangerous. The PBM Defendants did not

install reasonable controls in the form of quantity limits, prior authorization requirements or MME daily limits.

713.     The PBM Defendants knowingly and intentionally chose to include opioids that were easier to misuse (for example, by crushing them into powder and mixing them with liquid in order to inject them) instead of Abuse Deterrent Formulations ("ADFs") which tended to be more expensive.

714.     The PBM Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain. To this date, dozens of non-narcotic pain treatments are not covered by PBM baseline national formularies. This led directly to the increased sale and use of opioids.

715.     The PBM Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

716.     To this date, the PBM Defendants chose not to cover or create barriers to accessing drugs typically used to treat Opioid Use Disorder ("OUD") such as naloxone, methadone, buprenorphine and naltrexone.

717.     The public nuisance created by Defendants endangers the health and safety of the County and impacts negatively the County's ability to provide essential services.

718.     The public nuisance created by Defendants' actions has caused and continues to cause significant harm to Webb that includes but is not limited to:

   (a)     Responding to opioid-related drug overdoses and deaths;

   (b)     The disease of addiction and other diseases related to long-term opioid use;

   (c)     Other child abuse and neglect resulting from opioid abuse;

   (d)     Crime associated with illegal drug use and opioid sales;

(e)     Unemployment resulting from an inability to work while addicted to opioids;

(f)     Blight, vagrancy, property damage, and property crime.

719.    Defendants' actions created a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' actions is not only an explosion of prescription opioids on the black market, but also a marked increase in the availability of heroin and synthetic opioids.

720.    The diversion of opioids into the secondary, criminal market by Defendants and the increase in the number of individuals who abuse or are addicted to opioids has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of the County.

721.    Public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which would otherwise be used to serve the public at large in the County.

722.    Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimate societal interest in the Manufacturer Defendants' dissemination of false "scientific" facts and advice in their pursuit of increased profits and the expense of communities and families nationwide. There is no legitimate societal interest in the Distributor and Pharmacy Defendants failing to identify, halt, and report suspicious opioid transactions. There is no legitimate societal interest in the PBM Defendants constructing formularies that ensure uncontrolled opioids, and create barriers to treatment and less addictive pain alternatives.

723.    At all times, the Manufacturer Defendants had the power to stop providing false information to the market about the dangers of opioids and the highly addictive nature of their

opioid products. At all times, the PBM Defendants have had the power to adjust their baseline formularies to ensure proper opioid utilization, maximize access to non-opioid alternatives and treatment medicines.

724.     The Distributor and Pharmacy Defendants possessed the right and ability to control the nuisance-causing outflow of prescription opioids to pharmacy locations and other points of sale into the County.

725.     The PBM Defendants had the power to minimize the sale and use of less effective, more addictive and more divertible opioids. They could have installed preauthorization requirements for opioid prescriptions for chronic pain, when other non-opioid options were available. They could have responded favorably to direct requests from governmental payors attempting to control opioid flow and offer non-opioid options. They could have made it easier for patients to access less addictive, less dangerous drugs and treatment drugs. They could have monitored and modified patients' usage. They could have imposed stricter quantity limits or refill limitations or pre-authorization requirements.

726.     The Purdue Individual Defendants, who are officers, directors and/or equity holders of Purdue and affiliates, directed and participated in the tortious conduct of Purdue and are individually liable.

727.     As a direct and proximate result of the public nuisance, the County has sustained (and continues to sustain) harm by spending a substantial amount of money trying to fix the harms caused by the Defendants' nuisance-causing activity, including, but not limited to, the costs of hospital services, healthcare, emergency medical services, social services, prevention, treatment, education, intervention and law enforcement and overhead expenses as set forth more fully herein.

728.     The public nuisance – *i.e.* the opioid epidemic – created, perpetuated and maintained by the Defendants can be abated and further reccurrence of such harm can be abated.

729. Defendants should be required to pay for the harm the County has suffered and/or will suffer because of the public nuisance Defendants caused.

730. Therefore, Webb County demands judgment in its favor against Defendants for injunctive relief, abatement of the public nuisance, and for damages in an amount to be determined by a jury, together with all costs of this action, including pre-judgment interest, post-judgment interest, costs and expenses, attorneys fees and such other relief as this Court deems just and equitable.

## SECOND CAUSE OF ACTION
## NEGLIGENCE PER SE
## (AGAINST MANUFACTURER, DISTRIBUTOR AND PHARMACY DEFENDANTS)

731. Webb County re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

732. As set forth herein, the Manufacturer, Distributor and Pharmacy Defendants failed to perform their statutory and regulatory obligations under the CSA and Texas Controlled Substances Act, TEX. HEALTH & SAFETY CODE § 481.001 *et seq*., which were enacted to promote safety and to prevent exactly the type of harm that occurred as a result of Defendants' failures.

733. Defendants failed to maintain effective controls against diversion as required under 21 C.F.R. § 1301.74(b).

734. Defendants failed to report suspicious orders to law enforcement and perform due diligence prior to filling orders.

735. Defendants failed to design and operate a system to disclose suspicious orders of controlled substances.

736. Together, these requirements were intended to prevent opioid use and diversion.

737.     The Manufacturer, Distributor and Pharmacy Defendants violated the Texas Controlled Substances Act by knowingly diverting opioids for unlawful use. TEX. HEALTH & SAFETY CODE § 481.1285(b)(2).

738.     The Defendants' failure to comply with these requirements caused precisely the type of harm that the requirements were intended to prevent.

739.     As a proximate result of these failures, pills flooded the system causing substantial socio-economic harm to the County as described herein. These costs include, but are not limited to, increased policing, medical, fire, prevention, treatment, and court services, lost tax revenues, and lost communal benefits of the County's limited and diverted resources.

740.     These injuries are a direct and proximate result of the Manufacturer, Distributor and Pharmacy Defendants' conduct, and Webb County should be awarded civil penalties pursuant to the CSA and § 481.1191 of the Texas Controlled Substances Act, and all other damages and relief available under the law.

### THIRD CAUSE OF ACTION
### NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

741.     Webb County re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

742.     Defendants have a duty to Webb County to employ a reasonable standard of care in the sale, distribution, dispensing, reimbursement and promotion of what Defendants knew to be highly addictive, dangerous opioids. This includes a duty to not create a foreseeable risk of harm.

743.     Defendants breached this duty by failing to exercise reasonable care or skill with respect to their opioid-related conduct. Collectively, and individually, Defendants made highly addictive prescription opioids available to the marketplace with the knowledge that they were likely being used for non-medical purposes and/or posed an inherent danger especially to patients

who were using opioids for chronic pain not associated with active cancer, end-of-life or palliative care. Defendants knew their breach would foreseeably cause harm to Webb County and local governments nationwide.

744. Defendants were negligent in failing to abide their duties to conduct themselves with the requisite care and skill and faithfulness.

745. Defendants placed their profit motives above their legal duties and enabled, encouraged and caused the over-use of opioids.

746. All Defendants are highly sophisticated and knowledgeable actors in the health care marketplace, well informed of the highly addictive nature of prescription opioids and likelihood of foreseeable harm to communities from prescription opioid addiction and diversion. Defendants breached their duties when they failed to act with reasonable care in their respective roles, roles which positioned each of them to help abate the opioid epidemic if they elected to use their power for good, instead of profit.

747. A negligent and/or intentional violation of the Defendants' duties poses distinctive and significant dangers to the County.

748. At all times, Defendants each had the ability and obligation to control the opioid access and utilization that led to this man-made epidemic.

749. The Purdue Individual Defendants, who are officers, directors and/or equity holders of Purdue and affiliates, directed and participated in the tortious conduct of Purdue and are individually liable.

750. As a proximate result of their failures, the Defendants have caused the County to incur excessive social and economic costs related to responding to the opioid crisis. These costs include but are not limited to, increased policing, medical, fire, and court services, lost tax

revenues, lost productivity, and lost communal benefits of the County's limited and diverted resources.

751. The Injuries to the County would not have happened in the ordinary course of events had Defendants exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business in the manufacture, marketing, sale and distribution of opioids.

752. Webb County is entitled to recover compensatory damages as a result of Defendants' negligence, in an amount to be determined at trial.

753. As a result of Defendants' intentional, willful, wanton and/or reckless conduct described herein, the County is entitled to treble, punitive, exemplary and/or otherwise enhanced damages to the full extend available under state law, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
## GROSS NEGLIGENCE
## (AGAINST ALL DEFENDANTS)

754. Webb County re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

755. Defendants' scheme to optimize profits and opioid utilization regardless of the effect on Webb County was done intentionally.

756. Defendants' failure to take any action to prevent or reduce the unnecessary, non-medical, or criminal use of opioids was grossly negligent and done with conscious willful, reckless, or grossly negligent indifference or disregard for foreseeable consequences of promoting utilization of highly addictive drugs.

757. At every stage, Defendants knew or should have known that their conduct with respect to highly-addictive opioids would create an unreasonable risk of physical harm to others, including Webb County.

758. As a result of Defendants' intentional, willful, wanton and/or reckless conduct described herein, the County is entitled to treble, punitive, exemplary and/or otherwise enhanced damages to the full extend available under state law, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## FRAUD
## (AGAINST MANUFACTURER DEFENDANTS)

759. Webb County re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

760. As set forth herein, the Manufacturer Defendants, individually and acting through their employees and agents, and in concert with each other, made misrepresentations and omissions of facts material related to the addictive nature of opioids and their efficacy for treatment of chronic pain.

761. The Manufacturer Defendants intentionally made inaccurate representations regarding the adverse medical conditions associated with the use of opioids.

762. The Manufacturer Defendants knew or reasonably should have known that the representations made to the County regarding the risks of opioids were false or incomplete and misrepresented material facts regarding the use of opioids for chronic pain.

763. The Manufacturer Defendants willfully, knowingly, and deceptively withheld material facts regarding the risks and side effects associated with opioids from Webb County, healthcare providers, and consumers.

764. The County reasonably relied on the representations made by Defendants, which caused the County, through its programs, departments, and agencies, to spend County funds responding to the opioid crisis.

765. Webb County was justified in its reliance on Defendants to educate as to the risks and dangerous and potentially life-threatening side effects associated with opioid use.

766.     As a proximate and direct result of Defendants' fraudulent misrepresentations, Webb County has suffered and will continue to suffer damages and is therefore entitled to recover for those damages.

767.     Defendants' conduct was willful, wanton, and malicious and was directed at persons within the County.

768.     The reprehensible nature of the Defendants' conduct further entitles the County to an award of punitive damages.

## SIXTH CAUSE OF ACTION
## CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)

769.     Webb County re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

770.     The Defendants agreed to engage in a campaign to flood the market with false and misleading information about the safety of prescription opioid use for the treatment of chronic pain, to evade controls on opioid diversion, to increase opioid quotas, and to promote their use through plan design including formulary placements, not requiring pre-authorization, not installing quantity limits, and not covering less-addictive alternatives or OUD treatments.

771.     The Defendants did so in an effort to profit off the increased sales of prescription opioids.

772.     Each Defendant made false or misleading statements directly and through third parties to further the objectives of their conspiracy.

773.     Webb County was directly and proximately harmed by the Defendants' civil conspiracy in an amount to be determined in this litigation.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE DECEPTIVE TRADE PRACTICES –**
**CONSUMER PROTECTION ACT § 17.41 ET SEQ.**
**(AGAINST MANUFACTURER DEFENDANTS)**

774. Webb County re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

775. The Texas Deceptive Trade Practices – Consumer Protection Act ("DTPA") is designed to protect consumers against false, misleading, and deceptive business practices. Tex. Bus. & Comm. Code § 17.44(a). Defendants' acts and omissions, as set forth herein, constitute false or misleading oral or written statements or other representations and omissions that Defendants knowingly made in the regular course of their trade and in connection with the sale of their goods, which may have, tended to, or did deceive or mislead consumers and medical professionals. These acts and omissions therefore constitute unfair and deceptive trade practices in violation of § 17.44(a).

776. The DTPA specifically prohibits a person from representing that goods or services have "sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have." § 17.46(b)(5).

777. Moreover, "the term 'false, misleading, or deceptive acts or practices' includes, in the production, sale, distribution, or promotion of a synthetic substance that produces and is intended to produce an effect when consumed or ingested similar to, or in excess of, the effect of a controlled substance or controlled substance analogue, as those terms are defined by Section 481.002, Health and Safety Code: (A) making a deceptive representation or designation about the synthetic substance; or (B) causing confusion or misunderstanding as to the effects the synthetic substance causes when consumed or ingested." § 17.46(b)(31).

778.    As alleged herein, the Manufacturer Defendants violated the DTPA by representing that opioids have uses or benefits in treating chronic, non-cancer pain that they do not have, and by misrepresenting the risks of addiction, overdose, and other negative effects that opioids pose.

779.    Defendants engaged in the above-described acts and omissions intentionally and with knowledge that harm might result, and thus willfully violated the DTPA.

780.    As a proximate result of Manufacturer Defendants' deceptive acts, Defendants have caused the County to incur excessive costs related to responding to the opioid crisis. These costs include but are not limited to, increased policing, medical, fire, and court services, lost tax revenues, and lost communal benefits of the County's limited and diverted resources.

781.    Unless enjoined from doing so, Defendants will continue to violate the DTPA.

782.    Because the Defendants willfully and knowingly violated the DTPA, the County is entitled to three times the damages it sustained as a result of Defendants' conduct and an order enjoining such acts. § 17.50(b)(1)-(2).

## EIGHTH CAUSE OF ACTION
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

783.    Webb County re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

784.    As an intended result of their intentional wrongful conduct as set forth in this Complaint, Defendants have profited and benefited from the opioid epidemic they caused.

785.    Defendants were aware they were receiving this benefit.

786.    Defendants' conduct was designed to bring about this benefit.

787.    Defendants have been unjustly enriched in the form of profits because of their wrongful conduct.

788.	As a matter of equity, Defendants should be required to disgorge their unjustly obtained proceeds and other monetary benefits, including income, salaries and bonuses resulting from their unlawful conduct and provide restitution to Webb County.

**NINTH CAUSE OF ACTION**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT ("RICO") 18 U.S.C § 1962(C) - RICO**
**(AGAINST ALL DEFENDANTS)**

789.	Webb County re-alleges and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

790.	This claim is brought against each Defendant for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1961 et seq.

791.	Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …" 18 U.S.C. § 1962(c).

792.	Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise and/or a legal entity enterprise. At all relevant times, Defendants were "person[s]" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, a legal or beneficial interest in property.

793.	The Defendants conducted and participated in the conduct of the RICO enterprise described herein through a pattern of racketeering activity as defined in 18 U.S.C. §1961(b), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343); 18 U.S.C. § 1961(d) "fraud connected with … the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance … as defined in section 102 of the

Controlled Substances Act"; and 19 U.S.C. § 1952 (entering goods into commerce using a statement or omission that is materially false).

794.    The RICO enterprise described herein was created and organized to effectuate a pattern of racketeering activity, and maintained systematic links for a common purpose: to increase the use of opioids and fraudulently sell, distribute and authorize for third-party reimbursement as many opioids as possible by falsely marketing them as safe for treatment of chronic pain outside active cancer, ern-of-life or palliative care, suppressing evidence to the contrary, maintaining their placement on formularies to ensure reimbursement, limiting access to competing less-additive alternatives and improperly inducing physicians to prescribe opioids for chronic pain.

795.    The RICO enterprise described herein engaged in and affected interstate commerce because, *inter alia*, it marketed, promoted, sold, provided or reimbursed for opioids to thousands of individuals and entities throughout the U.S.

796.    Each of the Defendants either actively participated and/or aided and abetted in the pursuance of this common purpose. Each of the participants in the RICO enterprise described herein received substantial revenue from the scheme, in the form of sales for Manufacturer Defendants, sales and kickbacks for Distributor and Pharmacy Defendants who reached particular monthly goals, and rebates or other financial incentives for PBM Defendants who placed opioids in a preferred place on a formulary or otherwise made opioids readily available for improper use – all in an effort to maximize profits.

797.    Under the present facts, each co-conspirator either (a) agreed to operate or manage  the enterprise that did and does feloniously deal in controlled substances, an offense punishable under the laws of the United States, or (b) if a co-conspirator did not agree to operate or manage  the enterprise, each co-conspirator knowingly agreed to facilitate others who did and

do operate or manage the enterprise of felonious dealing in controlled substances, an offense punishable under the laws of the U.S.

798.     The Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues while benefitting from, encouraging, indirectly creating, contributing to, and maintaining an illegal secondary market for highly addictive and dangerous drugs. The predicate acts are not isolated events.

799.     While Defendants participated in, and are members of, the enterprise described herein, they have an existence separate from the enterprise, including distinct legal statuses, affairs, offices and roles, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

800.     In addition, finding it impossible to achieve their increasing sales ambitions through legal means, the Defendants systematically and fraudulently violated their statutory duties to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA of suspicious orders, allowing hundreds of millions of pills to enter the illicit market, which allowed the Defendants to derive and be unjustly enriched by enormous profits.

801.     An association-in-fact enterprise existed between the Defendants, the purpose of which was to engage in the sale of opioids while deceiving the public and regulators into believing that the Defendants were faithfully fulfilling their obligations.

802.     The Defendants operated as an association-in-fact to unlawfully increase sales and revenues in order to unlawfully increase the quotas set by the DEA, which in turn allowed them to collectively profit from distributing a greater pool of opioids each year. Each member of the RICO

enterprise described herein participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding profits generated by the scheme.

803.     The Defendants also engaged in lobbying efforts against the DEA's authority to investigate and hold responsible those who failed in their duty to prevent diversion. The Ensuring Patient Access and Effective Drug Enforcement Act was the result of an effort by the Defendants to reduce the DEA's ability to issue orders to show cause and to suspend and/or revoke registrations.

804.     In order to achieve this goal, Defendants thwarted the ability of federal and state regulators to prevent diversion. As set forth herein, this unified scheme was furthered by (1) habitual noncompliance with federal and state law; (2) intensive lobbying of federal and state official to evade further regulation; and (3) increasing and/or maintaining high production quotas for their prescription opioids from which Defendants could profit for as long as possible.

805.     The RICO enterprise described herein functioned by selling prescription opioids in interstate commerce in violation of the Defendants' legal obligations to maintain effective controls against opioid diversion.

806.     Each Defendant communicated with other Defendants, shared information on a regular basis, and participated in joint lobbying efforts, trade industry organizations, contractual relationships, and other coordination of activities to effect the RICO Scheme. The contractual relationships included, on information and belief, rebates, chargebacks, kickbacks, administrative fees, and other financial incentives on opioid sales and security arrangements.

807.     The Defendants refused to identify, investigate, or report suspicious orders despite their actual knowledge of drug diversion rings.

808.     The Defendants worked together to ensure that opioid production quotas continued to increase, allowing them to generate more and more profits from the RICO enterprise described herein.

809.     In addition to violating their statutory requirement to minimize diversion of opioids, as set forth herein, Defendants and their co-conspirators engaged in a coordinated conspiracy to deceive the American public and the medical profession about the efficacy and safety of opioids, including by minimizing the addictive qualities of opioids.

810.     To effectuate their goal of maximizing the number of opioid users and their profits at all costs, Defendants engaged in a sophisticated, well-developed, and fraudulent marketing scheme designed to increase the prescription rate for the sale and distribution of the Defendants' opioids and to popularize the misunderstanding that opioids are effective for chronic pain outside active cancer, end-of-life and palliative care and that the risk of addiction is low.

811.     The formation, existence, and actions of the enterprise described herein were essential to the success of Defendants' campaign to increase and maintain profits from unlawful sales of opioids. The constituent members of the enterprise were aware that, unless they agreed to act and acted as an enterprise, their sales of prescription opioids would substantially decrease, and accordingly, the profits would substantially diminish.

812.     Each of the Defendants, in concert with co-conspirators, created and maintained systematic links for a common purpose, *i.e.*, to aid in marketing opioids as effective and safe for use by patients in moderate pain, while suppressing evidence to the contrary. Each of the participants in the enterprise described herein received revenue, directly or indirectly, and/or otherwise benefitted from the scheme to promote opioids as safe and non-addictive.

813.     At all relevant times, each Defendant was aware of the enterprise's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form

of increased sales, distributions, and reimbursement of opioids. In fact, Distributor and Pharmacy Defendants received kick-backs from Manufacturer Defendants if they reached particular monthly goals and PBM Defendants received rebates and other financial incentives to promote the Manufacturer Defendants' drugs.

814. Such revenue was exponentially greater than it would have been had opioids been marketed appropriately, had the true efficacy and safety risks of prescription opioids disclosed, had formularies properly provided access to less addictive alternatives or installed appropriate controls on the drugs which created this public health crisis.

815. The Manufacturer and PBM Defendants and their co-conspirators engaged in a conspiracy to increase the use of the least expensive, most addictive opioids by controlling the drugs' availability for utilization through the formulary and the plan design. The enterprise would not have succeeded absent the PBMs controlling the flow of opioids from manufacturer to the end user.

816. The PBM and Manufacturer Defendants coordinated to ensure that the PBM Defendants got the maximum profit at the expense of patient health and communities nationwide who are now forced to address the foreseeable consequences of the scheme.

817. The persons engaged in the enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

818. Taken together, the interaction and length of the relationships between and among the Defendants reflects a deep level of interaction, data sharing and cooperation between four groups in a tightly knit industry. The Manufacturer, Distributor, Pharmacy and PBM Defendants were not four separate groups operating in isolation or four groups forced to work together in a closed system. The Defendants operated together as a united entity, working together as an

ongoing and continuous organization on multiple fronts to engage in the unlawful sale of prescription opioids.

819.    All participants of the enterprise described herein were aware of Defendants' control over the activities of the enterprise in promoting opioids for use in every situation in which a patient is in pain. Furthermore, each part of the enterprise benefited from the existence of the other parts.

820.    The enterprise described herein is engaged in interstate commerce, or its activities affect interstate commerce, because Defendants marketed, promoted, sold, provided or arranged for the reimbursement of opioids to thousands of individuals and entities throughout the U.S., including promotion of opioid sales between or among residents of different states, and/or physically transporting drugs or promotional materials across state lines.

821.    The Defendants used, directed the use of, and caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions regarding (a) the safety and efficacy of opioids for the treatment of chronic pain and (b) their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

822.    The Defendants' predicate acts of racketeering, 18 U.S.C. § 1961(1) include, but are not limited to:

(a)    Mail Fraud: Defendants violated 18 U.S.C. §1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to deceptively market, sell, promote, distribute and reimburse the opioids by means of false pretenses, misrepresentations, promises, omissions and the operation of the PBM plan design; and

(b)    Wire Fraud: Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to deceptively market, sell, promote, reimburse,

distribute the opioids by means of false pretenses, misrepresentations, promises, omissions and the operation of the PBM plan design.

823. The Defendants' use of the mails and wires include, but are not limited to:

(a) representations that they would comply with their duty to (1) design and operate a system to disclose to the registrant suspicious orders of controlled substances, and (2) disclose the results of such a program to resolve concerns about overprescription and diversion of opioids;

(b) communications with and among the enterprise participants that misrepresented the safety and risks of opioid drugs amongst themselves and others;

(c) communications with Plaintiff, inducing payments for opioids by misrepresenting the safety and risks of opioids;

(d) receiving the proceeds in the course of and resulting from Defendants' improper scheme;

(e) transmittal and receipt of payments in exchange for, directly or indirectly, activities in furtherance of the RICO enterprise.

(f) suppressed and destroyed records of suspicious orders to hide evidence of overprescription and diversion

(g) negotiations concerning opioid formulary placement, opioid alternatives, quantity limits, refill limits, prior authorization requirements, rebates and other financial incentives and arrangements between Manufacturer and PBM Defendants.

824. The Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme, and participated in the common course of conduct to commit acts of fraud and indecency in manufacturing, promoting, and distributing prescription opioids.

825. Many of the precise dates of the Defendants' criminal actions are not known and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the unified scheme alleged herein depended upon secrecy and, towards that end, Defendants took deliberate steps to conceal their wrongdoing. However, given the massive scope of the illegal and scheme, Defendants likely committed thousands, if not millions, of predicate acts of racketeering activity. All of the data necessary to prove these allegations resides

on Defendants' databases, and is shared between them routinely and for the purpose inter alia, of perpetuating the epidemic.

826.    The multiple acts of racketeering activity that the Defendants committed, or aided and abetted in the commission of, were related to each other, had a similar purpose, involved the same or similar participants and methods of commission, and have similar results affecting similar victims, including Plaintiff, Webb County. These acts pose a threat of continued racketeering activity and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

827.    These acts were conducted pursuant to an understanding and agreement, whether explicit or implicit, that each member would participate to facilitate and further the purpose of the Defendants' enterprise, which was to maximize profits by manufacturing, distributing, and selling as many opioid pills as possible.

828.    As a result of Defendants' racketeering activity, Webb County has been injured in their business and/or property in multiple ways, including but not limited to increased costs of providing necessary county services, increased human services and resource costs, costs related to dealing with opioid-related crimes and emergencies, and other public safety costs. But for the conduct of the enterprise's affairs, Webb County would not have sustained damages.

829.    The RICO enterprise described herein largely created, encouraged, contributed to, and maintained an illegal secondary market for opioids.

830.    The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

831.    Defendants' violations of 18 U.S.C. §1962(c) have directly and proximately caused injuries and damages to Webb County who is entitled to bring this action for three times its actual

damages, as well as injunctive/equitable relief, costs, and reasonable attorney's fees pursuant to 18 U.S.C. §1964(c).

**TENTH CAUSE OF ACTION**
**VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT 18 U.S.C § 1962(D) - RICO CONSPIRACY**
**(AGAINST ALL DEFENDANTS)**

832.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth.

833.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

834.    Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the RICO enterprise described herein through a pattern of racketeering activity.

835.    Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff of money.

836.    The nature of the above-described Defendants' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § l962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

837.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § l962(c), Webb County has been and continues to be injured in its business or property as set forth more fully above.

838.    Defendants sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

    (a)    Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

    (b)    Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

839.    Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and, upon information and belief, will continue into the future unless enjoined by this Court.

840.    Webb County has been injured in its property by reason of these violations in that Webb County has been constrained to provide essential county services, and in effect, "clean up" the harm Defendants have recklessly and intentionally caused. Webb County must abate the societal harms resulting from Defendants conduct, a significant and ongoing cost Webb would not have paid, or be paying, had Defendants not conspired to violate 18 U.S.C. § 1962(c).

841.    Injuries suffered by Plaintiff were directly and proximately caused by Defendants' racketeering activity as described above.

842.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff for compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays:

1.    Judgment against Defendants, jointly and severally, and in favor of Plaintiff.

2.    That the acts alleged herein be adjudged and decreed to be unlawful and that the Court enter a judgment declaring them to be so;

3. For a preliminary injunction directing pharmacy benefit manager defendants Caremark, Express Scripts and OptumRx to make immediate edits to their formularies, consistent with the 2016 CDC Guideline and effective immediately:

(a) For chronic pain[378] outside of active cancer, palliative and end-of-life care, no opioids are covered in the first instance. Step therapy using nonpharmacologic therapies[379] and nonopioid medications must be completed first.

(b) For acute pain, any opioid, including the widely abused immediate-release opioids hydrocodone-acetaminophen, oxycodone-acetaminophen and codeine-acetaminophen, may only be covered for three-days. Prior authorization is required for any acute pain opioid prescriptions beyond this three-day limit.

(c) Given overdose risks, prescription coverage is limited to amounts where daily dosages do not meet or exceed 50 MME/day absent prior authorization, and coverage should be excluded for dosages of greater than or equal to 90 MME/day.

(d) To prevent overdose and treat opioid addiction, cover naloxone, methadone, buprenorphine, and naltrexone on the lowest formulary tier or otherwise waive cost-sharing for such treatments. Eliminate prior authorization requirements and quantity limits for all formulations of such treatments that are covered.

(e) Remove any barriers to accessing less-addictive non-opioid pain treatments.

4. That Defendants be enjoined from, directly or indirectly, through any third parties, continuing to misrepresent the risks and benefits of the use of opioids for chronic pain, outside of palliative end-of-life or active cancer care, and from continuing to violate Texas law;

5. That Plaintiff recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorneys' fees as provided by law;

---

[378] The CDC Guideline defines chronic pain as pain lasting longer than 3 months or past the time of normal tissue healing (which could be substantially shorter than 3 months, depending on the condition).

[379] Nonpharmacologic therapies include CBT, exercise therapy, interventional treatments, and multimodal pain treatment. Nonopioid medications include NSAIDs (*e.g.,* acetaminophen or ibuprofen), or certain medications that are also used for depression or seizures.

6.      That Defendants be ordered to abate the public nuisance that they caused and that they be ordered to reimburse Plaintiff for damages sustained by the Plaintiff as a result of Defendants' breaches of statutory and common law as described herein;

7.      For an award of equitable relief against Defendants as the Court should find appropriate, including disgorgement of illicit proceeds;

8.      For punitive damages against the Defendants for their intentional wrongdoing, including, but not limited to, damages for those acts or omissions which resulted in the Defendants, or any one of them, being convicted of a felony under state or federal law, and which acts or omissions caused the Plaintiff's damages or injuries;

9.      For an award of restitution from the Defendants, and an order requiring disgorgement of all profits, benefits and other compensation obtained by the Defendants;

10.     For an order of abatement and permanent injunction against all Defendants prohibiting them from flooding the Texas markets, specifically Webb County, with illegal opioids;

11.     That Plaintiff recover all measures of damage, including punitive, exemplary, compensatory and treble damages, allowable under law; and

12.     For such other and further relief as the Court deems just and proper.

THIS IS THE FIRST REQUEST FOR INJUNCTIVE RELIEF.

*[signature page follows]*

Date: March 16, 2019

Respectfully submitted,

**THE CICALA LAW FIRM PLLC**

/s/ Joanne Cicala
Joanne Cicala
joanne@cicalapllc.com
101 College Street
Dripping Springs, Texas 78620
Tel: (512) 275-6550
Fax: (512) 858-1801

*Lead Counsel for Webb County*

**SANFORD HEISLER SHARP, LLP**

Kevin Sharp
ksharp@sanfordheisler.com
611 Commerce Street, Suite 3100
Nashville, Tennessee 37203
Tel: (615) 434-7000
Fax: (615) 434-7020

Ross Brooks
RBrooks@sanfordheisler.com
1350 Avenue of the Americas,
31st Floor
New York, New York 10019
Tel: (646) 402-5668
Fax: (646) 402-5651

*Co-counsel to The Cicala Law Firm PLLC;*

**ATTORNEYS FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 16, 2019, I electronically filed a redacted version of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record at their e-mail addresses on file with the Court.

An unsealed copy of the foregoing instrument was served upon all parties to the above case to each of the attorneys of record herein at their respective addresses disclosed on the below Service List on March 16, 2019 by email.

/s/ Joanne Cicala
Joanne Cicala

**SERVICE LIST**

Mark S. Cheffo
Quinn Emanuel Urquhart & Sullivan, LLP
markcheffo@quinnemanuel.com

*Counsel for Purdue Pharma, L.P.; Purdue Pharma, Inc.;*
*The Purdue Frederick Company, Inc.*

Steven F. Napolitano
Skarzynski Black LLC
snapolitano@skarzynski.com

*Counsel for Rhodes Technologies; Rhodes Technologies, Inc.;*
*Rhodes Pharmaceuticals, L.P.; Rhodes Pharmaceuticals, Inc.*

Alper T. Ertas
John A. McCauley
Venable LLP
atertas@venable.com
JAMcCauley@venable.com

*Counsel for Abbott Laboratories; Abbott Laboratories, Inc.*

J. Laurens Wilkes
Jones Day
jlwilkes@jonesday.com

*Counsel for AbbVie Inc.*

Brien T. O'Connor
Andrew J. O'Connor
Ropes & Gray
Brien.O'Connor@ropesgray.com
Andrew.O'Connor@ropesgray.com
MNKOpioidService2804@ropesgray.com

*Counsel for Mallinckrodt PLC; Mallinckrodt LLC;*
*SpecGx LLC*

Sean O. Morris
Jonathan L. Stern
Kathleen Dallon
Arnold & Porter Kaye Scholer
sean.morris@arnoldporter.com
jonathan.stern@apks.com
kathleen.dallon@arnoldporter.com

*Counsel for Endo Health Solutions, Inc.; Endo Pharmaceuticals, Inc.;*
*Par Pharmaceutical Companies, Inc.; Par Pharmaceuticals, Inc.*

Rebecca J. Hillyer
Evan K. Jacobs
Steven A. Reed
Eric W. Sitarchuk
Morgan, Lewis & Bockius
rebecca.hillyer@morganlewis.com
evan.jacobs@morganlewis.com
steven.reed@morganlewis.com
eric.sitarchuk@morganlewis.com

*Counsel for Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.;*
*Watson Laboratories, Inc.; Actavis, LLC; Actavis Pharma, Inc.*

Jennifer Cardelus
Stephen Kemp
Charles C. Lifland
Daniel M. Petrocelli
O'Melveny & Myers LLP
jcardelus@omm.com
skemp@omm.com
clifland@omm.com
dpetrocelli@omm.com

*Counsel for Johnson & Johnson; Janssen Pharmaceuticals, Inc.*

Timothy W. Knapp
Michael LeFevour
Donna M. Welch
Kirkland & Ellis LLP
tknapp@kirkland.com
michael.lefevour@kirkland.com
dwelch@kirkland.com

*Counsel for Allergan PLC; Allergan Finance, LLC*

J. Matthew Donohue
Joseph L. Franco
Nicholas A. Sarokhanian
Holland & Knight LLP
matt.donohue@hklaw.com
joe.franco@hklaw.com
nicholas.sarokhanian@hklaw.com

*Counsel for Insys Therapeutics, Inc.*

Paul J. Cosgrove
Ulmer & Berne LLP
pcosgrove@ulmer.com

*Counsel for Amneal Pharmaceuticals LLC;
Amneal Pharmaceuticals of New York, LLC*

Thomas E. Rice
Baker, Sterchi, Cowden & Rice
rice@bscr-law.com

*Counsel for KVK-Tech, Inc.;*

Adam K. Levin
Hogan Lovells US LLP
adam.levin@hoganlovells.com

*Counsel for Mylan Inc.; Mylan Pharmaceuticals, Inc.;
Mylan Institutional Inc.; Mylan Technologies, Inc.*

Ronni Fuchs
Logan N. Anderson
Pepper Hamilton LLP
fuchsr@pepperlaw.com
andersonl@pepperlaw.com

*Counsel for Hikma Pharmaceuticals USA Inc.*

Mark H. Lynch
Nathan Shafroth
Geoffrey E. Hobart
Covington & Burling LLP
mlynch@cov.com
nshafroth@cov.com
ghobart@cov.com

Russell D. Jessee
Brian J. Labliberte
Vincent I. Holzhall
Steptoe & Johnson
russell.jessee@steptoe-johnson.com
brian.laliberte@steptoe-johnson.com
vince.holzhall@steptoe-johnson.com

*Counsel for McKesson Corporation;*

Enu Mainigi
Steven M. Pyser
Emily Pistilli
Jennifer G. Wicht
Williams and Connolly LLP
emainigi@wc.com
spyser@wc.com
EPistilli@wc.com
jwicht@wc.com

*Counsel for Cardinal Health, Inc.;*

Shannon E. McClure
Lou Schack
Stan Perry
Neil Hlawatsch
Reed Smith LLP
smcclure@reedsmith.com
LSchack@ReedSmith.com
SPerry@ReedSmith.com
NHlawatsch@reedsmith.com

*Counsel for AmerisourceBergen Drug Corporation*

Frank H. Spruiell, Jr.
Russell R. Dickson
Wiener, Weiss & Madison
fspruiell@wwmlaw.com
rdickson@wwmlaw.com

*Counsel for Morris & Dickson Co., L.L.C.*

Eric. R. Delinsky
Jason Acton
Alexandra W. Miller
Zuckerman Spaeder
edelinsky@zuckerman.com
jacton@zuckerman.com
smiller@zuckerman.com

*Counsel for CVS Health Corporation; CVS Pharmacy, Inc.;*
*Caremark Rx, L.L.C.; Caremark, L.L.C.; Caremark Texas Mail Pharmacy, LLC;*
*CaremarkPCS Health, L.L.C.; CaremarkPCS, L.L.C.;*

Kaspar J. Stoffelmayr
Bartlit, Beck, Herman, Palenchar & Scott
kaspar.stoffelmayr@bartlit-beck.com

*Counsel for Walgreens Boots Alliance, Inc.; and Walgreen Co.;*

Tara A. Fumerton
Jones Day
tfumerton@jonesday.com

*Counsel for Walmart, Inc.; Wal-Mart Stores Texas, LLC;*

Steven G. Kobre
Julian W. Park
Adriana Riviere-Badell
Alana F. Montas
Kobre & Kim LLP
steven.kobre@kobrekim.com
julian.park@kobrekim.com
Adriana.Riviere-Badell@kobrekim.com
alana.montas@kobrekim.com

*Counsel for Express Scripts Holding Company;*
*Express Scripts, Inc.; ESI Mail Pharmacy Service, Inc.;*
*Express Scripts Pharmacy, Inc.*

William H. Jordan
Kimberly K. Chemerinsky
Brian D. Boone
Alston & Bird LLP
bill.jordan@alston.com
kim.chemerinsky@alston.com
brian.boone@alston.com

*Counsel for UnitedHealth Group Incorporated;*
*Optum, Inc.; OptumRx Inc.*